*Bethesda African Cemetery Coalition, et al. v. Housing Opportunities Commission of Montgomery County*, No. 18, September Term, 2023. Opinion by Biran, J.

**COMMON LAW – BURIAL GROUNDS – THE COMMON LAW OF BURIAL PLACES –** The Supreme Court of Maryland recognized the common law of burial places in Maryland. This body of law developed in the United States in the courts of equity after the rejection of the ecclesiastical law of England, and it attaches when human remains are interred in land. The Court noted that the various principles of the common law of burial places can provide the appropriate framework for certain disputes regarding burial places. The Court further held that Petitioners, who sought to challenge the sale of a desecrated burial ground for continued use for purposes other than burial, could seek relief under the common law of burial places. Accordingly, extraordinary relief, in the form of a writ of mandamus, was not appropriate. The Court ordered a remand to the circuit court to allow Petitioners to seek leave to amend their complaint to state a claim for relief based on an alleged violation of a specific right or rights protected under the common law of burial places.

**BUSINESS REGULATION ARTICLE – SALE OF A BURIAL GROUND FOR ANOTHER PURPOSE – STATUTORY PROCEDURE NOT REQUIRED –** The Court further held that section 5-505 of the Business Regulation Article provides an optional procedure through which a person may request a judgment to sell certain types of burial grounds in fee simple, without restrictions on use, and free and clear of the claims of the owners of the land and the holders of burial lots. Md. Code Ann., Bus. Reg. ("BR") § 5-505 (2015 Repl. Vol.). The Court noted that, as a practical matter, the procedure may be necessary in certain circumstances, such as when restrictions in the chain of title for a burial ground would prevent using the land for other purposes. However, the procedure itself is optional, and a seller may attempt to sell a burial ground without invoking the procedure. Accordingly, the Court held that Petitioners were not entitled to extraordinary relief, in the form of a writ of mandamus, to compel Respondent, a seller of a burial ground, to use the statutory procedure.

**BUSINESS REGULATION ARTICLE – SALE OF A BURIAL GROUND FOR ANOTHER PURPOSE – ABROGATION OF THE COMMON LAW –** The Court further held that BR § 5-505 does not abrogate the common law of burial places in Maryland. There is no indication that the General Assembly intended to abrogate the common law in enacting the statute and its predecessors. The statute was primarily designed to address historical problems that were grounded in property law principles and that hindered the sale of certain burial grounds, and the statute is consistent with the common law of burial places.

IN THE SUPREME COURT

OF MARYLAND

No. 18

September Term, 2023

BETHESDA AFRICAN CEMETERY
COALITION, ET AL.

v.

HOUSING OPPORTUNITIES COMMISSION
OF MONTGOMERY COUNTY

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

Opinion by Biran, J.
Booth, J., concurs and dissents.
Watts and Hotten, JJ., dissent.

Filed: August 30, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This case concerns a desecrated burial ground in Montgomery County, Maryland. The ground, sometimes known as Moses Cemetery, was a historic Black burial place that contains interments of many individuals, including formerly enslaved persons and their families. After burials ceased in the mid-20th century, the land was sold and eventually developed into an apartment complex and parking lot in the late 1960s. The record suggests that, rather than respectfully disinterring and moving the remains of the deceased, the developers disturbed the ground, removed human remains haphazardly and inconsistently, destroyed grave markers, and ultimately paved a portion of the land into a parking lot. It appears likely that human remains are still interred in the land today, which is currently part of a property known as the Westwood Tower Apartments ("Westwood").

Since the land was developed, it has changed hands multiple times. Today, it is owned by the Respondent, the Housing Opportunities Commission of Montgomery County ("HOC"). The Petitioners are three descendants of individuals who were buried in Moses Cemetery; Reverend Olusegun Adebayo, the pastor of Macedonia Baptist Church, which is located near the burial ground; and the Bethesda African Cemetery Coalition ("BACC"), a nonprofit entity that seeks to preserve the history of Black people in the area (together, the "Coalition").

When HOC sought to sell the land to a property developer, the Coalition filed suit in the Circuit Court for Montgomery County, seeking relief to protect the remains of the deceased and ensure that their memory was respected. The Coalition's complaint included a single count, seeking extraordinary relief (in the form of a common law writ of

mandamus) to compel HOC to file an action under Md. Code Ann., Bus. Reg. ("BR") § 5-505 (2015 Repl. Vol.). BR § 5-505 provides that "[a]n action may be brought … and a court may pass a judgment for sale of a burial ground for another purpose" if "the ground has been dedicated and used for burial," "burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots," "the ground has ceased to be used for burial," and "it is desirable to dispose of the burial ground for another purpose." BR § 5-505(a). If the "court is satisfied that it is expedient or would be in the interest of the parties to sell the burial ground," the court "may pass a judgment for the sale of the burial ground on the terms and notice the court sets[.]" *Id.* § 5-505(b)(1). As part of such a judgment, the court must order that "as much of the proceeds of the sale as necessary" be used to pay for removal of any human remains, to purchase burial lots in another burial ground, and to rebury the remains. *Id.* § 5-505(b)(2). In addition, the court must "distribute the remaining proceeds of the sale among the parties according to their interests." *Id.* § 5-505(b)(3). A judgment for the sale of a burial ground obtained under BR § 5-505 "passes to the buyer of the burial ground the title to the burial ground free of the claims of … the owners of the burial ground … and … the holders of burial lots." *Id.* § 5-505(c).

According to the Coalition, a judgment issued by a court under BR § 5-505 is required whenever a burial ground is sold to be used for a purpose other than burial. Thus, the Coalition asserts that HOC must file an action under BR § 5-505 and obtain a judgment before it can sell the property containing Moses Cemetery.

The circuit court largely agreed with the Coalition. It granted preliminary injunctive relief preventing HOC from completing its sale, and it later issued a writ of mandamus compelling HOC to file an action under BR § 5-505 and to comply with the provisions of that statute before selling the land.

The Appellate Court of Maryland reversed, reasoning that BR § 5-505 is a "quiet-title" statute, designed to allow certain burial grounds to be sold free from the claims of owners and holders of burial lots. *Housing Opportunities Comm'n of Montgomery Cnty. v. Adebayo*, 258 Md. App. 137, 144 (2023). The Appellate Court concluded that § 5-505's provisions are not mandatory and, therefore, that HOC was not required to follow them before selling the land. *Id.* at 195-96. The Coalition sought further review in this Court.

We conclude that extraordinary relief in the form of a writ of mandamus is not available here for two reasons. *First*, there is an applicable legal framework in Maryland to seek ordinary relief. *Second*, although we understand BR § 5-505 somewhat differently from the Appellate Court (and from the parties here), we agree with the Appellate Court that the statute does not impose a duty on parties like HOC to file suit before selling land containing burial grounds for non-burial use.

As we explain below, it appears that the parties have misunderstood the legal framework in Maryland that protects the repose of the deceased and the feelings of the living who remember the deceased. This misunderstanding appears to have driven the focus throughout these proceedings on BR § 5-505. That statute imposes no duty on sellers of burial grounds to file an action. However, that does not mean that burial grounds in

3

Maryland are left without protection. There is a robust body of common law governing the treatment of burial places in the United States. This common law of burial places has not been entirely abrogated in Maryland. As such, to this day it provides a means to seek ordinary relief to protect the resting places of the deceased where statutes do not apply. Although this body of law is not well known, it supplies the appropriate framework for many disputes concerning burial grounds where human remains are interred. As we discuss below, when a person with standing brings a claim under the common law of burial places, and where the General Assembly has not enacted an applicable statute covering the subject matter, a circuit court will consider whether appropriate equitable relief is available to protect the remains of the dead and to respect the feelings of the living. The remedies available to a circuit court under the common law of burial places in any particular case may include, but are not necessarily limited to, the core remedy specified in BR § 5-505: the right to disinter bodies on land that will no longer be used as a burial ground and have them reinterred elsewhere. The common law of burial places applies not only to the subset of burial grounds covered under § 5-505. In addition, persons with standing may seek appropriate relief under the common law of burial places where no sale of a burial ground for another purpose is contemplated.

We will affirm the Appellate Court's judgment in part, reverse it in part, and order that the case be remanded to the circuit court. On remand, the Coalition may seek leave to amend its complaint under Maryland Rule 2-341(b) to state a claim for equitable relief to

4

remedy an alleged violation of a specific right or rights protected under the common law of burial places.

I

**Background**

Before recounting the facts of the case, we provide historical background on the development of the common law of burial places in the United States. We also describe the historical and legal landscape of the time. Because it had a unique development in the United States, the common law of burial places operates somewhat differently from other familiar legal areas. As such, the historical and legal background will help to show how the law functions today and what remedies it may provide. This background will also help to show how legislative efforts to facilitate moving burial grounds, like BR § 5-505, operate and fit into the larger picture.

**A. Developing a Common Law of Burial Places in the United States**

In the United States, references to the "common law" typically refer either to the common law of England as it existed at the time of our nation's founding, or to the modern interpretation and development of that common law as it applies to today's disputes in the United States. This is because most states, including Maryland, either explicitly adopted English common law and afforded their citizens its benefits, *see, e.g.*, Md. Decl. of Rts. art. 5 (providing that "the Inhabitants of Maryland are entitled to the Common Law of

5

England" and to certain English statutes that existed on July 4, 1776), or modeled their legal systems on the English common law paradigm.[1]

However, when we refer here to the common law of burial places in the United States, we mean something else. This law, unique to the United States, developed in our courts of equity beginning in the 1800s.[2] Although it was informed in part by legal principles that existed in England, it also drew from several other sources, including principles of Greek and Roman law and Christian religious thought. *See* Tanya D. Marsh, *When Dirt and Death Collide: Legal and Property Interests in Burial Places*, 30 Prob. & Prop. 59, 60 (2016); SAMUEL B. RUGGLES, AN EXAMINATION OF THE LAW OF BURIAL IN A REPORT TO THE SUPREME COURT OF NEW-YORK 45-46, 55 (1856). This new common

---

[1] The sole exception is Louisiana, which derives its civil law from the French Napoleonic Code. *See* John T. Hood, Jr., *The History and Development of the Louisiana Civil Code*, 19 La. L. Rev. 18, 25-27 (1958).

[2] The distinction between courts of equity and courts of law in Maryland has been eliminated. In 1984, by rule, Maryland merged its courts of law and equity, "eliminat[ing] distinctions between law and equity for purposes of pleadings, parties, court sittings, and dockets." *LaSalle Bank, N.A. v. Reeves*, 173 Md. App. 392, 404 (2007) (quoting Md. Rule 2-301 Comm. Note); *see also* Md. Rule 2-301 ("There shall be one form of action known as 'civil action.'"). The merger of law and equity "was not intended to abolish all differences between legal and equitable claims and the defenses to them, but only to abolish the pleading distinctions ... and to assure that all claims and defenses are determined in one court." *LaSalle Bank*, 173 Md. App. at 404-05 (citations omitted). Today, Maryland's circuit courts "are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county[.]" Md. Code Ann., Cts. & Jud. Proc. § 1-501 (2020 Repl. Vol.).

law of burial places[3] arose in the United States by necessity, responding to a gap in our

legal system left by rejecting an established church, and by declining to adopt the English

legal system in its entirety. Thus, to understand this body of law, it is helpful to look at the

gap that it developed to fill.

At the time of our nation's founding, the English system comprised more than the

English common law and statutory enactments: it also included ecclesiastical law. This

third body of law was administered by the ecclesiastical courts of the Church of England,

and its jurisdiction included marriage, divorce, alimony, and – relevant here – the final

---

[3] In discussing the U.S. common law of burial places, we specifically refer to the court-made legal principles that govern, among other things, owning, using, accessing, protecting, and disposing of places where human remains are interred. We distinguish this from what one commentator has termed the law of human remains, a related and somewhat overlapping area of law that governs unburied human remains. *See generally* TANYA MARSH, THE LAW OF HUMAN REMAINS 31-53 (2016) (discussing this area of law and various recurring issues, including inquests and autopsies, determining the final disposition of human remains, and causes of action relating to the treatment of human remains). Thus, the common law of burial places does not include all of the rights that fall under the broad term of "sepulcher" (sometimes also referred to as "sepulture"). In particular, the common law of burial places does not address that part of the right of sepulcher that concerns the final disposition of human remains and possessing and controlling human remains *before* their final disposition. *See* Katherine Calderon, *The World of the Dead, the Right of Sepulcher and the Power of Information*, 32 Touro L. Rev. 785, 792 (2016). However, the common law of burial places does protect the portion of the right of sepulcher that applies after interment, "particularly to prevent the grave from being disturbed." Tanya D. Marsh, *When Dirt and Death Collide: Legal and Property Interests in Burial Places*, 30 Prob. & Prop. 59, 63 (2016); *see Partridge v. First Independent Church of Balt.*, 39 Md. 631, 637 (1874) ("Whenever, therefore, by lawful authority, the ground ceased to be a place of burial, the lot-holder's right and privilege ceased, except for the purpose of removing the remains previously buried."). The common law of burial places is part of what another commentator has termed, more broadly, "the law of burial[.]" *See* PERCIVAL E. JACKSON, THE LAW OF CADAVERS AND OF BURIAL AND BURIAL PLACES 247 (2d ed. 1950).

disposition and treatment of human remains.[4] *See* Franklyn C. Setaro, *A History of English Ecclesiastical Law*, 18 B.U. L. Rev. 102, 120-22 (1938); PERCIVAL E. JACKSON, THE LAW OF CADAVERS AND OF BURIAL AND BURIAL PLACES 22-25 (2d ed. 1950).

The American states rejected this third body of law. The rejection was part of larger skepticism about the power of an established church, a desire to break with the Church of England generally, and negative sentiment left over from the American Revolution toward "the role of the King's church in oppressing colonists[.]" *See* Sarah Barringer Gordon, *The First Disestablishment: Limits on Church Power and Property Before the Civil War*, 162 U. Pa. L. Rev. 307, 317-18 (2014).[5] Thus, "the United States was born with a sizeable legal

---

[4] This is not to say that there was no overlap between ecclesiastical and common law jurisdiction. For example, both the common law and the ecclesiastical law imposed a duty to bury the body of the deceased: the common law required certain individuals to arrange for burial (thus preventing an uninterred body from becoming a public nuisance), and the ecclesiastical law required the minister to provide a Christian burial. *See* Kate Falconer, *The Right to Possession of the Body of the Deceased: A History*, 8 L. & History 1, 15-16 (2021).

[5] Several cases have referenced this skepticism and leftover revolutionary sentiment. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 183 (2012) (noting that even colonists in the South, who "brought the Church of England with them ... sometimes chafed at the control exercised by the Crown and its representatives over religious offices[,]" and so, "[f]amiliar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church"); *City Council of Charleston v. Benjamin*, 33 S.C.L. 508, 525 (2 Strob.) (1848) (noting that separation of church and state "plainly pointed to the evils from which we had escaped, in our separation from England" and that "[t]he Church of England, as an established State religion, had been felt as a great grievance").

8

void – it had no law regarding the disposition of human remains or burial places."[6] Marsh, *When Dirt and Death Collide*, *supra*, at 60.

At first glance, that might suggest that the problem for the courts of our new nation was simply a missing area of law, but the problem was greater. The common law of England had developed as part of an interconnected whole. And in the context of protecting human remains and burial places, it was "derived from the peculiar position of the English parish churchyard[.]" Peter Sparkes, *Exclusive Burial Rights*, 2 Ecclesiastical L.J. 133, 139 (1991). Thus, if the English common law had simply been adopted as it was, and left to operate without its ecclesiastical counterpart, it could have led to results that would never have occurred in the English system. *See Larson v. Chase*, 50 N.W. 238, 238 (Minn. 1891) ("[T]he English common-law authorities are not very helpful .... for the reason that from a very early date in that country the ecclesiastical courts assumed exclusive jurisdiction of such matters.... The repudiation of the ecclesiastical law ... by the American colonies left the temporal courts the sole protector of the dead and of the living in their dead.").

---

[6] As to the other areas of law formerly under ecclesiastical jurisdiction, including marriage and divorce, state legislatures stepped in to fill the gap left by enacting statutory schemes. *See, e.g.*, *Gilsey v. Gilsey*, 201 S.W. 588, 590 (Mo. Ct. App. 1918) ("[W]e have no ecclesiastical courts, and hence it was necessary to formulate and enact statutes governing matters of divorce."). However, state legislatures did not enact (and even today, largely have not yet enacted) comprehensive statutes regulating all burial places. *See* Marsh, *When Dirt and Death Collide*, *supra*, at 59 (noting that statutes "are often highly fragmented ... and scattered throughout state codes"). There generally are, however, robust regulatory schemes governing cremation and commercial cemeteries. *See, e.g.*, *Hickman ex rel. Hickman v. Carven*, 366 Md. 362, 371 (2001) (discussing the "extensive regulations on the use and operation of land" by commercial cemeteries in Maryland).

In England, the common and ecclesiastical laws functioned together, and almost every person "had a right to be buried in the parish churchyard." *Pierce v. Proprietors of Swan Point Cemetery*, 10 R.I. 227, 236 (1872); *see also* Charles Burke Elliott, *Grave Yard Law*, 16 Cent. L.J. 161, 162 (1883). "[O]nce buried, the body could not be removed without license" from the church, *Pierce*, 10 R.I. at 236, and only the church and its officials had an action for injury to a body or trespass to a grave. *See* Elliott, *supra*, at 163 ("By the common law, the heir had no property in the body of the ancestor, nor could he bring a civil action against those who disturbed the remains .... The only protection for a grave, independent of ecclesiastical law, was by way of indictment.") (footnote omitted). Absent rare exceptions, "the ecclesiastical courts had control over the church and church-yard, including rights of burial." Sparkes, *supra*, at 135.

Secure in the knowledge that the Church and its ecclesiastical law would protect the repose of the deceased, common law doctrines in England developed in part to respect ecclesiastical jurisdiction. For example, the common law recognized a protectable interest in personal property in and around the grave – the headstone, the deceased's clothing, and other items buried with the remains of a loved one – but generally held that human remains were not "property." This meant that there was little recourse at common law for relatives of the deceased when the physical remains of their loved ones were disturbed. *See Ritter v. Couch*, 76 S.E. 428, 430 (W. Va. 1912) ("By the old English law the body was not recognized as property, but the charge of it belonged exclusively to the church .... So while there was property in the burial lots, in the monuments, and in the ornaments and

10

decorations of the deceased or his grave, there was none in the remains themselves[.]")
(cleaned up).

Even so, as William Blackstone once noted, the lack of common law protection posed little problem in the English system. This is because the Church, through the parson of the local parish, had a property interest in almost all of England's burial places and was well able to protect the deceased (and the feelings of the living who remembered the deceased):

> [T]hough the heir has a property in the monuments and escutcheons of his ancestors, yet he has none in their bodies or ashes; nor can he bring any civil action against such as indecently at least, if not impiously, violate and disturb their remains, when dead and buried. *The parson, indeed, who has the freehold of the soil, may bring an action of trespass against such as dig and disturb it*[.]

2 WILLIAM BLACKSTONE, COMMENTARIES 428-29 (emphasis added).[7]

Several modern cases have similarly remarked that England's common law developed with the power and authority of the ecclesiastical law in mind. *See, e.g., Pet. of*

---

[7] Similarly, the Church also exerted broad control over the character and aesthetics of its burial grounds, and it was typically the final authority concerning the treatment of human remains in its care. Thus, there was little need for the common law to intrude. Among other things, the Church's consistory courts were able to issue or deny permissions (called "faculties") to make changes to church grounds and graves – including aesthetic changes – and to disinter or reinter human remains. In effect, churchyards "were subject to a high degree of regulation" by ecclesiastical authorities. *See* Ian Blaney, *The Treatment of Human Remains under the Ecclesiastical Law of England*, 23 Ecclesiastical L.J. 3, 5 (2021). The Church was also entrusted with determining when to move burial grounds – *i.e.*, "[t]he practical necessities of occasionally relocating burial places in England were met by vesting control over corpses, and their burial and removal, in an ecclesiastical officer called the ordinary." HUGH Y. BERNARD, THE LAW OF DEATH AND DISPOSAL OF THE DEAD 13 (2d ed. 1979).

*Sheffield Farms Co.*, 126 A.2d 886, 890 (N.J. 1956) ("[I]n England the ecclesiastical courts had exclusive jurisdiction of the dead and as a consequence the early common law refused to recognize a concept of property rights in the body of a deceased person[.]"); *Jackson v. Rupp*, 228 So. 2d 916, 918 (Fla. Dist. Ct. App. 1969) ("The early English common law recognized no ... property rights in the body of a deceased person ... this being due undoubtedly to the fact that the ecclesiastical courts exercised jurisdiction over the affairs of decedents."); *cf. DuPont v. DuPont*, 85 A.2d 724, 733 (Del. 1951) (the decision to reject ecclesiastical law "disturbed the balance which existed in England between the High Court of Chancery and the Ecclesiastical Courts which complemented each other to afford a means of relief for some causes for which there was no adequate remedy in the law courts").

Accordingly, in the United States, courts dealing with cases formerly under ecclesiastical jurisdiction struggled with the deference that the adopted English common law paid to the now-absent ecclesiastical law. Early judicial decisions perceived a tension between what appeared to be the technically correct result under property law principles, and a morally or ethically preferred result – *i.e.*, a result that, in substance, might have been provided in England by the ecclesiastical law. Compounding the issue, courts in the United States also faced problems that simply would not have existed in England, given the near

monopoly that the Church had over the disposition of human remains and control of burial places.[8]

As an example, one early opinion reasoned that the sale of a burial ground in fee simple by a religious corporation meant that – as a matter of law – interred bodies could be removed without any further "prohibition or regulation[.]" *Windt v. German Reformed Church*, 4 Sand. Ch. 471, 475 (N.Y. Ch. 1847). The court lamented this result, but concluded that it was required, at least in the absence of some other property interest (such as a deed to a burial plot or vault) that would provide a basis for relief under the English common law. *See id.* at 476 ("It is painful and deeply abhorrent ... to have the remains of beloved friends and relatives disturbed in their last homes, and removed by rude and careless hands, to a distant cemetery, not hallowed by any of the associations which encircle the consecrated ground where we have deposited them in sadness and in sorrow.... But I cannot shut my eyes to the clear light of the law[.]"). Another court of equity raised a similar concern in a different context (validity of a marriage): "Are the principles of

---

[8] Commentators have likewise pointed out that the "optional element" in American burial practices meant that unique problems arose in the United States. *See* BERNARD, *supra*, at 14 (noting that "the seeds of future trouble" were present in the United States because of the various available options for burial, including family burial grounds, secular and municipal burial grounds, and churchyards, unlike "[i]n England, [where] almost without exception, burials were in churchyards or elsewhere in consecrated ground"); *see also* MARSH, THE LAW OF HUMAN REMAINS, *supra*, at 8 ("[T]he practical needs of colonial and frontier life led to a diversity of disposition models .... [An] ethnically and religious[ly] diverse population had different needs than the sedentary, homogenous English of the seventeenth and eighteenth centur[ies] .... [and] [l]aws that deferred to the spiritual authority of the Church of England simply did not translate. A new common law therefore had to be created.").

natural law, and of Christian duty, to be left unheeded, and inoperative, because we have no ecclesiastical Courts recognized by law ...?" *Wightman v. Wightman*, 4 Johns. Ch. 343, 347 (N.Y. Ch. 1820). The latter decision-maker, however, answered the question in the negative, concluding that "[a]ll matrimonial, and other causes of ecclesiastical cognizance, belonged originally to the temporal Courts ... and when the Spiritual Courts cease, the cognizance of such causes would seem, as of course, to revert back to the *lay* tribunals." *Id.* (emphasis in original). Eventually, this latter view took hold more broadly in the United States. The "lay tribunals" began to come into their role of protecting the interred remains of the deceased, paving the way for developing a common law of burial places. This effort – to recognize and provide the "secular guardian" for the dead made necessary by the separation of church and state, *see* MARSH, THE LAW OF HUMAN REMAINS, *supra*, at 8 – was furthered in large part by two significant legal developments.

*First*, in 1829, the United States Supreme Court handed down a groundbreaking decision in *Beatty v. Kurtz*, 27 U.S. 566 (1829), supporting the idea that the courts could protect the repose of the deceased and the feelings of the living (*i.e.*, the role held in England by the Church). The Supreme Court was faced with an ownership dispute over land in Georgetown that had been used for a church and burial ground.[9] The landowner had "marked out" the land at issue in 1769 in a recorded plan for an addition to Georgetown, inscribing it with the words "for the Lutheran church[.]" *Id.* at 578-79. A few

---

[9] The town of Georgetown was once in Maryland, but it became part of the District of Columbia in the early 1790s. As such, the Supreme Court grounded its decision, in part, in Maryland law.

14

decades later, after the landowner had died, the putative trustees of a Lutheran church filed suit in the court of equity in the District of Columbia. They alleged that they had been in a contract with the landowner to obtain the land, that members of their church had used the land for more than 50 years as both a church and burial ground (though their church had since "decayed" and fallen down), and that the successors of the landowner recently had entered the burial ground and "threw down the fence and tombstones" in an attempt to dispute the Lutheran congregation's claim. *See id.* at 571, 567, 579-80. Accordingly, the plaintiffs sought specific performance by conveyance of legal title to the land, to quiet title to the land, and an injunction to prevent future trespass. The defendants, however, claimed that the landowner had only intended to convey the land to the Lutheran congregation on the condition that they would build a church on the land "within a reasonable time," and the defendants disputed that any building erected on the land was ever used as a church. *Id.* at 580.

The Supreme Court ultimately resolved the dispute in favor of the Lutheran congregation, affirming an injunction against the defendants. In so doing, the Court articulated a fundamental principle of the common law of burial places: that a court of equity has the power, "operating by its injunction," to protect the resting places of the deceased and the feelings of the living with respect to those places:

> This is not the case of a mere private trespass; but a public nuisance, going to the irreparable injury of the Georgetown congregation of Lutherans.... [T]he sepulchres of the dead are to be violated; the feelings of religion, and the sentiment of natural affection of the kindred and friends of the deceased are to be wounded; and the memorials erected by piety or love, to the memory of the good, are to be removed .... It cannot be that such acts are to be

15

redressed by the ordinary process of law. The remedy must be sought, if at all, in the protecting power of a court of chancery; operating by its injunction to preserve the repose of the ashes of the dead, and the religious sensibilities of the living.

*Id.* at 584-85.[10]

*Second*, a few decades later, a New York attorney named Samuel Ruggles added another key contribution to the U.S. common law of burial places, drafting what came to be considered a foundational commentary in this area. In the mid-1800s, Ruggles was appointed as a referee in a matter involving taking a portion of a churchyard in New York City to widen a street and dividing the compensation between the church and the affected vault owners. He drafted a report for the trial court that summarized the relevant legal principles and traced their development, and the report was later published. *See* SAMUEL B. RUGGLES, AN EXAMINATION OF THE LAW OF BURIAL IN A REPORT TO THE SUPREME COURT OF NEW-YORK (1856) ("Ruggles Report"). The Ruggles Report, as it came to be known, has been cited authoritatively in cases concerning human remains and burial

---

[10] In discussing *Beatty*, the Appellate Court stated that the case "has nothing to do with the common law" and "was not an action at common law"; it was simply "an action in equity to compel the conveyance of a lot that had been dedicated for a charitable purpose ... and to enjoin others from trespassing onto the lot." *Adebayo*, 258 Md. App. at 168, 172-73. Although we agree with the Appellate Court that *Beatty* had little to do with the *English* common law or the law courts of England, the U.S. common law of burial places developed its guiding principles within the courts of equity, and *Beatty* is a foundational authority for this body of law. *See* Marsh, *When Dirt and Death Collide*, *supra*, at 61, 63 (discussing the significance of *Beatty* in developing this new area of American common law).

16

places.[11] Although written in controversial language and with an anti-ecclesiastical bent, the Ruggles Report nevertheless provided foundational thought for developing a common law of human remains and burial places in the United States.

According to Ruggles, the historical division of judicial authority in England between the Church and the State, in one composite system, "materially narrowed the powers and the action of the courts of common law." Ruggles Report at 35. Ruggles asserted that, although the English common law courts of his time gave "humble deference to the ecclesiastical tribunals," this was not always so; instead, authority over the dead had originally belonged to the ancient civil law courts and, over the centuries, it had been "gradually abstracted" from these secular courts into the ecclesiastical authority. *Id.* at 41, 43. Thus, reasoned Ruggles, even though the English ecclesiastical system was incompatible with the American legal system, that did not mean that rejecting ecclesiastical law left the dead without protection in America. Instead, the authority to secure the repose of the deceased "was only absorbed by the Church, and held in suspense, until some political revolution or religious reformation should overthrow the ecclesiastical power[.]"

---

[11] *See, e.g.*, *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 748 (Tenn. Ct. App. 2001) (observing that the Ruggles Report "has become a cornerstone of the development of the common law of burial in the United States"); *Larson v. Chase*, 50 N.W. 238, 238 (Minn. 1891); *Herzl Congregation v. Robinson*, 253 P. 654, 655 (Wash. 1927). The Ruggles Report has also informed several of the leading books and treatises on these issues. *See, e.g.*, SIDNEY PERLEY, MORTUARY LAW 36 n.2 (1896); JACKSON, *supra*, at 13 n.27; BERNARD, *supra*, at 14-15; MARSH, THE LAW OF HUMAN REMAINS, *supra*, at 7-8; *see also* RESTATEMENT (THIRD) OF TORTS, Miscellaneous Provisions, § 48 D. The Right of Sepulcher (Disposition of Human Remains), cmt. a (Am. L. Inst. Tentative Draft no. 2, March 2023) ("Ruggles's articulation powerfully influenced the law's development.").

*Id.* at 48. Ruggles emphasized that the American Revolution did just that, and therefore that courts in the United States must take up certain of the responsibilities and powers formerly held by the ecclesiastical courts to protect the remains of the deceased:

> Burial, in the British Islands, may possibly remain, for many generations, subject exclusively to "ecclesiastical cognizance;" but in the new, transplanted England of the Western continent, the dead will find protection, if at all, in the secular tribunals, succeeding, by fair inheritance, to the primeval authority of the ancient, uncorrupted common law.

*Id.* at 51.

Building upon these two authorities, equity and appellate courts in the United States set out to resolve disputes and further articulate the principles of the U.S. common law of burial places, frequently referencing the opinions of other state courts (and later also the secondary sources collecting those cases) both as persuasive authority, and to ensure that judicial decision-making was as consistent as possible. *See, e.g.*, *Larson*, 50 N.W. at 238 ("Inclined to follow the precedents of the English common law, [American] courts were at first slow to realize the changed condition of things, and the consequent necessity that they should ... administer remedies as in other analogous cases. This has been accomplished by a process of gradual development[.]"); *Pet. of Sheffield Farms Co.*, 126 A.2d at 890-91 ("[W]ith the repudiation of the ecclesiastical courts in the American colonies, jurisdiction over these matters passed to the temporal courts.... It is now settled beyond question that once a body is buried it is in the custody of the law, and removal or other disturbance of it is within the jurisdiction of our courts with equitable powers.").

A consistent theme runs through these decisions: courts of equity have the power to balance the interests of the living and the repose of the deceased. They do so by applying

the principles of the common law of burial places, and developing those principles as needed to resolve future controversies. *See Dougherty v. Mercantile-Safe Deposit & Trust Co.*, 282 Md. 617, 620 (1978) ("[W]hen ... proper burial has been discharged, the right of custody ceases and the body is thereafter in the custody of the law and disinterment or disturbance of the body is subject to the control of a court of equity."); *Wilson v. Read*, 68 A. 37, 39 (N.H. 1907) ("It is well settled that in this country, in the absence of ecclesiastical tribunals ..., courts of equity have power to settle controversies as to the burial of the dead, the care of their remains after burial, and the preservation of the place of interment from wanton violation or unnecessary disturbance."); *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 749 (Tenn. Ct. App. 2001) ("In this country today, the civil courts have unquestioned jurisdiction to resolve disputes involving the burial and reinterment of human remains. It is now commonly said that human remains, after interment, are in the custody of the law, and are subject to the control and discretion of the courts applying equitable principles.") (internal citations omitted); *see generally* JACKSON, *supra*, at 247 ("[A] court of equity is free to announce a law of burial and preserve the sanctity of burial places by virtue of the principles of the law of burial alone.").

**B. The Historical and Legal Landscape – Conflicts Between Urban Growth and Burial Ground Uses of Land**

1. Population Growth in the 1800s Caused Cities to Encroach Upon Burial Grounds.

In the 1800s, when our courts of equity were beginning to develop a common law of burial places, the social and legal landscape differed from that of today in certain

19

significant respects. Cemetery companies were still a relatively new concept. And despite the availability of family burial grounds, the traditional American place of burial was similar to England's: the churchyard. *See* HUGH Y. BERNARD, THE LAW OF DEATH AND DISPOSAL OF THE DEAD 76 (2d ed. 1979); Elizabeth Searcy, *The Dead Belong to the Living: Disinterment and Custody of Dead Bodies in Nineteenth-Century America*, 48 J. of Soc. Hist., No. 1, Fall 2014, at 112, 114-15; *see also Medicine Bird*, 63 S.W.3d at 747 ("Even though the colonists did not have the same right to be buried in a churchyard ..., interment in churchyards was the most common mode of burial, followed by family burial grounds and, later, public cemeteries.").[12]

During this time, cities in the United States began to grow rapidly, leading to overcrowding and the need to expand. This brought with it the desire to relocate urban burial sites, and – as a result – the further development of the U.S. common law (as well as statutory law) of burial places. *See* Searcy, *supra*, at 112, 115 (describing the "urban crowding[,]" "[n]ew sanitary restrictions[,]" and the dilapidated conditions of urban graveyards" that developed during the mid-1800s); MARSH, THE LAW OF HUMAN REMAINS, *supra*, at 60 (describing the "rapid urban grown in the nineteenth century [that] led to significant changes in burial practices"); PERLEY, *supra*, at Preface (noting, in 1896, that "all law concerning dead human bodies" became "increasingly important" because of, among other things, "the increase of population" and "for sanitary reasons").

---

[12] Other burial options included public cemeteries "under the sole control of towns and cities[,]" cemeteries controlled by states and established by statute, and national cemeteries created by acts of Congress. *See* PERLEY, *supra*, at 125.

Simultaneously, overcrowding and neglect began to plague many burial grounds located in growing municipalities. *Cf. Reed v. Stouffer*, 56 Md. 236, 249 (1881) (noting allegations that "in consequence of the growth of the city," a burial ground in Maryland had become "unsuitable for burial purposes"). And because these burial grounds were often located at the center of towns, they were "perceived as a nuisance to neighbors" and occupied increasingly valuable land that could be put to other uses. *See* MARSH, THE LAW OF HUMAN REMAINS, *supra*, at 60; PERLEY, *supra*, at 151 ("A burying ground within the limits of a city, where the population is dense, may readily become a nuisance.").

Similar problems in managing burial grounds were faced by religious societies of the time, frequently because of financial pressures and dwindling membership. Sometimes land would be abandoned by religious societies. *See Appeal of Gumbert*, 1 A. 437, 439 (Pa. 1885) (discussing land that had been used as a burial ground and place of worship, but that had been abandoned as a place of worship "long ago"). Cities also began to encroach on land held by those societies. *See Appeal of Kincaid*, 66 Pa. 411, 419 (1870) ("The city was growing and becoming closely built around [the burial ground], and as no income was derived from it by the churches, there were no means of keeping it in proper order, and from its neglected condition it was rapidly becoming a nuisance[.]"). And a lack of funds sometimes impeded efforts by religious societies to manage their land. *See Beatty*, 27 U.S. at 581 (noting that a burial ground had once contained a church, but the church had decayed, and the religious association did not have the funds to rebuild it because its

21

congregation "constituted but a small number" and they could not "maintain public worship constantly" at the location).

In part to address these concerns, states began to allow the incorporation of cemetery companies. The Baltimore Cemetery Company was chartered in 1849. *See* 1849 Md. Laws, Ch. 71 ("An act to incorporate the Proprietors of Baltimore Cemetery."). And a few years later, the General Assembly passed another act generally allowing additional cemetery companies (or "cemetery associations," as they were sometimes termed) to be incorporated. 1852 Md. Laws, Ch. 221. In incorporating the Baltimore Cemetery Company, the General Assembly cited many of the concerns that troubled cities of the time – particularly the "interment of the dead amid the abodes of the living":

> [P]ublic sentiment, in the city of Baltimore, in accordance with the enlightened experience of larger cities elsewhere, is opposed to the interment of the dead amid the abodes of the living, for sanitary and other obvious reasons; and ... experience hath also shewn that it is desirable to have public burial grounds, subject to such laws, rules, and regulations as will insure to the living the continued protection of the remains of their dead, and the decent preservation of the grounds by securing them in perpetuity to the object of their dedication[.]

1849 Md. Laws, Ch. 71.

2. Property Law Restrictions Tied Up Land for Burial Ground Purposes, Particularly in Maryland.

Compounding problems of overcrowding, the legal landscape of the time also impeded efforts to repurpose existing burial grounds and serve the needs of the growing population. For many large burial grounds, deeds in the chain of title contained express restrictions limiting the allowable uses of burial ground land. These sorts of restrictions were particularly common in burial grounds owned and operated by religious institutions

22

– the traditional burial option of the time – and they also existed in burial grounds operated by cemetery companies and municipalities.

Specifically, when land was conveyed with the intent that it would be used as a burial ground, deeds of the 1700s and 1800s generally included language referencing that intent. Such language could be interpreted in different ways, with different effect. In certain cases, it would create a "condition" that the land be used as a burial ground, meaning that ownership of the land could revert to the heirs of the grantor (and ownership of the land would be forfeited) if the land was ever put to another use. *See Kelso v. Stigar*, 75 Md. 376, 386 (1892) (language in a deed conveying land "for and to the use of and purposes ... for a burying place" left the grantor and his heirs with a possibility of reverter, and the land would be forfeited to them if used for another purpose); *Appeal of Gumbert*, 1 A. at 438-39 (language in a deed meant that the grantor retained a reversionary interest if the land ceased to be used for "a church and church-yard, and burying-place"); *Dolan v. Mayor and City Council of Balt.*, 4 Gill 394, 404, 405 (Md. 1846) (language in a deed conveying land for "a church ... and to lay out a burying ground" meant that "[i]f the conditions of the deed have not been performed, the whole estate ... will have reverted to the heirs of the grantor").

In other cases, language in a deed might "reserve" a portion of the land conveyed, allowing the reserved portion to continue to be used for burial under the ownership of the grantor. *See Belcher v. Powers*, 573 S.E.2d 12, 14-15 (W. Va. 2002) (language in a deed conveyed certain land but reserved a burial ground). Thus, the grantee would not be able to put the land to different uses without violating the rights of another landowner. Like

23

language of condition, language of reservation in a deed would ensure that a burial ground would not be disturbed – and it could similarly lock the land into use only as a burial ground or for the other purposes specified in the chain of title.

There were also other possibilities for interpreting deed language, each with similar effect. These other interpretations included a restrictive covenant, an easement, or a charitable trust. *See, e.g.*, *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 46-47 (2013) (language in a deed created a restrictive covenant requiring land to be operated as a burial ground); *In re Estate of Harding*, 878 A.2d 201, 204-05 (Vt. 2005) (language in a deed created a "burial easement" allowing those benefitted and their descendants to continue to maintain a burial ground); *Rawson v. Inhabitants of Sch. Dist. No. 5 in Uxbridge*, 89 Mass. (7 Allen) 125, 130-31 (Mass. 1863) (language in a deed created a "trust and confidence" that land would continue to be used as a burial ground "so long as it was reasonable and practicable so to do"); *Reformed Protestant Dutch Church in Garden Street v. Mott*, 7 Paige Ch. 77, 77 (N.Y. Ch. 1838) ("The conveyance ... to have a house of public worship erected ... and for no other use whatever, was a valid conveyance ... to a charitable and pious use; and the court of chancery has original jurisdiction to enforce the performance of the trust.").

Regardless of the precise legal characterization of a given land use restraint, each of these possibilities would prevent land from being used for another purpose – sometimes

indefinitely.[13] They would also provide a litigant who had standing with some ability to protect a burial ground by seeking to enjoin other land uses.

In Maryland, these sorts of restrictions in the chains of title of burial grounds were particularly common. This is largely because, from 1776 until the late 1940s, a so-called "Mortmain" provision in the Maryland Declaration of Rights *required* that conveyances of land to religious associations contain specific land use restrictions. This Mortmain provision was based upon the English "statutes of mortmain" that were enacted in the 1200s to prevent the Church from continuing to accumulate lands in perpetuity, "thereby withdrawing them from public and feudal charges." *Fletcher v. Safe Deposit & Trust Co.*, 193 Md. 400, 411 (1949). Under Maryland's Mortmain provision, in the absence of special permission from the General Assembly, all conveyances of land to a religious entity were deemed void, with the exception that a conveyance under a certain acreage could be made without legislative approval, provided that it was for "a church, meeting, or other house of worship, and for a burying ground, *which shall be improved, enjoyed or used only for such purpose*[.]" *Trustees of the Catholic Cathedral Church of Balt. v. Manning*, 72 Md. 116,

---

[13] The rule against perpetuities generally did not interfere with these sorts of restrictions. For instance, a trust or "donative disposition" of property solely for charitable purposes, such as for a church and burial ground, was generally exempt from the rule. *See generally* RESTATEMENT (THIRD) OF PROPERTY (WILLS & DONATIVE TRANS.) § 27.3 (Am. L. Inst. 2011). The rule against perpetuities likewise did not disturb reversionary interests that were left in the grantor and their successors. *See* RESTATEMENT (FIRST) OF PROPERTY § 372 (Am. L. Inst. 1944). Accordingly, commentators have noted the lack of influence that the rule against perpetuities had in this area. *E.g.*, BERNARD, *supra*, at 80 ("Often the traditional rule against perpetuities, which forbids the tying up in a private trust of funds or property ... is suspended or rendered inapplicable to cemetery organizations and trusts.").

121 (1890) (emphasis added). If a deed did not explicitly restrict the purpose of the land conveyance to the permitted purposes, it was void. *See id.* at 123 (noting that "all other sales or grants to religious sects, orders, and denominations" besides those not greater than two acres and intended for a church, meeting, or other house of worship or burying ground, "were declared void unless made with the 'leave' of the Legislature");[14] *Grove v. Congregation of Disciples of Jesus Christ*, 33 Md. 451, 454 (1871) ("Upon its face this deed is in direct contravention of the [Mortmain] Article of the [] Declaration of Rights.... [T]he original grantor, in our opinion, had the right to treat it as defective and void[.]").

Thus, even though it is largely a historical footnote today,[15] during its time the Mortmain provision in the Maryland Declaration of Rights had significant effect. Leading commentators on Maryland's constitutional law have remarked that the provision was "perhaps the [second] most important in the Declaration of Rights" and "furnished a

---

[14] From 1776 to 1851, the exception was limited to conveyances of no larger than two acres. *See* Md. Decl. of Rts. art. 34 (1776). The Constitution of 1851 increased this allowance to five acres and renumbered the Mortmain provision to Article 35. Md. Decl. of Rts. art. 35 (1851). Although the requirements for use restrictions remained largely unchanged from 1776 to 1947, the 1851 Constitution additionally allowed conveyances of land for parsonages. Eventually, the Mortmain provision was renumbered again to Article 38, and it still bore that number when it was repealed in 1977. *See generally* Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights*, 71 Temp. L. Rev. 637, 669 & nn. 507-14 (1998).

[15] In 1947, the requirement of legislative approval was removed, rendering the Mortmain provision in the Maryland Declaration of Rights largely ineffective. Instead, conveyances of land to religious entities were allowed absent express legislative *disapproval*. Friedman, *supra*, at 669 & n.509 (citing Act of Apr. 25, 1947, Ch. 623, 1947 Md. Laws 1557-58); *see also Murray v. Comptroller of Treasury*, 241 Md. 383, 394 (1966). The Mortmain provision was then formally repealed in the late 1970s. *See* 1977 Md. Laws 2743, Ch. 681.

considerable amount of litigation[,]" ALFRED S. NILES, MARYLAND CONSTITUTIONAL LAW 56-57 (1915), and have termed it "a unique provision in the Maryland Declaration of Rights" intended to prevent religious entities from acquiring property in perpetuity. Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights*, 71 Temp. L. Rev. 637, 669 & n.514 (1998). During the almost two centuries that Maryland's Mortmain provision was in effect, deeds conveying land to religious entities in Maryland typically included language limiting the permissible uses of the land. For example, deeds sometimes conveyed land "to enclose and keep the same for a burying place ... and also to erect or build a meeting house[,]" *Second Universalist Soc'y of the City of Balt. v. Dugan*, 65 Md. 460, 465 (1886), or "to ... erect ... a church ... and to lay out a burying ground[.]" *Dolan*, 4 Gill at 404.

This is not to say that religious entities in Maryland could never hold land outright in fee simple, subject to no conditions or other use restrictions. There were a few narrow circumstances where that was possible. Conveyances made before the Maryland Declaration of Rights was adopted, for instance, were exempt from its requirements. *See Kelso*, 75 Md. at 401. And even if a conveyance to a religious entity was void under the Mortmain provision, the religious entity could eventually obtain the land outright, without any restrictions, through adverse possession. *See, e.g.*, *Trustees of Zion Church v. Hilken*, 84 Md. 170, 171-72 (1896) ("The deed, even if void, could not be less than color of title ... and a continuance of this possession for twenty years would perfect the title against all persons[.]") (quoting *Gump v. Sibley*, 79 Md. 165, 169 (1894)); *Rydzewski v. Vestry of*

27

*Grace and St. Peter's Church*, 145 Md. 531, 535 (1924) ("It is conceded that the conveyance ... was void under [the Mortmain provision] of the Declaration of Rights .... The evidence shows, however, that the grantee ... has [] acquired a good title by adverse possession.").

Nevertheless, use and purpose restrictions in deeds to burial ground land were the norm of the time, especially in Maryland. Even deeds executed before 1776 sometimes contained such restrictions. *See Kelso*, 75 Md. at 386-87 (discussing restrictions in a 1773 deed requiring that the land be used for, among other things, a burial ground and a meeting house). Many deeds of land to cemetery companies also contained similar restrictions. *See, e.g.*, *Dumbarton Improvement Ass'n*, 434 Md. at 43, 46-47 (discussing a restrictive covenant in a 1913 deed to a cemetery company requiring the property to be "maintained and operated as a cemetery"); *Sapper v. Mathers*, 133 A. 565, 565 (Pa. 1926) (discussing an 1827 deed conveying land to a cemetery association "for no other purpose whatsoever than a cemetery or burial ground" and explaining that "[t]he charter of the cemetery association permitted it to hold land for burial purposes only, which may account for the deed being so drawn"). These sorts of property law restrictions hindered efforts to move burial grounds outside of growing cities, and to use increasingly valuable burial ground land for other purposes.

## C. This Case

In 1911, White's Tabernacle No. 39 ("White's Tabernacle"), a fraternal society that supported the Black community,[16] purchased land for a community burial ground in Bethesda, Maryland. This land encompassed what is now known as parcel 175 (sometimes also referred to as "lot 175"), as well as additional land. Interments on parcel 175 began as early as 1912 and continued for several decades, with the last burial likely occurring in the mid-1940s. Throughout this time, the burial ground was frequently referred to as Moses Cemetery.[17] Although interments occurred for several decades and, at one point, the burial ground contained at least 200 individual graves, it appears that no recorded deeds ever mentioned Moses Cemetery or any use of the land as a burial ground.[18]

Moses Cemetery was not the first burial ground operated by White's Tabernacle. Since the 1880s, that organization had operated Christian Cemetery in Tenleytown in the

---

[16] The full name of the fraternal society was White's Tabernacle Number 39 Lodge of the Ancient Order of Sons and Daughters, Brothers and Sisters of Moses.

[17] The burial ground is referred to in the record by several different names, including the Moses African Cemetery, the Moses Macedonia African Cemetery, and the River Road Moses Cemetery. We will adopt the Coalition's convention in its brief of referring to the burial ground as Moses Cemetery.

[18] The 1911 deed to White's Tabernacle conveyed the land in fee simple, with no mention of any use as a burial ground. Likewise, when White's Tabernacle sold the land in 1958, the deed also stated that the conveyance was in fee simple, and neither Moses Cemetery nor any particular land use or purpose was mentioned. The record, however, does suggest that certain tax records in Montgomery County filed during the twentieth century referenced use of the land as a graveyard. Although these tax documents were not made part of the record, they are referenced in the record and do not appear to be disputed here.

District of Columbia. After selling the land containing Christian Cemetery,[19] White's Tabernacle sought to disinter the bodies buried there and to reinter them elsewhere. An Act of Congress was passed allowing the disinterment, and White's Tabernacle then disinterred the remains of as many as 192 persons from Christian Cemetery and reinterred them in Moses Cemetery.

Among those buried or reinterred at Moses Cemetery were formerly enslaved persons and their descendants, including members of the nearby River Road community that was established shortly after the end of slavery in the 1860s. From the record here, it appears likely that formal deeds or certificates as to particular burial lots in Moses Cemetery were not issued to buyers. Instead, the Coalition's expert testified generally that it was common in historic African-American cemeteries not to record in writing where particular bodies were buried or who owned which plots. The expert also testified that no records of any deeds or certificates as to lots in Moses Cemetery had been found. Reverend Adebayo provided similar testimony that burial grounds like Moses Cemetery would typically be subdivided into burial plots, that plots would be sold at nominal prices as the need arose to bury loved ones, and that individual purchasers would not be issued deeds for any particular burial places. Rather, family members would "simply know the plot ... where their loved one is buried[.]"

---

[19] It appears that White's Tabernacle sold Christian Cemetery to a land development company. That company then used the land to develop Chevy Chase Parkway (which at the time was named 37th Street). *See* David Kathan et al., *Tracing a Bethesda, Maryland, African American Community and Its Contested Cemetery*, 29 Wash. Hist., No. 2, Fall 2017, at 24, 32.

In 1958, representatives of White's Tabernacle sold parcel 175 to Leo Furr, and the land was later conveyed again. These conveyances led to the construction of Westwood's apartment building and adjacent parking lot in the 1960s. However, rather than respectfully disinterring the bodies in Moses Cemetery and reinterring them elsewhere, the developers desecrated Moses Cemetery by bulldozing parcel 175 and paving it over. The circuit court heard testimony from an eyewitness who recalled workers pushing grave markers into a nearby creek, exposing human remains during construction, and carrying those remains away from the site.[20] Eventually, visible evidence of Moses Cemetery's existence was all but erased, although the burial ground was not forgotten in the community.[21]

HOC began leasing Westwood in 1997, and it obtained an option to purchase the property as part of the lease.[22] Westwood was then purchased by a different entity in 2013, and the new owner began plans to redevelop the property while HOC continued to lease it.

---

[20] As the Appellate Court noted, *Adebayo*, 258 Md. App. at 146-47, it appears that this was done without securing the required permission from the State's Attorney, which would have been required before removing human remains from a burial site. *See* Md. Code Ann., Art. 27, § 265 (1957). Such permission is still required today. *See* Md. Code, Crim. Law § 10-402 (2021 Repl. Vol.).

[21] The record indicates that, over the last several years, community members have visited the burial ground to leave flowers and conduct libation ceremonies – that is, ritual offerings of liquid to the spirits or souls of the deceased. The site has also seen notable visitors, including King Toffa IX, who visited from Porto-Novo, Benin to perform a libation ceremony and give remarks.

[22] In its opinion granting a preliminary injunction in favor of the Coalition, the circuit court found, among other things, that HOC "was established in 1974 to better respond to [Montgomery County's] need for affordable housing" and that HOC "receives state funding to provide affordable housing and supportive services[.]"

However, news of the planned redevelopment – and knowledge that the property might stand atop a desecrated burial ground – sparked public outcry. In response, the Montgomery County Planning Department commissioned a documentary research study of the site.

This study produced a preliminary report in 2017 that contained several conclusions about parcel 175 and Moses Cemetery. Among other things, the report stated that Moses Cemetery existed on parcel 175 and that there was no evidence that any human remains were formally disinterred and reinterred elsewhere. The report also noted that there was "ample evidence" of Moses Cemetery's existence, and although some of the burial ground had been disturbed (and there was "uncertainty" concerning its present condition), the report further concluded that "it is improbable that the cemetery was completely effaced[,]" and there was no indication that it had been moved. Also in 2017, the Historical Society of Washington, D.C. published an article about the history of Moses Cemetery and the surrounding River Road community. This article noted that the burial ground likely "lay under a parking lot next to Westwood Tower Apartments[.]" *See* David Kathan et al., *Tracing a Bethesda, Maryland, African American Community and its Contested Cemetery*, 29 Wash. Hist., No. 2, Fall 2017, at 24, 25.[23]

HOC exercised its option to purchase Westwood (including parcel 175) and completed its acquisition of the property in 2018. In 2021, HOC contracted to sell

---

[23] The circuit court found that, before 2017, HOC had "acknowledged that a burial ground was present on Lot 175."

Westwood to a developer for a profit of approximately $30 million. The contract for sale contained provisions that would require the developer to make capital improvements to the property, set aside a percentage of the residential units for low- and moderate-income families, and use "commercially reasonable efforts ... to memorialize the historical significance of the land formerly owned by White's Tabernacle … (which is sometimes referred to as Moses Cemetery[.])."

Shortly after news of the pending sale became public, the Coalition brought a single-count complaint against HOC, requesting a writ of mandamus to compel HOC to bring an action "for sale of a burial ground for another purpose" under BR § 5-505 and Md. Rule 14-401 as part of HOC's effort to sell Westwood. In support, the Coalition argued that a burial ground could not be sold with an intent to use it (or to continue to use it) for some other purpose, unless HOC followed the procedures in that statute and rule. The Coalition further sought to enjoin HOC from completing its sale while the request for mandamus relief was pending.

The circuit court largely agreed with the Coalition, temporarily restraining HOC from completing the sale, and later granting a preliminary injunction to the same effect. Ultimately, the circuit court issued a writ of mandamus compelling HOC to comply with BR § 5-505 before selling Westwood and parcel 175. In so doing, the circuit court found that there was "overwhelming evidence" that a burial ground existed on parcel 175 and that "many bodies likely still remain on the property[.]" The circuit court further explained that it was a court of equity and had an obligation to ensure that the resting places of the

33

deceased are respected. However, the court determined that "Maryland statutes provide

few civil remedies to protect those buried on Lot 175" and that "no other sufficient remedy

exists to ensure that the remains on Lot 175 are protected and respected."

The Appellate Court reversed in a reported opinion. *Housing Opportunities Comm'n

of Montgomery Cnty. v. Adebayo*, 258 Md. App. 137 (2023).[24] Consistent with the parties'

framing of the issues, the Appellate Court focused its analysis on BR § 5-505. Pointing out

that BR § 5-505 provided only that an action "may" be brought to sell a burial ground for

another purpose, the Appellate Court reasoned that BR § 5-505 does not set forth a required

procedure, but instead provides only an optional mechanism to sell (and to quiet title to) a

burial ground in certain circumstances. *Id.* at 192-96. The Appellate Court acknowledged

that the word "may" in a statute can sometimes connote a mandatory action or precede

mandatory requirements, but determined that this was not the case with respect to

---

[24] Before the circuit court entered its final decision on the request for mandamus relief, the buyer backed out of the transaction, citing its inability to timely acquire the property because of the pending litigation. According to the Appellate Court, this rendered the case moot. *See Adebayo*, 258 Md. App. at 154 (reasoning that, "[b]ecause this is a case to enjoin a sale and to require the seller to obtain court approval ... it would certainly seem that the case became moot" once the buyer terminated the sale agreement). The Appellate Court nevertheless addressed the merits of granting mandamus relief, reasoning that even though the case was moot, it fell within a narrow exception for cases where, among other things, the issue is likely to evade review and the public interest would clearly be hurt by refusing to decide the issue. *Id.* at 156-57. Neither party challenges that determination before us.

"Generally, a case is moot if no controversy exists between the parties or when the court can no longer fashion an effective remedy." *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 351-52 (2019) (cleaned up). We agree with the Appellate Court that the Coalition's mandamus claim is moot. We also agree that it is appropriate to reach the merits of the Coalition's appeal for the reasons stated by the Appellate Court.

34

BR § 5-505. *Id.* at 164-65, 167, 196. Concluding that HOC had no duty under § 5-505 to file an action to sell the land containing Moses Cemetery, the Appellate Court reversed the circuit court's grant of mandamus relief. *Id.* at 196-97.

We subsequently granted the Coalition's petition for writ of certiorari, *Bethesda African Cemetery Coalition, et al. v. Housing Opportunities Comm'n of Montgomery Cnty.*, 486 Md. 96 (2023), agreeing to address the following questions:

1. Did the Appellate Court err in holding – on an issue of first impression – that BR § 5-505 is nothing more than a "quiet title" statute, providing land owners with an optional proceeding that they may choose to institute when selling land containing a burial ground if they wish to convey a "clean" title to the realty?

2. Under Maryland law, does a court of equity need to assess whether (and if so, on what conditions) a property owner can sell land containing a burial ground for non-burial use in view of the 1829 decision of the United States Supreme Court in *Beatty v. Kurtz*, which (applying Maryland law) charged courts of chancery operating pursuant to their equity powers "to preserve the repose of the ashes of the dead and the religious sensibilities of the living," as well as subsequent decisions by this Court and other courts?

## II

### Standard of Review

Whether the circuit court had the power to issue a writ of common law mandamus is a question of law that we review *de novo*. *Elsberry v. Stanley Martin Cos., LLC*, 482 Md. 159, 178 (2022). We also review questions of statutory interpretation *de novo*. *Id.*

## III

## Discussion

"[C]ommon law mandamus is an extraordinary remedy that is generally used to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right." *Mayor and City Council of Balt. v. ProVen Mgmt., Inc.*, 472 Md. 642, 669-70 (2021) (internal quotation marks and citation omitted). A writ of mandamus will only issue "where the law has established no specific remedy, and where in justice and good government there ought to be one." *Wilson v. Simms*, 380 Md. 206, 217 (2004) (citation omitted). Thus, a writ of mandamus will not issue where there is "any ordinary adequate legal remedy." *Priester v. Balt. Cnty.*, 232 Md. App. 178, 187-88 n.8 (2017) (quoting *George's Creek Coal & Iron Co. v. Allegany Cnty. Comm'rs*, 59 Md. 255, 259 (1883)).

Additionally, "unless a legal right and a corresponding duty are clearly established, there is no ground for the issuance of a mandamus." *Buchholtz v. Hill*, 178 Md. 280, 288 (1940); *see also Balt. Cnty. v. Balt. Cnty. Fraternal Order of Police*, 439 Md. 547, 578 (2014) ("A court cannot grant a writ of mandamus, … where the provisions governing the duty sought to be compelled or the entitlement to that duty claimed is doubtful.").

The Coalition argues that a seller of the type of burial ground described in BR § 5-505, arguably including Moses Cemetery, must seek judicial approval if the sale contemplates that the burial ground will be used (or will continue to be used) for purposes

other than burial.[25] According to the Coalition, should a seller fail to file a BR § 5-505 action, the correct enforcement mechanism is for an interested person to seek extraordinary relief, in the form of a writ of mandamus, to compel the seller to file suit.[26]

HOC contends that the Coalition largely is making "political arguments" and that "any debate concerning the transfer of burial grounds is properly left to the legislature." HOC also adopts the Appellate Court's reasoning, arguing that BR § 5-505 is a quiet title statute that allows a seller to bring an action to convey a burial ground free of all claims. Thus, according to HOC, BR § 5-505 imposes no duty on it to file an action under the statute, and therefore mandamus relief is unavailable to the Coalition.

_____

[25] The Coalition noted in its brief that Macedonia Baptist Church traces its heritage back to the African River Road Community, and that BACC is a nonprofit working to preserve the history of Black people in the area. The Appellate Court held that at least the three descendants of individuals buried in Moses Cemetery have standing as "persons in interest" under Maryland Rule 14-401(c) and § 14-121(a)(4) of the Real Property Article ("RP"), and it further noted that Reverend Adebayo and BACC could likely claim to have standing because of a "cultural affiliation" with "someone who was or may have been interred" in Moses Cemetery. *Adebayo*, 258 Md. App. at 149 & n.9, 160 & n.18. HOC has not asserted that the Appellate Court's standing analysis is incorrect. We will not conduct any additional analysis regarding standing.

[26] The Coalition does not explain what enforcement, if any, is available when a private individual or company – who cannot be compelled by a writ of mandamus – seeks to sell a burial ground. HOC concedes that it is a quasi-governmental entity, and thus it may be compelled to perform an action by a common law writ of mandamus in appropriate cases. As the Appellate Court noted, HOC has waived any argument that it should not be subject to a writ of mandamus to comply with BR § 5-505 on the ground that the alleged statutory duty "is not one that is imposed upon HOC in its capacity as a governmental or quasi-governmental entity" but rather is "one that is allegedly imposed upon anyone who sells a certain kind of burial ground for another purpose[.]" *Adebayo*, 258 Md. App. at 148 n.7.

We think that both parties have misunderstood BR § 5-505 and the relevant case law, particularly given the larger historical and legal context. BR § 5-505 is a quiet title statute, but it is not only a quiet title statute: it allowed (and continues to allow) transacting parties to remove certain restrictions in the chain of title that would prevent other uses of certain burial ground land, thus facilitating the sale of those burial grounds when it is "desirable" that they be used for a different purpose.[27] However, at the same time, BR § 5-505 recognizes the importance of protecting the repose of the deceased and the feelings of the living – even as the needs of the living change and time moves on. Accordingly, BR § 5-505 and its predecessor statutes have not abrogated the common law of burial places that had developed before the first version of the statute was enacted, and that continues to develop today. It follows that the extraordinary remedy of mandamus that the Coalition has

---

[27] Respectfully, we disagree with Justice Watts's view that our description of BR § 5-505 as designed to remove restrictions in the chain of title and the Appellate Court's description of § 5-505 as providing an action to quiet title are "just two ways of saying the same thing[.]" Dissenting Op. of Watts, J., at 1-2. Quiet title actions adjudicate ownership of land and can sort out competing claims by those with alleged interests in land. *See Wilkinson v. Bd. of Cnty. Comm'rs of St. Mary's Cnty.*, 255 Md. App. 213, 259 (2022) ("The purpose of a quiet title action is to protect the owner of legal title from being disturbed in his possession and from being harassed by suits in regard to his title[.]") (cleaned up), *aff'd*, 483 Md. 590 (2023). Questions concerning legal ownership of the land itself are different from questions concerning the applicability of restrictions on how that land can be used, such as those validly imposed through restrictive covenants or other mechanisms. *See Logan v. Dietz*, 258 Md. App. 629, 672-73 (2023) (discussing architectural control and use restrictions imposed by, alternatively, restrictive covenants and homeowners' associations). Quiet title actions determine and memorialize ownership interests in land as a matter of law. Although they are designed to discern and enforce legal ownership, such as when legal ownership has been acquired by adverse possession, they are not designed to *change* legal ownership or to alter overarching use restrictions that run with the land simply when it is deemed "desirable" to do so. Accordingly, BR § 5-505 is more than a quiet title statute.

sought here is unavailable: there is ordinary relief available to the Coalition – an action seeking equitable relief for an alleged violation of a specific right protected under the common law of burial places. Thus, as the Appellate Court correctly held, HOC is not required to file an action under BR § 5-505 before selling the property containing Moses Cemetery. However, if the would-be seller of a qualifying burial ground elects not to file an action under BR § 5-505, a person with standing may file a claim seeking appropriate relief. In addition, a person with standing may file a claim with respect to a burial ground that is *not* covered under BR § 5-505 – *i.e.*, a burial ground where lots have not been sold or where deeds have not been executed and certificates have not been issued to buyers of lots.

## A. An Extraordinary Writ Is Unavailable Because This Dispute Is Within the Circuit Court's General Equitable Powers.

The first problem with the Coalition's position here is that it disregards the common law of burial places, and the possibility of relief under its principles, which demonstrates why extraordinary relief in the form of a writ of mandamus is inappropriate.

But, before we address the common law of burial places, it is important to acknowledge that the General Assembly has legislated extensively with respect to some aspects of burial. Typically, these statutory provisions pertain to more contemporary methods of burial than were the norm when the common law of burial places began to develop. Thus, Maryland statutes regulate (among other things) commercial cemeteries (*see* BR § 5-102(a) (excluding certain other types of cemeteries), perpetual care cemeteries (*see id.* §§ 5-603, 5-604), preneed contracts (*see id.* §§ 5-704, 5-705), licensed individuals

39

who bury and transport human remains (*see* Md. Code Ann., Health-Gen. § 4-215 (2023 Repl. Vol.), and particular lots and crypts that are formally documented and sold (*see* BR §§ 5-503, 5-504). Where the General Assembly has legislated in this area, the common law of burial places has no application. However, where the General Assembly has not covered subjects that fall under the common law of burial places, there remains a gap in Maryland that this doctrine can fill. Most pertinent to this case, the General Assembly has not filled that gap with respect to informal, nominal-fee cemeteries like Moses Cemetery. Thus, it is appropriate for us to consider how the common law of burial places may apply in Maryland cases such as this one.

The common law of burial places is both unique to the United States, and unique within the United States. Perhaps for that reason, it has been described as "a difficult area for the uninitiated to navigate." Marsh, *When Dirt and Death Collide*, *supra*, at 59. Indeed, courts have struggled over the years in developing this area of law. As discussed above, the common law inherited from England – so helpful and familiar in other contexts – provided little guidance to the courts in difficult, emotional disputes concerning burial places and the remains of the deceased. *See, e.g.*, *Larson*, 50 N.W. at 238 (noting that courts "were at first slow to realize the changed condition of things" after the rejection of ecclesiastical law in the United States and that "English common-law authorities are not very helpful or particularly in point").

Nevertheless, the courts did develop a body of law to resolve these disputes. In so doing, they drew heavily from the decisions from other state courts, developed the law

incrementally, and sought to harmonize their decisions to develop a fairly consistent legal framework. *E.g.*, *Wilson v. Read*, 68 A. at 39 ("The cases are numerous which involve controversies as to the place of burial of a deceased relative ... or the diversion to other purposes of land once dedicated for use as a burial place[.]"); *Radomer Russ-Pol Unterstitzung Verein of Balt. City v. Posner*, 176 Md. 332, 339 (1939) (looking to "the authorities" for guidance, including cases from New Hampshire, New York, and Louisiana). Rather than creating bright-line rules, this body of law developed around general principles that could be applied by courts of equity (and, today, by Maryland's circuit courts) to balance competing concerns and resolve challenging disputes. Many principles can be distilled from the common law of burial places, and over the years there have been several attempts to record some of them. *See, e.g.*, Ruggles Report at 58-59; PERLEY, *supra*, at Preface ("In this volume it is endeavored to show the principles that underlie all law concerning dead human bodies."); Marsh, *When Dirt and Death Collide*, *supra*, at 59-62. We do not attempt to detail all of the potentially applicable principles here. Instead, we will briefly discuss a handful of principles by way of illustration, to show how, where it has not been supplanted by statute, the common law of burial places supplies the appropriate legal framework to adjudicate concerns like those brought by the Coalition.[28]

---

[28] To be clear, we do not envision a person with standing asserting a claim for relief captioned as a cause of action generally under the "common law of burial places." Rather, a claim for relief should be stated in terms of a specific right protected under the common law of burial places – *e.g.*, the right of sepulcher (to the extent it is included under the common law of burial places) or the right to interment. *See* note 3 above. In the prayer for

41

*First*, when interments are made in land, the land becomes a unique subtype of real property that is subject to the jurisdiction of a court of equity. *See, e.g.*, *Beatty*, 27 U.S. at 584-85 (explaining that desecration of a burial ground is "a public nuisance" that can be remedied by a court of equity, operating by injunction "to preserve the repose of the ashes of the dead, and the religious sensibilities of the living"); *Hines v. State*, 149 S.W. 1058, 1059 (Tenn. 1911) ("When land has been definitely appropriated to burial purposes, it cannot be conveyed or devised as other property ... the then owner holds the title to some extent in trust[.]"). Put another way, the common law of burial places attaches when human remains are interred in land. Likewise, buried human remains themselves are "in the custody of the law," *Radomer*, 176 Md. at 339, and "subject to the control of a court of equity." *Unger v. Berger*, 214 Md. App. 426, 434 (2013) (quoting *Dougherty v. Mercantile-Safe Deposit & Trust Co.*, 282 Md. 617, 620 (1978)).

*Second*, while the remains of the dead rest in the land, the dead and their monuments should be protected. Thus, the dead generally cannot be disturbed unless there is good reason to do so. This includes disturbances through disinterment, *see Dougherty*, 282 Md. at 620 ("The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose." (quoting *Yome v. Gorman*, 152 N.E. 126, 129

relief, a plaintiff may seek various equitable remedies for a violation of a specific right protected under the common law of burial places, such as an injunction to prevent desecration of a grave, or an order directing the disinterment of human remains because the ground has become unsuitable for burial. Whether a court should order these or other remedies, and the details of such remedies, will depend on the circumstances and equities of the particular case.

(N.Y. 1926)); *Unger*, 214 Md. App. at 434 (disinterment "is a disfavored action" and "generally is granted only for good cause"), as well as disturbances through incompatible uses of the land. *See, e.g.*, *Concerned Loved Ones and Lot Owners Ass'n of Beverly Hills Mem. Gardens v. Pence*, 383 S.E.2d 831, 835-36, 838 (W. Va. 1989) (discussing mining operations "in or under cemetery grounds" and concluding that "the next of kin of those buried ... as well as those who own land for burial in the cemetery, have a cause of action to prevent ... the unlawful desecration of such cemetery"); *Boyce v. Kalbaugh*, 47 Md. 334, 335-36 (1877) (affirming injunction against constructing a "store-room" on burial ground land); *Stoker v. Brown*, 583 S.W.2d 765, 766-68 (Tenn. 1979) (holding that a court of equity could enjoin a landowner's cultivation of a burial ground); *Roundtree v. Hutchinson*, 107 P. 345, 347 (Wash. 1910) (same). Disturbances, of course, also include destruction of the burial ground or other desecration. *Beatty*, 27 U.S. at 584-85.

*Third*, at least as far as the common law of burial places is concerned,[29] land containing the remains of the deceased is freely alienable – meaning it may be bought and

---

[29] As mentioned earlier, there may be restrictions on selling burial ground land based upon other areas of law, such as statutory and regulatory restrictions and property law principles (which may turn on the language in deeds conveying the property). *See, e.g.*, *Brendle v. German Reformed Congregation*, 9 Casey 415 (Pa. 1859). *Brendle* involved applying property law principles and interpreting statutory requirements to determine whether land was alienable. There, the trustees of a congregation received title to land in fee simple and then executed a declaration of trust that purported to limit the congregation's use of the land to a "house of religious worship ... [and] for a place to bury their dead." *Id.* at 416. Over a hundred years later, a court of equity attempted to enforce this restriction by enjoining the congregation and its trustees from mortgaging the portion of the land that actually contained a church and burial ground, but allowing the congregation to mortgage

sold privately, whenever transacting parties so desire. This is because buying and selling this land ordinarily does not affect a court of equity's ability to protect the repose of the deceased and the feelings of the living. *See, e.g.*, *Boyce*, 47 Md. 335-37. Courts have described this principle differently. Some cases explain that ownership of the land (and other property law concepts, such as issues concerning "claim[s] of title" and "paper title") are separate from the rights with respect to burial places that a court of equity can enforce. Thus, in appropriate circumstances, these rights can include performing further burials at a site or "protect[ing] the graves of the buried dead from desecration" – regardless of who owns the land. *Frost v. Columbia Clay Co.*, 124 S.E. 767, 769-70 (S.C. 1924) (Cothran, J., dissenting); *see also Hines*, 149 S.W. at 1059 (noting that, once "interments have there been made, the then owner holds the title to some extent in trust ... and the heir at law, devisee, or vendee takes the property subject to this trust[,]" and that rights with respect to a burial site can be exercised "in a reasonable manner and at seasonable times, so as not to unnecessarily injure the owner").

---

the remainder of the land. The court of equity reasoned that "[t]he grant is for a charitable use, and therefore a restraint on alienation may be tolerated[.]" *Id.* at 420, 423. Only the court of equity's refusal to enjoin mortgaging the remainder of the property was appealed. *Id.* at 425. On appeal, the Supreme Court of Pennsylvania emphasized the alienability of property, reasoning that the declaration of trust should be interpreted merely as demonstrating that the congregation was holding the property for the limited purposes set out by an applicable statute (rather than as creating a standalone restraint on alienation). In support, the Pennsylvania Supreme Court noted that the declaration of trust was executed only after "a complete fee-simple title in legal form passed ... to the trustees" and that the declaration therefore conveyed "an equal title," even though it was set out "in the form usually adopted for conveying land to congregations under the Act of 1731[.]" *Id.* at 425.

Other decisions have instead couched these concepts and rights in property law terms, explaining them in language that was more familiar at the time. Nevertheless, many of these decisions reached the same results. For instance, some courts reasoned that using land for burial creates a special kind of "easement against the fee" – meaning that "bare legal title" to the land can be freely transferred, but that the land will pass "subject to" an easement protecting the burial ground (and access to it) that can only be extinguished when the burial ground is abandoned. *Estate of Harding*, 878 A.2d at 205; *see also Hunter v. Trustees of Sandy Hill*, 6 Hill 407, 414 (N.Y. Sup. Ct. 1844) (noting that one can establish good "paper title" to land, but still not be able to use a burial ground on the land for any purpose, if the ground has not ceased to be used as a burial ground); *Heiligman v. Chambers*, 338 P.2d 144, 148 (Okla. 1959) (noting that "naked legal title ... passes subject to the easement created").[30]

---

[30] That is not to say that there are no cases reaching different results. As mentioned earlier, over the years a few non-Maryland decisions have mechanically applied traditional property law principles to these sorts of disputes, without recognizing the common law of burial places. These cases have sometimes reached results that failed to protect burial places, and that caused the judicial decisionmakers of the time some apparent consternation. *See, e.g.*, *Windt v. German Reformed Church*, 4 Sand. Ch. 471, 474 (N.Y. Ch. 1847); *Wooldridge v. Smith*, 147 S.W. 1019, 1021-22 (Mo. 1912) (determining that, because a burial ground was private rather than public and was not mentioned in a conveyance, there was no right under the "cold law" of traditional property principles to prevent desecration of the graves). Commentators later criticized these sorts of approaches. *See, e.g.*, JACKSON, *supra*, at 247 & n.27 (characterizing *Wooldridge* and other like cases as "based on technical dogma" and "hampered by an astigmatism which has prevented [the courts] from seeing that a court of equity is free to announce a law of burial and preserve the sanctity of burial places").

*Fourth*, eventually, the use of land as a burial ground might end. This is generally known as abandonment. There are multiple paths to abandoning a burial ground. Often, abandonment occurs through eminent domain or some other lawful process, where the land is put to a different use and any human remains are respectfully disinterred and reinterred elsewhere.[31] *E.g.*, *Church of the Holy Spirit of Wayland v. Heinrich*, 204 N.E.3d 363, 364 (Mass. 2023) (dwindling membership in a church compelled it to sell its property and relocate buried remains, in compliance with the church's own regulations, when burial lots had been sold "subject to" those regulations); *Appeal of Kincaid*, 66 Pa. at 421 (burial ground became abandoned by an act of a state legislature outlawing further burials and providing for removal of interred bodies). Burial grounds can also be abandoned by consent, and the effect is the same. *Clarke v. Keating*, 183 A.D. 212, 213-15 (N.Y. App. Div. 1918) (burial ground where all bodies were reinterred elsewhere by consent had "lost its sacred character [and] should not be withheld from serving the needs of the community").

---

[31] Some states have enacted statutory processes for declaring burial grounds abandoned and removing and reinterring any buried remains. *See, e.g.*, Ala. Code §§ 11-47-60 to 11-47-74. As we discuss below, our view is that BR § 5-505 is a similar type of statutory procedure that allows certain burial grounds to be abandoned and sold through process of law. *See Rayner v. Nugent*, 60 Md. 515, 520 (1883) (predecessor to BR § 5-505 "furnished additional facilities for parties interested in abandoned burial grounds" to sell such grounds). However, the owner of a burial ground has "the lawful power and authority" to seek to abandon a burial ground without going through the BR § 5-505 process, subject to the rights of lot holders or other appropriate persons to pursue their rights, including the rights to "remov[e] the remains previously buried[,]" *see id.* at 519, and to seek to protect the repose of the dead.

46

Burial grounds can also be deemed abandoned through a sufficient showing of neglect and disuse or destruction.[32] However, this is a high bar. Courts and commentators have differed in discussing the requirements of abandonment by this method, and there is variation in how the principle is applied. *See Mayes v. Simons*, 8 S.E.2d 73, 75 (Ga. 1940) ("As to what will constitute abandonment of a cemetery, the decisions of the several courts ... do not appear to be in perfect accord."). Some courts appear to have taken a strict view, holding that this type of abandonment cannot occur "until the bodies reposing there are removed by friends or relatives or by proper public authority[.]" *Bowen v. Hooker*, 372 S.W.2d 257, 259 (Ark. 1963); *see also Bitney v. Grim*, 144 P. 490, 491 (Or. 1914) ("Having been thus dedicated [as a burial ground] ... the premises are subject to that use so long as bodies remain buried there[.]"); *Frost*, 124 S.E. at 768 ("[A] graveyard may not be abandoned except by the removal of the remains of the dead[.]"); *but see Frost*, 124 S.E. at 770 (Cothran, J., dissenting) ("I am of opinion that ... where the beneficiaries of the dedication of land for a graveyard have conducted themselves toward it as the plaintiff and his relatives have done ... the abandonment is complete, regardless of the matter of the removal of the bodies buried there.").

Other courts have taken a more moderate approach, suggesting that abandonment through neglect is possible even while the remains of the dead remain interred, so long as there is a sufficient showing to support abandonment. Among other things, these courts

---

[32] This type of abandonment is often asserted by landowners or purchasers of land as a defense. *See, e.g.*, *A.F. Hutchinson Land Co. v. Whitehead Bros. Co.*, 218 A.D. 682, 684 (N.Y. App. Div. 1926); *Frost v. Columbia Clay Co.*, 124 S.E. 767, 768 (S.C. 1924).

have looked to how long it has been since interments were made,[33] whether the public has preserved the area "as a resting place for the dead," the physical condition of the burial ground, and whether it has been "treated or neglected by the public as entirely to lose its identity as a graveyard, and is no longer known, recognized, and respected ... as such[.]" *Mayes*, 8 S.E.2d at 75-76; *see also Boyd v. Brabham*, 414 So. 2d 931, 935 (Ala. 1982). Commentators in this area are more unified than the courts – they generally agree that abandonment should be able to occur while human remains are still interred in land, if a sufficient factual showing is made to satisfy the demanding requirements of abandonment. *See, e.g.*, PERLEY, *supra*, at 199 ("[W]hen all parties in interest appropriate the burial ground to other uses and purposes, or allow it to be destroyed or lose its identity as a burial place, and no longer regard it as such, it is a legal abandonment at common law."); JACKSON, *supra*, at 395-97 (generally, abandonment requires "disinterment, and

---

[33] The length of time is only one factor that these courts have considered, and it is different from an otherwise-applicable statutory limitations period. *See, e.g.*, *Hunter v. Trustees of Sandy Hill*, 6 Hill 407, 414 (N.Y. Sup. Ct. 1844) (describing the time period as "[w]hen these graves shall have worn away; when they who now weep over them shall have found kindred resting places for themselves; when nothing shall remain to distinguish this spot from the common earth around, and it shall be wholly unknown as a grave yard"); PERLEY, *supra*, at 199 (suggesting that a period of "sixty years, for instance" might support abandonment). It is also different from a laches analysis, although certain considerations may inform both an abandonment and a laches inquiry. Courts have taken differing approaches in applying laches within the common law of burial places, and their analyses are highly fact-specific. *Compare St. Peter's Evangelical Lutheran Church v. Kleinfelter*, 98 Pa. Super. 146, 153-54 (Pa. Super. Ct. 1929) ("Laches in a general sense is the neglect, for an unreasonable and unexplained length of time ... to do what in law should have been done.... We do not find that the doctrine of laches has ever been applied in a proceeding to restrain the desecration of burial grounds."), *with Mayes*, 8 S.E.2d at 74 ("[T]he verdict for the defendants may be sustained upon the theory of either laches or estoppel.... [T]he verdict is sustainable also on the theory of abandonment[.]").

reinterment ... so far as possible[,]" but "[n]eglect resulting in loss of identity" can support abandonment, such as when a burial ground has been "permanently appropriated" by the public to an inconsistent use and "has become impossible to use ... as a graveyard") (footnote omitted);[34] 14 Am. Jur. 2d Cemeteries § 25 (May 2024 update) ("The actual condition of the cemetery ... and whether the cemetery is recognizable and known to the general public are matters going to the question of abandonment. However, where evidence shows that there are no tombstones and no burials have taken place in many years, a finding ... [of] abandon[ment] is supported.").

The final principle we discuss here is flexibility. The common law of burial places can adapt to address emerging issues, and courts of equity can articulate new principles of law in appropriately balancing the needs of the living with protecting the deceased,[35] with

---

[34] In Maryland, the Jackson treatise has been favorably cited to in the past for other propositions. *See Snyder v. Holy Cross Hosp.*, 30 Md. App. 317, 329 (1976) ("The rule set out by Jackson is the law of this State."); *Hill v. Towson Realty, Inc.*, 221 Md. 389, 397 (1960) (describing Jackson as a "well-known author" and "accept[ing], without deciding, what Mr. Jackson says as being the law"). However, it does not appear that Maryland's appellate courts have yet adopted a precise standard for abandonment of a burial ground.

[35] A word of caution is appropriate here. The power to protect the interests of the deceased is tempered by another principle that courts and commentators alike have recognized: "As between the interests of the dead in silent and undisturbed repose and the interests of the living in material growth and progress ... the interests of the living prevail." BERNARD, *supra*, at 4; *see also* Marsh, *When Dirt and Death Collide*, *supra*, at 62 ("[T]he needs of the living trump the interests of the dead."); *Windt*, 4 Sand. Ch. at 473 ("The principle of the bill is utterly impracticable; else the whole earth will in time be appropriated for the remains of the dead.").

their decisions subject to review on appeal. For example, courts have resolved disputes about the size of burial grounds, enjoining landowners from reducing the size of lands set apart for burial. *See Vidrine v. Vidrine*, 225 So. 2d 691, 697 (La. Ct. App. 1969). Courts have enjoined desecration of burial grounds. *See, e.g.*, *Roundtree*, 107 P. at 345, 347; *Heiligman*, 338 P.2d at 146, 150. For certain family burial grounds where interments were still being made (but where ownership of the land had since changed hands), courts have allowed landowners to "make and enforce regulations as to how burials shall be made" while ensuring that the regulations "are consistent with the manner in which burials have been accomplished in the past." *Roberts v. Stevens*, 389 So. 2d 782, 785 (La. Ct. App. 1980). In certain circumstances, courts have also afforded specific rights to those who remember the deceased, such as entering the land to visit gravesites and to maintain the appearance of the burial ground. *See Estate of Harding*, 878 A.2d at 205 (discussing the

---

Additionally, we do not suggest that a court of equity should readily or haphazardly articulate new principles of the law. Like all developments to the common law, courts should ensure that their efforts are careful and gradual. Our prior cases have not covered all of the subjects discussed in the out-of-state cases cited here. Our citation of these cases should not be read to suggest how a circuit court should rule when asked to provide a remedy under the common law of burial places that has been applied elsewhere, but which has not been the subject of a case in Maryland. *See also* note 41 below. In addition, courts must be cognizant of any constitutional provisions or statutes that may constrain their ability to provide equitable relief. Courts also should consider the relevant interests and opinions before rendering their decisions. For example, the Real Property Article requires that owners of burial sites, where the majority of interred persons have been buried for over 50 years, consult "the Director of the Maryland Historical Trust about the proper treatment of markers, human remains, and the environment surrounding the burial site[,]" but provides that the director's advice is "not binding[.]" Md. Code, Real Prop. ("RP") § 14-121.1(b), (c) (2023 Repl. Vol.). In appropriate cases, when advice such as this is available, we expect that a circuit court would consider it.

50

rights of "ingress, egress, and the ability to maintain the area around the grave in a traditional manner"); *Hines*, 149 S.W. at 1059 ("[The descendants] also have the right to visit the cemetery for the purpose of repairing, beautifying, and protecting the graves and grounds around the same[.]"). And even after a burial ground is abandoned, if disinterment is appropriate,[36] a court of equity has power to ensure that disinterment and removal of human remains is performed reasonably according to the preferences of the persons interested. *See Partridge v. First Independent Church of Balt.*, 39 Md. 631, 637-38 (1874) (noting the right to remove human remains when a ground "cease[s] to be a place of burial" and that the right includes "removing the bodies and monuments to some other place of [a certificate holder's] own selection, or that, on his failing to do so, such removal should be made by others" (quoting *Appeal of Kincaid*, 66 Pa. at 421)); *cf. Walser v. Resthaven Mem. Gardens, Inc.*, 98 Md. App. 371, 382 (1993) ("[T]he ability of equity to resolve disputes as to contemplated disinterments ha[s] clearly been recognized in Maryland."). Additionally, when the circumstances counsel against an all-or-nothing result in protecting a burial ground, courts can use the common law of burial places to fashion nuanced relief

---

[36] Although some cases suggest that disinterment is always required for a burial ground to be abandoned, others recognize that it is not always practicable or possible to disinter human remains. *See, e.g.*, *Wilson v. Read*, 68 A. 37, 38-39 (N.H. 1907) (refusing to disinter human remains because the remains had disintegrated to the point where disinterment was not possible).

that appropriately balances the relevant interests, consistent with applicable constitutional and statutory provisions.[37]

Indeed, in a case that bears some similarities to the dispute here, at the request of a landowning party, a court of equity in Georgia went so far as to judicially supervise the construction of a highway expansion on land containing a disused burial ground.[38] *See Birdine v. Moreland*, 579 F. Supp. 412, 413 (N.D. Ga. 1983) (discussing the case); *Robinson v. Department of Transp.*, 364 S.E.2d 884, 884-85 (Ga. Ct. App. 1988) (same).

---

[37] If a property owner responds to a claim for relief under the common law of burial places by asserting that awarding relief would constitute a judicial taking in violation of the Fifth Amendment, the circuit court should consider and address that argument. We note that the United States Supreme Court has not decided whether "judicial takings" claims are cognizable under the Fifth Amendment. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702 (2010); *see also Petro-Hunt, L.L.C. v. United States*, 126 Fed. Cl. 367, 378-79 (Fed. Cl. 2016) (discussing the opinions of several Justices in *Stop the Beach*); Kenneth A. Stahl, *The Trespass/Nuisance Divide and the Law of Easements*, 86 Geo. Wash. L. Rev. 966, 1006-08 (2018) (noting that a plurality in *Stop the Beach* was of the view that a judicial taking could occur when a court alters the common law to eliminate an established property right, and questioning the "coherence" of the plurality's proposed test); *see generally* Barton H. Thompson, Jr., *Judicial Takings*, 76 Va. L. Rev. 1449 (1990). Nothing in this opinion should be construed as in any way endorsing unconstitutional takings of private property.

[38] The court was the Superior Court for Fulton County. In 1887, by statute, Georgia eliminated the distinction between law and equity, allowing its superior courts to "settle in one suit" both legal and equitable controversies. *See Moore v. Robinson*, 55 S.E.2d 711, 719 (Ga. 1949) (citing Georgia's Uniform Procedure Act of 1887, 1887 Ga. Laws p.64). The superior court determined that it "must balance the equities of the need for the public improvement with the need to preserve the dignity of the memory of the ancestors of those persons, loved ones and heirs who have an interest in these proceedings[.]" First Order and Decree of Judicial Supervision Relative to Graves and Human Remains on Condemned Property at 3, *Ga. Department of Transp. v. 4.414 Acres of Land*, No. C-74635 (Supr. Ct. Fulton Cnty., Ga. Mar. 10, 1982) ("Fulton County Order"). Accordingly, the court exercised "judicial supervision relative to the recognition of burial rights and of the remains of those persons who were buried in [the] cemetery site." *Id.*

The burial ground, which was once known as Gilbert Cemetery, contained the bodies of several individuals, including enslaved persons, who were buried beginning in the 1800s and continuing through the mid-1900s. *Birdine*, 579 F. Supp. at 413; *Robinson*, 364 S.E.2d at 885. By the 1980s, around the time of the planned highway expansion, the burial ground had been desecrated, erased, and largely forgotten, and various buildings including a "motel, a restaurant, [and] repair shops" had been erected on portions of the land. *Robinson*, 364 S.E.2d at 884-85. After the Georgia Department of Transportation acquired the land through condemnation, it discovered evidence of a burial ground and brought the issue to the attention of a court of equity. That court, the Superior Court for Fulton County, then held multiple hearings and made several rulings.

Among other things, the court determined that the Georgia Department of Transportation had "fee simple title" to the land, unencumbered by any restrictions, because it had successfully condemned the land. However, because efforts to memorialize the burial ground could coexist with the planned highway expansion (which would only require a "portion" of the land), and because "no good purpose" would be served by further excavating the burial ground, the court ultimately entered an order allowing for a "landscape plan" and a "suitable memorial" to be established. *See* First Order and Decree of Judicial Supervision Relative to Graves and Human Remains on Condemned Property at 2-5, *Georgia Department of Transp. v. 4.414 Acres of Land*, No. C-74635 (Supr. Ct. Fulton Cnty., Ga. Mar. 10, 1982). It also ordered, among other things, that the planned highway construction could proceed in the interim, subject to the condition that there be

"no excavations" in a particular portion of the property where the burial ground was likely

to exist. *Id.* at 6.[39,40]

In sum, although the common law of burial places is not always easy to discern and

apply, it nevertheless provides the appropriate framework to adjudicate disputes over burial

grounds that are not governed by statute.[41] As we explain in more detail below, even if the

---

[39] The court made one exception to its ruling regarding excavation, directing that

> the Department of Transportation accompany [a descendant of someone who had been buried at the site] to the property … and mark the location where [the descendent] states that her ancestor is buried, and the Department shall, by appropriate means, with the assistance of a licensed funeral director, excavate at the site located by [the descendent] and attempt to locate the remains of … [the] ancestor and relocate any remains [to another specified cemetery]. Expenses of this are to be borne by the Department of Transportation, and the Department will attempt to choose a time suitable to [the descendent] so that she can be present during the disinterment and reinterment.

Fulton County Order at 4.

[40] Our discussion of the Gilbert Cemetery case as an example of how the common law of burial places has been employed in other jurisdictions does not suggest that a Maryland court would or should apply that law in the same manner. Whether it would be appropriate to do so is not before us. We note that Maryland's condemnation statute provides for compensation if human remains must be disinterred as a "reasonably necessary consequence of condemnation[.]" RP § 12-112(a).

[41] As Justice Watts notes in her dissenting opinion, our discussion of the common law of burial places leaves room for argument about how the law should apply to resolve burial ground disputes in Maryland – including the dispute over Moses Cemetery. *See* Dissenting Op. of Watts, J., at 3. Although we have discussed the approaches of other state courts and the guidance contained in secondary sources, these authorities do not necessarily state the law in Maryland. The task of charting the course of our law and applying it to specific factual disputes falls in the first instance to our circuit courts. These courts are

Coalition were correct that the procedure in BR § 5-505 is mandatory, when compared to the common law of burial places it would provide only narrow and less flexible relief.[42] In any event, because there is an existing legal framework by which to seek ordinary relief to protect burial grounds like Moses Cemetery, extraordinary relief in the form of a writ of mandamus is not available. *See Wilson v. Simms*, 380 Md. at 217 (a writ of mandamus will only issue "where the law has established no specific remedy, and where in justice and

---

closest to the facts, they hear from the interested persons, and they will have a strong sense of the equities, which they can draw upon to fashion appropriate remedies. As we mentioned above, the common law of burial places embraces flexible equitable principles that can evolve in response to novel facts. Specific applications (and evolutions) of these principles generally should work their way through our courts before we opine on them.

[42] The criminal laws generally prohibiting removing and destroying buried human remains and funerary objects, CR §§ 10-402, 10-403, 10-404, in conjunction with certain statutory provisions that relate to a few of the rights we have discussed, *see* RP § 14-121 (allowing interested persons to request access to a burial site, providing suggested language for an access agreement, and discussing liability under such an agreement); RP § 14-122 (allowing counties and municipal governments to take certain actions to maintain burial sites), do not show that the General Assembly has dealt with the entire subject matter. Indeed, the General Assembly has not addressed several potential issues discussed in the common law that likely could recur with respect to burial grounds in Maryland. For instance, and particularly with respect to historic family burial grounds and informal, nominal-fee cemeteries, it appears that the General Assembly has not spoken at all with respect to, among other things: what rights of interment exist (if any) in burial grounds where lots have not been sold and documented; whether, and under what circumstances, burials can continue at an active family burial ground or other informal burial site with unused plots; whether, and under what circumstances, a landowner can buy land containing a burial ground and develop it or put it to different uses; whether, and how, disinterment must occur if a landowner seeks to change the use of burial ground land against the wishes of the surviving families of the deceased; what rights, if any, interested persons might have to seek to disinter the remains of loved ones (and to oversee that process) if land is later put to non-burial uses against their wishes; whether a landowner can seek to have a burial ground declared abandoned; and what criteria can be considered in determining whether a burial ground is abandoned.

good government there ought to be one"); *Priester*, 232 Md. App. at 187-88 n.8 (a writ of mandamus will not issue where there is "any ordinary adequate legal remedy") (quoting *George's Creek Coal & Iron Co.*, 59 Md. at 259).[43]

### B. An Extraordinary Writ Is Also Unavailable Because BR § 5-505 Provides an Optional Mechanism for Parties to Remove Certain Restrictions on Land Use and to Quiet Title.

The second problem with the Coalition's position is that it misunderstands the purpose and effect of BR § 5-505. The Coalition argues that BR § 5-505 sets forth a mandatory procedure "intended to protect the sanctity of the dead[.]" Although BR § 5-505 provides that a seller of a burial ground "may" bring an action for "a judgment for sale of a burial ground for another purpose[,]" the Coalition contends that the statute should be interpreted to require that such an action be brought before any sale can occur. According to the Coalition, BR § 5-505 provides only statutory permission to seek to sell a burial ground in certain circumstances, and such permission should be understood against a general background prohibition on selling a burial ground without court approval, at least when the transacting parties contemplate that the burial ground will be used for another

---

[43] The availability of ordinary relief is an independent and sufficient ground to deny mandamus relief, and so is central to the issue here. However, the appropriate amount of detail to provide at this stage is subject to fair debate. Our colleagues in dissent have asserted both that we have said too much about the common law of burial places and not enough. *Compare* Concurring and Dissenting Op. of Booth, J., at 1, *with* Dissenting Op. of Watts, J., at 1-2. Our approach has been to provide sufficient detail to show that there is an existing legal framework under which the Coalition may seek relief, thus rendering mandamus relief unavailable, and to point circuit courts to cases they may wish to consult if and when the need arises, while at the same time avoiding opining on questions not before us.

purpose after the sale. The Coalition further asserts that BR § 5-505 should be interpreted as a mandatory "public interest" statute and read in light of "its predecessor statutes and cases such as *Beatty v. Kurtz*[.]" Arguing that the history, context, and purpose of BR § 5-505 must be considered, the Coalition urges that the circuit court was correct that HOC was required to file a BR § 5-505 action.

In our view, however, after considering the language, history, context, and purpose of BR § 5-505, the statute provides only an optional mechanism to sell a burial ground for another purpose. The statute was not designed to overcome an otherwise always-applicable bar to selling a burial ground for another purpose; there was no such general bar. Rather, it was designed, in appropriate circumstances, to make selling a burial ground for another purpose easier and more commonplace. BR § 5-505 thus operates separately from the common law of burial places. Nevertheless, the statute is wholly consistent with the common law, and indeed it appears that, in drafting it, the General Assembly codified some of the common law's protections.

1. Relevant Principles of Statutory Interpretation

"The goal of statutory construction is to discern and carry out the intent" of the General Assembly. *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (citation omitted). We discern legislative intent not by considering text in isolation, but instead by viewing it "within the context of the statutory scheme to which it belongs." *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021). Our review is holistic, "seeking to give

57

effect to all of what the General Assembly included and not to add anything that the General Assembly omitted." *Westminster Mgmt.*, 486 Md. at 644.

Generally, as the Appellate Court noted, the word "may" in a statute "connotes permission or authorization[,]" whereas "the term 'shall' in a statute indicates the legislative intent that the statute be mandatory." *Adebayo*, 258 Md. App. at 164-65.

Of course, a statute providing authorization or permission can sometimes have a limiting effect. For instance, where a statute authorizes a particular way of taking an action, that authorization can imply that other ways of taking the same action are not allowed. *Roselle Park Trust Co. v. Ward Banking Corp.*, 177 Md. 212, 220 (1939) ("A statute that directs a thing to be done in a particular manner ordinarily implies that it shall not be done otherwise."). This can also occur when the action would be generally prohibited, absent some express statutory authorization. *See Office and Pro. Emps. Int'l Union, Local 2 (AFL-CIO) v. Mass Transit Admin.*, 295 Md. 88, 96-97 (1982). Likewise, in certain limited contexts, this Court has interpreted the word "may" in statutes designed to protect the public from harm as mandatory. *See, e.g.*, *State v. Knowles*, 90 Md. 646, 653, 655-56 (1900) (interpreting dental licensing language to require an examination when it read as follows: "[a]ny person twenty one years of age, who ... holds a diploma ... in dental surgery ... and who is desirous of practicing dentistry in this State, *may* be examined by said board ... and after passing an examination ... a certificate shall be issued to such person") (emphasis added). This interpretation, however, is context-specific and an exception to the general rule.

After we review the text of a statute, if we determine that the statute is unambiguous – *i.e.*, that the words of the statute are not susceptible of more than one reasonable interpretation, either alone or when read as part of the larger statutory scheme – then our inquiry usually ceases and we "apply the statute as written." *Williams v. Morgan State Univ.*, 484 Md. 534, 546 (2023) (cleaned up); *see also Bennett v. Harford Cnty.*, 485 Md. 461, 485-86 (2023) (describing how ambiguity can arise). However, even when statutory language is unambiguous, it can be useful to review the legislative history and historical context to confirm our interpretation or to "eliminate another version of legislative intent alleged to be latent in the language." *See Blackstone v. Sharma*, 461 Md. 87, 113 (2018); *see also Williams*, 484 Md. at 555 ("Although we conclude that the text of the [statute] is unambiguous, we note that our interpretation … is consistent with the Act's purpose and historical context."). And if we determine that the statute is ambiguous, we "resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Bennett*, 485 Md. at 486 (cleaned up).

Ultimately, regardless of whether we find statutory language ambiguous, we must arrive at "a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Comptroller v. FC-GEN Operations Investments LLC*, 482 Md. 343, 380 (2022) (cleaned up). When possible, we also interpret statutes consistently with the common law. Put another way, when the General Assembly's intent "is unclear with regard to abrogation, we will interpret the statute to be congruent with the common law." *Antonio*

59

*v. SSA Sec., Inc.*, 442 Md. 67, 74 (2015). "[This] rule of construction seeks to limit judicial hair-splitting and reading acts of the Legislature as changing the common law when the Legislature had no such intention. In theory, it might also cause legislatures to announce clearly when it is their intent to abrogate the common law." *Id.* at 74 n.7.

2. <u>The Language of BR § 5-505 Shows That the Statute Provides an Optional Procedure to Sell a Burial Ground for Another Purpose.</u>

Bearing these principles in mind, we turn first to the relevant statutory language. BR § 5-505 provides that an action "may" be brought to obtain a "judgment for sale of a burial ground for another purpose":

(a) An action may be brought in accordance with the Maryland Rules and a court may pass a judgment for sale of a burial ground for another purpose if:

(1) the ground has been dedicated and used for burial;

(2) burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots;

(3) the ground has ceased to be used for burial; and

(4) it is desirable to dispose of the burial ground for another purpose.

(b) If the court is satisfied that it is expedient or would be in the interest of the parties to sell the burial ground, the court:

(1) may pass a judgment for the sale of the burial ground on the terms and notice the court sets;

(2) shall order that as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains; and

(3) shall distribute the remaining proceeds of the sale among the parties according to their interests.

(c) A judgment for the sale of a burial ground passes to the buyer of the burial ground the title to the burial ground free of the claims of:

(1) the owners of the burial ground; and

(2) the holders of burial lots.

Considering this language, we do not perceive any relevant ambiguity in BR § 5-505. The word "may" in BR § 5-505(a) connotes an optional mechanism by which to obtain a *judgment* for sale of a burial ground "for another purpose[,]" not the sole mechanism by which to *sell* a burial ground. No other language in the statute undercuts that interpretation. To be sure, the subsection also includes some requirements and restrictions: if a party wants to bring an action, the action must be brought "in accordance with the Maryland Rules[,]" and it can only be brought if, among other things, lots were sold at the burial ground in question and certificates or deeds were issued to buyers. *Id.* § 5-505(a). However, these restrictions do not control whether a burial ground may be sold for another purpose; they control whether (and how) an action may be brought to obtain a judgment for selling a burial ground for another purpose – a judgment that, among other things, cuts off any claims of the owners of the burial ground and the holders of the burial lots. *Id.* § 5-505(c).

We also see nothing in the language to indicate that the statute is intended to abrogate the common law of burial places in Maryland. The statute does not reference the common law, nor does its language suggest that it is generally intended to be the sole means of resolving an aspect of disputes concerning burial grounds. Instead, it appears to provide a procedure for selling certain burial grounds, along with certain protections (including

61

notice and providing funds to disinter and move human remains) that apply when its procedure is invoked.

3. The History and Historical Context of BR § 5-505 Confirms This Interpretation.

Having concluded that the unambiguous language of BR § 5-505 provides only an optional procedure that does not abrogate the common law, our inquiry could end.[44] However, a review of the legislative history and historical context of the statute confirms our understanding of its intent.

Although this statute has been in effect, in one version or another, for over 150 years, there is little legislative history to shed more light on the meaning of the statutory language. The original version of the statute was enacted in 1868. In its original form, the statute shared several features of the current enactment. It allowed a party to file suit to sell certain grounds that had been "dedicated and used for the purposes of burial[,]" so long as the ground was no longer used for burial and the court found that it was "necessary" and "would be for the interest and advantage of the parties interested that the ground should be

---

[44] In its opinion, the Appellate Court also discussed at length the meaning of "for another purpose" in BR § 5-505(a), concluding that the phrase was ambiguous because it supported two reasonable interpretations: it could refer only to the first time that a burial ground was sold for another purpose, or it could refer to each time that an existing burial ground is sold, if the transacting parties contemplate that the ground will be used (or will continue to be used) for purposes other than burial. *Adebayo*, 258 Md. App. at 161-64. However, the Appellate Court did not resolve the ambiguity. Instead, it "assum[ed], for the sake of argument" that the second interpretation was correct – *i.e.*, that "for another purpose" simply meant for a purpose other than as a burial ground, regardless of the current use of the land. *Id.* at 164. Because we conclude that BR § 5-505 provides an optional mechanism to obtain a judgment, we do not need to consider whether "for another purpose" is ambiguous and, if so, to determine precisely when a sale falls within that language.

sold[.]" 1868 Md. Laws 368-69, Ch. 211.[45] Like it does today, the 1868 statute only applied

to burial grounds "in which lots have been sold and deeds executed or certificates issued

to the purchasers of such lots[.]" *Id.*

Cases from this time, however, shed light on the statute – both as to what it did, and

what it did not do. In *Rayner v. Nugent*, 60 Md. 515, 520 (1883), this Court considered a

---

[45] The operative text of the 1868 statute provided:

[U]pon any bill being filed for the sale of any ground dedicated and used for the purposes of burial in which lots have been sold and deeds executed or certificates issued to the purchasers of such lots, provided such lots shall be no longer used for burial purposes, the court may order notice to be given by publication in one or more newspapers published in the city or county in which the ground to be sold may be situated, stating the substance and object of the said bill, and containing the names of the original lotholders or their assignees if known, warning all the lotholders, whether they be residents or non-residents, adults or infants to appear on or before a day fixed in such order and show cause why the relief prayed should not be granted, and such notice shall be published as the court may direct, not less however than once a week for four successive weeks, two months before the day fixed by such order for the appearance of the parties, and if such lotholders shall not appear at the time stated in such notice a commission to take testimony may be issued by the complainant *ex parte*. That after the return of such commission the court, upon being satisfied from the testimony, that it is necessary and would be for the interest and advantage of the parties interested that the ground should be sold, may forthwith pass a decree for the sale of the same upon such terms as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests as the same shall be shown to the court. That a decree passed in a proceeding for the sale of a burial ground shall be valid to pass the title to the purchaser or purchasers of the same or any part thereof free, clear and discharged of and from the claims of the corporation or trustees who may hold the same for the purposes aforesaid, their successors or assigns and of all persons an [sic] interest as lotholders in such ground whether they are entitled as original lotholders and whether they be residents or non-residents, adults or infants.

1868 Md. Laws 368-69, Ch. 211.

"private" sale of a burial ground that was "not made under ... the Act of 1868, ch. 211" (*i.e.*, the predecessor to BR § 5-505). The land at issue originally had been acquired by a religious corporation "in fee, and without any declaration of use or trust whatever" and was used as a burial ground in which lots were sold and certificates were issued. *Id.* at 517-18. Because there was no language in the deed to the corporation creating a trust, a restrictive covenant, or otherwise limiting the corporation's use of the property, the corporation was free to "abandon the use of the ground as a cemetery and to dispose of it."[46] *See id.* at 517-18. To do so, the corporation paid back the lot holders who could be located and those lot holders "re-interred their own dead elsewhere." *Id.* at 518. The corporation re-interred the remaining bodies itself in another cemetery and sold the burial ground without paying back the lot holders connected to those remains and whose certificates, therefore, remained "outstanding." *Id.* The land was conveyed again, and eventually the new purchaser took exception, complaining that "title [was] clouded and unmarketable" because the sale to him "was not made under the Act of Assembly relating to the sale of burial grounds, and [the] lot-holders would have the right to assert their claim against [him][.]" *Id.* at 516-17. That

---

[46] The original conveyance to the religious corporation occurred in 1828. At that time, under the Mortmain provision of the Maryland Declaration of Rights, the conveyance presumably would have been deemed void unless the General Assembly had provided express authorization, because the deed contained no restriction on using the property. *See, e.g.*, *Trustees of Zion Church of City of Balt. v. Hilken*, 84 Md. 170, 171-72 (1896). The *Rayner* opinion did not discuss this (possibly because no party raised the issue), but regardless, the religious corporation did not attempt to sell the land until 1867, *Rayner*, 60 Md. at 518, and by that time the religious corporation likely would have acquired title anyway through adverse possession. *See, e.g.*, *Rydzewski v. Vestry of Grace and St. Peter's Church*, 145 Md. 531, 535 (1924).

is, they might still enjoy "the right of burial" or could otherwise "defeat or qualify the estate[.]" *Id.* at 518.

This Court rejected those arguments, reasoning that regardless of whether the remaining lot holders might have some claim against the religious corporation for abandoning the burial ground, their rights as to the land itself ceased once the religious corporation abandoned the land (in compliance with its governing corporate documents) and removed the bodies. *Id.* at 519-20. In reaching this conclusion, the Court made two comments about BR § 5-505's predecessor: the statute "furnished additional facilities for parties interested in abandoned burial grounds to procure a sale of the same[,]" and "it in no wise conflict[ed] with the established doctrine relating to rights of burial in the cemeteries of religious bodies derived from certificates similar to that in the present case and their liability to extinguishment[.]" *Id.* at 520.

These comments were consistent with this Court's language in an earlier decision, in which it likewise distinguished a sale of a burial ground under the statute from other types of possible sales. *See Partridge*, 39 Md. at 639 (distinguishing the sale in the case before it, which was made under "the Act," and which therefore had required a showing that a sale of the burial ground was "necessary," from a hypothetical sale where the "cemetery had been sold simply from motives of gain or convenience to the church

corporation" and suggesting that, in the latter type of sale, the lot holders might be able to seek compensation for monuments placed on their burial lots).[47]

In another case decided around the same time, this Court considered an attempt to invoke the predecessor to BR § 5-505, and it had occasion to discuss the effect of the statute. *See Reed v. Stouffer*, 56 Md. 236, 248 (1881). Like *Rayner*, *Reed* involved land that had been deeded to a religious society. But unlike *Rayner*, in *Reed* there were restrictions in the chain of title. Specifically, the deed required, among other things, that the land "be used as a burial ground or place of deposit for the remains of the members of the Society of German Baptists" and "for no other use, intent or purpose whatever." *Id.* At the time, the original 1868 version of BR § 5-505 was still in effect, meaning that the court could not issue a decree of sale unless it found that doing so was "necessary" and "would be for the interest and advantage of the parties interested[.]" *Id.* at 251-52. This Court concluded that "the proof [did] not come up to" the "necessary" standard because, among other things, only two witnesses had testified in favor, and neither had stated that it was necessary to sell the burial ground. *Id.* at 252-53. In the absence of a decree of sale issued under the statute, this Court remarked that *the restrictive language in the deed controlled*, meaning that the land could not be sold for another purpose. *See id.* at 253 ("The deed of 1808 in express terms ... [conveys the property] *for the particular purposes set forth ... and for no*

---

[47] Indeed, contrary to the Coalition's argument that there is a general prohibition on selling a burial ground without court approval, courts articulating the common law of burial places outside of Maryland have also referenced sales and other conveyances of burial grounds that have been made without court approval. *See, e.g.*, *Hines*, 149 S.W. at 1059 (noting that "various conveyances" of land containing a burial ground had occurred).

*other purpose*, and the grantees by their acceptance of that deed, are bound by that intention.") (emphasis added). Accordingly, this Court reasoned that the land "must be held and used in strict conformity to the terms of the deed by which it was conveyed, and for the uses therein specially declared." *Id.* at 254. And under traditional property law principles, this meant that a violation of the terms of the deed would cause the land to revert to the heirs of the grantor. *See id.* ("Should it be diverted from those uses, the terms of the deed ... would be violated, and the heirs of [the grantor] would immediately become re-invested with the title to the lot."); *see also Manning*, 72 Md. at 128 (explaining that, in *Reed*, "it was held that, inasmuch as the purposes for which the land was conveyed were particularly set forth in that deed, the property could not be sold or applied to any other use; and that any attempt ... would cause it to revert to the heirs of the original grantor").

In *Gump v. Sibley*, 79 Md. 165 (1894), this Court again discussed the function of the 1868 version of the statute, explaining that the statutory procedure removed restrictions contained in the chain of title to burial ground land. In 1840, the trustees of St. John's Church had conveyed a lot to the Archbishop of Baltimore under a deed that incorporated the requirements of an 1832 law, which allowed conveyances of land to the Archbishop where the land was to be used only as a church lot, parsonage, or burial ground. Under the law, if the land was not used for one or more of these purposes, the conveyance would be void. *See id.* at 170-71. Later, a decree of sale for the lot under the original version of BR § 5-505 was passed. This Court opined that "[t]he reasonable, just, and necessary construction of the Act of 1868 is that … it enlarged the corporate powers granted to the

67

archbishop by the Act of 1832." *Id.* at 171. That is, the decree issued under the predecessor to BR § 5-505 "removed the restriction" that had been contained in the chain of title, "put[ting] an end to the use for which the archbishop was authorized to hold the lot by the terms of the Act of 1832" and therefore enabling the purchaser to take "good title to the burial [land]" without a restriction on its use. *Id.* at 171-72.

A few years after this Court held in *Reed* that a decree of sale was not appropriate, the General Assembly amended the predecessor statute to BR § 5-505, lowering the applicable standard and removing the "necessary" language that had prevented the *Reed* sale. The 1888 version of the statute was similar to the 1868 version, but among other things, the 1888 revisions provided that a court could decree a sale if it found that it was "desirable to dispose of [the] burial ground" and that doing so was "expedient *or* would be to the interest and advantage of the parties[.]" 1888 Md. Laws 617-19, Ch. 369 (emphasis added). However, the 1888 revisions also provided additional protections when the procedure was used, helping to ensure proper treatment of the deceased and respect for the feelings of the living: "other persons in interest" (who were not lot owners) were allowed take part in proceedings, and the court was authorized to order that a portion of the sale proceeds be set aside to purchase a new "place of sepulture" and to disinter and reinter the remains of the dead.[48]

---

[48] There are only a few substantive differences between the 1888 version of the statute and BR § 5-505 today. Among other things, unlike BR § 5-505 today, the 1888 statute did not require the court to order funds to be set aside to pay for procuring a new

burial site and relocating any human remains, and it provided specific requirements for the type of notice to be provided to interested persons. The operative text of the statute, as amended in 1888, provided:

> [I]n any case in which a burial ground has ceased to be used for burial purposes, and the said ground has been dedicated and used for burial purposes, and lots have been sold therein, and deeds executed or certificates issued to purchasers thereof, and it shall be considered desirable to dispose of said burial ground for other purposes, upon a bill being filed in any of the circuit courts of the state, in equity, in the city or county in which said burial ground is situated, setting forth the aforegoing facts, and containing the names of the lot owners or their assignees so far as known, the court shall order notice by publication in one or more newspapers published in the county or city where such burial ground is situated, warning all the lot holders or other persons in interest, residents or non-residents, adults or infants, to appear in court on or before the day fixed in said notice, to show cause why the relief prayed for should not be granted; and said notice shall be such as the court may direct, not less, however, than once a week for four successive weeks two months before the day fixed by such order for the appearance of the parties; and upon a failure of appearance by any of said lot owners, or any party in interest by the time limited in said notice, the court may order testimony to be taken *ex parte*, according to the usual course in equity in cases of default for non-appearance, and upon testimony taken in the cause *ex parte*, or otherwise, if it is made to appear to the satisfaction of the court that it is expedient or would be to the interest and advantage of the parties concerned that the said burial ground should be sold, the court may forthwith pass a decree for the sale of said ground upon such terms and notice as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests, as the same shall be shown to the court; and before making said distribution the court may order and direct that so much and such part of said proceeds of sale, as shall be necessary for the purpose, shall be set aside and applied to the removal and burial of any dead that may lie in said burial ground, in the purchase of a lot in any cemetery, graveyard, or other appropriate place of sepulture, and in the expense of disinterment and re-interment of said dead; and any decree passed in a proceeding for a sale of a burial ground, as hereinbefore provided for, shall be valid to pass to the purchaser or purchasers of said burial ground the title of the same free, clear and discharged of, and from the claims of the corporation or trustees who may hold the same, their successors or assigns,

The statute then remained unchanged for over a half-century, until it was revised slightly in 1962. In this revision, the detailed procedural requirements about where to file an action and how a court must provide notice of the action were removed. In their place, the General Assembly provided that these procedural requirements would be specified in the Maryland Rules: "an action for sale of said ground may be commenced in accordance with the Maryland Rules." 1962 Md. Laws 114, Ch. 36. The statute was not otherwise changed.

To provide procedural requirements for actions under BR § 5-505 and its predecessors, former rules J70-J73 were adopted. *See* Md. Rules J70-73 (1962), *superseded by* Md. Rule 14-401 (1997). Today, those rules have been revised and combined into Maryland Rule 14-401, which provides that an action under BR § 5-505 shall be brought in any county in which a part of the burial ground at issue is located. Md. Rule 14-401(a). The rule also sets out, among other things, the required contents of the complaint.[49] Md. Rule 14-401(b).

---

and of all persons in interest as lot holders in such ground, whether they are entitled as original lot holders, and whether they be residents or non-residents, adults or infants.

1888 Md. Laws 617-19, Ch. 369.

[49] It appears that the Standing Committee on Rules of Practice and Procedure (the "Rules Committee") has consistently viewed these rules as procedural in nature. In 1959 – a few years before the 1962 revisions to the statute that removed certain procedural requirements and referenced the Maryland Rules – the Rules Committee approved a report "that there should be a rule to provide for the procedural aspects of Art. 16, § 119 (Sale of

Finally, in 1992, the statute was revised into its current form and codified in the Business Regulation Article. The revisor's note to the 1992 statute explains that the new language was derived without substantive change from the former statute. 1992 Md. Laws 165, Ch. 4.[50]

This history and context support our interpretation that BR § 5-505 provides an optional mechanism to sell certain burial grounds for other purposes.[51] This interpretation

---

Burial Grounds)" and directed the subcommittee chairman "to submit ... a draft of such a rule." Meeting Minutes, Standing Committee on Rules of Practice and Procedure, at 6 (Feb. 27, 1959). The rules became effective in 1962. *See* Md. Rules J70-73 (1962), *superseded by* Md. Rule 14-401 (1997). Later, in 1984, the Chairman of the Property Subcommittee "noted that the ... burial ground rules are essentially procedural in nature, unlike some of the other special proceeding rules that cover substantive issues." Meeting Minutes, Standing Committee on Rules of Practice and Procedure, at 15, 65 (Sept. 14/15, 1984). The timing of adopting the rules coincides with deleting the statutory procedural requirements. The rules also cover much of the same content as the former statutory language. This further suggests that the rules are procedural.

[50] In 1992, the revised statute became BR § 5-501. The statute was renumbered as § 5-505 in 1997.

[51] In a case decided after the 1992 revisions, we stated in *dicta* that, in BR § 5-505, the General Assembly "has also provided for, and perhaps requires, a court judgment prior to the sale of a burial ground." *Hickman ex rel. Hickman v. Carven*, 366 Md. 362, 371 (2001). Although a court judgment under BR § 5-505 will sometimes be needed to sell certain burial grounds, *see, e.g.*, *Gump*, 79 Md. at 165 (decree of sale bypassed restrictions in a deed and restrictions in the charter provided by the General Assembly), we disavow the language in *Hickman* to the extent it suggests that the General Assembly may have intended BR § 5-505 to set forth a general, mandatory procedure for selling a burial ground. For one thing, not all burial grounds are subject to restrictions based on the chain of title. In addition, the procedure in BR § 5-505 is not the exclusive means of removing restrictions in a chain of title to land containing a burial ground. *See Dumbarton*, 434 Md. at 62 (explaining that a restrictive covenant restricting "the use of the Development Parcel for any purpose other than a cemetery" could be removed by showing that "the continuing

71

is not illogical or absurd. Legal ownership and use of many burial ground lands was historically complex: lot holders and their heirs may have had certain rights to or interests in the land,[52] many large burial grounds had legal restrictions (of various forms and effect) in their chains of title, and multiple ownership interests could be created with respect to the same burial ground land – including possibilities of reverter or forfeiture that could be held in the distant heirs of the original grantors. It makes sense that the General Assembly would create a mechanism to bypass certain property law restrictions that cities had outgrown,[53]

_____

validity of the covenant cannot further the purpose for which it was formed in light of changed relevant circumstances[,]" but holding that such a showing was not made) (cleaned up); *see also* RP §§ 6-101, 6-102 (establishing, in 1974, limits on certain reversionary interests).

[52] Although deeds and certificates to burial plots typically were held to grant only licenses to make interments, courts have noted that this was not always the case, and that sometimes these deeds and certificates could present difficult questions about ownership interests in the land itself. *See, e.g.*, *In re Brick Presbyterian Church's Pet.*, 3 Edw. Ch. 155, 164 (N.Y. Ch. 1837) ("The great question, with respect to these [deeds to vaults] is: what rights do they confer? Do they confer a mere right of interment ... or is it a right to the land – an estate or interest in the land itself ...? This is a question not entirely free from difficulty."). If a given deed or certificate created an interest in land, those interests could also be terminated and compensated as part of a judgment under BR § 5-505 and its predecessors. *See Partridge*, 39 Md. at 639 (noting that the predecessor to BR § 5-505 directs that sale proceeds be used to compensate "interest[s] in the land sold" and that "[t]he most that the lot-holders [here] could claim to receive is the price paid by them for the license. [But if] their interest was in the estate, then they would be entitled to distribution according to that interest[.]").

[53] Indeed, the statutory language – originally allowing burial grounds to be sold "for other purposes[,]" and later "for another purpose" – appears to closely track and respond to common language in the conveyances of the time that restricted land use. Often, deeds created land use restrictions by specifying the "purpose" to which land could be put and stating that no other purposes were permitted. *See, e.g.*, *Sapper v. Mathers*, 133 A. 565,

72

clear title to the land, and ultimately allow the land to be put to other uses. Thus, the

procedure within BR § 5-505 is historically significant, and it served an important function.

However, it was (and continues to be) an optional procedure to clear title and move remains

from a property that will no longer be used as a burial ground to another that will.[54]

565 (Pa. 1926) (deed "for no other purpose whatsoever than a cemetery or burial ground"); *Reed*, 56 Md. at 248 (deed for "burial ground" and "for no other use, intent or purpose whatever"); *Herbert v. Pue*, 72 Md. 307, 310 (1890) (deed reserving "grave-yard, but for no other uses or purposes whatsoever"). In this context, a conveyance or sale for "other purpose" or "another purpose" could refer to more than the subjective intent of the parties about how the land would be used after it was sold; it may well refer to land use restrictions for a limited "purpose" in the chain of title that were common in Maryland in the nineteenth century, and to eliminating those restrictions so that the land may be conveyed in fee simple and used for any purpose. *See generally Reed*, 56 Md. at 253 (noting that, absent a judgment under the predecessor to BR § 5-505, a conveyance of land "for the particular purposes set forth in the deed, and for no other purpose" meant that there was no right "to have the lot in question sold" and "divert it from those uses").

[54] Our colleagues in dissent point to the views of twentieth and twenty-first century policymakers and nongovernmental organizations, some of whom seem to understand BR § 5-505 as requiring a party who wishes to sell a qualifying burial ground to first seek court approval. *See* Dissenting Op. of Watts, J., at 19-22; Dissenting Op. of Hotten, J., at 17-18 n.9. We see no indication that these policymakers and organizations have considered the history and context of BR § 5-505 that we have discussed here, including the development of the common law of burial places. This observation in no way should be construed as criticism. The common law of burial places has never been widely known, and seems to have become even less well known over the course of the century-and-a-half that BR § 5-505 and its predecessors have been in existence.

We also respectfully disagree with Justice Watts's suggestion that the current codification of BR § 5-505 in the "Cemeteries" title of the Business Regulation Article, which includes a number of mandatory statutes, means that BR § 5-505 is also mandatory. *See* Dissenting Op. of Watts, J., at 5. Unlike BR § 5-505 (and BR § 5-506, a statute similar to § 5-505 that applies in Baltimore City), the other statutory provisions in that title refer to "cemeteries" or a "cemetery," a defined term in BR § 5-101(d). The phrase "burial ground" is not included in the definitions section of the title, nor does it appear in any of

73

In that same vein, when the General Assembly provided for an optional action in BR § 5-505, it did not supplant the common law of burial places; it simply ameliorated the effects of the *property law* principles that tied up burial grounds and prevented expanding cities from using the land. We see nothing in BR § 5-505 or its history to indicate that the General Assembly intended to abrogate the common law of burial places or remove its protections. Even though the statute was designed to provide "additional facilities" for selling burial grounds – and thus to make it easier to do so – the General Assembly nevertheless imported some of the protections that the common law of burial places provided, ensuring that these protections would continue to apply even when the statutory mechanism was used. That is, interested persons would be able to present their views to the court; the court would weigh the interests of the deceased and the needs of the living; and the court would be able to determine whether moving the burial ground was "desirable" – refusing to enter a judgment if it was not. BR § 5-505. And even if a sale was desirable and a judgment was entered, the court would still be able to set terms for the sale and ensure

the other statutory provisions. This makes sense because BR § 5-505 is derived from a statute that long predates the "Cemeteries" title and its mandatory provisions. Additionally, most of the title's mandatory provisions are designed to regulate today's crematories and commercial cemetery companies, rather than other types of burial grounds. *See* BR § 5-102(a) (noting that the registration and permitting subtitles do not apply to family cemeteries that do not conduct public sales, as well as to various other burial grounds, including those operated by religious nonprofits, municipalities, and nonprofits created before 1900); *id.* § 5-602(a) (noting similar exceptions to statutory provisions concerning perpetual care cemeteries). These differences provide more than sufficient reason to interpret BR § 5-505 differently than other provisions in the Cemeteries title of relatively less ancient lineage.

not only that the various property interests were compensated, but also that funds were set aside to respectfully disinter the deceased and secure new burial lots.

The scope of BR § 5-505 and its predecessors is narrower than the common law of burial places. Among other things, the statutory mechanism is only available for certain types of burial grounds; it provides a limited choice for a court in adjudicating an action to sell a burial ground for another purpose; it applies only when a sale for another purpose is contemplated; and it does not mention the various types of rights that are protected by the common law of burial places, which a court of equity can enforce through its injunction, depending on the particular circumstances of a case. However, we do not see this as reflecting an intent to limit and displace the common law. Rather, the more natural interpretation is that BR § 5-505 was designed to address specific problems that hindered the sale of certain burial grounds, and to operate alongside the common law of burial places that would continue to apply where BR § 5-505 does not. That is, BR § 5-505 drew somewhat from the principles of the common law to protect the deceased and the feelings of the living, even while it helped to bypass certain rules of property law that tied up burial ground land.

In fact, we think the narrowness of BR § 5-505 supports the proposition that the statute was not intended to abrogate the common law. Its narrowness also undercuts the Coalition's argument that the statute sets forth a mandatory procedure. Most notably here, the statute only applies to burial grounds where "burial lots have been sold … and deeds

executed or certificates issued to buyers of the lots[.]" BR § 5-505(a)(2).[55] If we were to conclude that the General Assembly intended to abrogate the common law of burial places and install a mandatory statutory procedure in its stead by enacting BR § 5-505, we also would have to conclude that the General Assembly intended to leave other burial grounds not covered by the statute (such as family plots, free or nominal-fee public cemeteries, and probably Moses Cemetery itself) unprotected.[56] We do not think the General Assembly intended to leave some burial grounds in Maryland with no protection. Also, as stated above, the statutory procedure would only apply when a sale of land is contemplated – not when an existing landowner attempts to develop a burial ground without selling the land. *Id.* § 5-505(a). And because the supposed enforcement mechanism of the mandatory procedure would be an extraordinary writ, the procedure could at most only be enforced when a governmental or quasi-governmental actor like HOC attempts to sell a burial

---

[55] We disagree with Justice Watts's suggestion that the procedure in BR § 5-505 is available regardless of whether deeds were executed or certificates were issued for lots in a burial ground. *See* Dissenting Op. of Watts, J., at 39-40. The language of BR § 5-505(a)(2) unambiguously limits the statute's application to burial grounds where deeds were executed or certificates were issued to buyers of burial lots. Nevertheless, as discussed, a person with standing may bring a claim under the common law of burial places with respect to a burial ground that is *not* covered under BR § 5-505(a)(2).

[56] The record suggests that an action under BR § 5-505 regarding the sale of Moses Cemetery for another use likely would not be available due to the requirement stated in BR § 5-505(a)(2) (court may pass a judgment for sale of a burial ground for another purpose "if … burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots"). Only the Coalition introduced evidence on this point, and that evidence indicated that deeds were not executed and certificates were not issued for burial lots in Moses Cemetery. Although the Coalition argues that HOC has waived any argument based upon this statutory requirement, it does not assert that deeds were executed or that certificates were issued for lots in Moses Cemetery.

ground. That is, there would effectively be no remedy when a burial ground is sold and developed by private actors. Additionally, in contrast to the common law, the BR § 5-505 procedure would present a limited approach to disputes over burial grounds by envisioning only two possible outcomes: (1) rejection of the sale of the burial ground for another purpose; or (2) acceptance of the sale, on terms and notice set by the court, and disinterment of all human remains. The statute says nothing about the various possible rights and protections that can be enforced through the common law.

In short, BR § 5-505 (and its implementing rules) do not impose a duty to file an action when seeking to sell a burial ground for another purpose. It may well be prudent for a would-be seller of a qualifying burial ground to file an action under BR § 5-505 before going through with a sale of the property for another purpose. We agree with the Appellate Court that, if a seller of a qualifying burial ground does not obtain a judgment under § 5-505, "the sale can still occur, but the buyer will take the property subject to the claims of the lot holders." *Adebayo*, 258 Md. App. at 196. To put a finer point on it, if a seller of a qualifying burial ground sells such a property for another purpose without obtaining a judgment under § 5-505, interested parties remain able to bring not only any legal claims, but also their own equitable claims in circuit courts. And, perhaps more to the point here, interested parties need not wait for a burial ground to be the subject of a contract for sale to seek equitable relief in connection with an alleged desecration of the burial ground. Further, the descendants of people who were laid to rest in burial grounds where deeds

were not executed and certificates were not issued may seek equitable relief under the common law of burial places.

At oral argument, counsel for the Coalition indicated that, if this Court were to conclude that an action under BR § 5-505 is not mandatory, the Coalition would seek to amend its complaint to add other claims. Given this representation and our discussion of the potential equitable remedies available under the common law of burial places, we shall direct that this case be remanded to the circuit court so that the Coalition may seek leave to amend its complaint under Maryland Rule 2-341(b).

The obscurity of the common law of burial places and the misunderstandings in this case about its applicability have created an unusual procedural posture. Although the Coalition incorrectly sought extraordinary relief to protect Moses Cemetery, HOC never opposed that relief by asserting that ordinary relief was available. Thus, the Coalition did not amend its pleading or seek leave to amend before the circuit court ruled upon its request for mandamus relief. The circuit court then granted the Coalition's mandamus petition without anyone having mentioned the common law of burial places. If the circuit court had concluded, as we do, that extraordinary relief is unavailable to the Coalition because the Coalition may assert a claim for ordinary relief, the circuit court would have dismissed the Coalition's mandamus claim on that ground, and the Coalition would have sought to file an amended pleading stating a claim for equitable relief. By ordering a remand to allow the Coalition to seek leave to amend its complaint, we effectively are putting the parties in the place they would have been if the circuit court had been able to foresee how we would

resolve this case. In this unusual posture, our remand ensures that the parties' mutual misunderstanding about the relevant legal regime, coupled with the Coalition's success in the circuit court, does not unfairly put the Coalition in a worse procedural position than it would have been in if HOC had raised the availability of ordinary relief as a ground to oppose the grant of extraordinary relief.

We offer no criticism of the parties for failing to bring the existence of the common law of burial places to the attention of the circuit court. Nor do we fault the circuit court for not raising the common law of burial places on its own initiative. As discussed, this area of the law has never been well known among the bench and bar. Its existence seemingly has been further obscured by the passage of time.

## IV

## Conclusion

The Coalition is not entitled to extraordinary relief in the form of mandamus to compel HOC to file a BR § 5-505 action. Courts in Maryland and in other states have developed a common law of burial places that provides the appropriate framework for resolving disputes concerning burial grounds, and so extraordinary relief is not available. Indeed, in comparison to this body of common law, BR § 5-505 is a relatively narrow statute, designed to provide an optional mechanism to make it easier to sell and repurpose

certain burial grounds. HOC has no duty to file a BR § 5-505 action, and so extraordinary

relief is inappropriate on that basis as well.

This case shall be remanded to the circuit court, at which time the Coalition shall be

permitted to seek leave to amend its complaint.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH THE INSTRUCTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

Circuit Court for Montgomery County
Case No.: 486734V
Argued: January 8, 2024

IN THE SUPREME COURT
OF MARYLAND

No. 18

September Term, 2023

BETHESDA AFRICAN CEMETERY
COALITION, ET AL.

v.

HOUSING OPPORTUNITIES COMMISSION
OF MONTGOMERY COUNTY

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Concurring & Dissenting Opinion by Booth, J.

Filed: August 30, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision.

Respectfully, I concur in judgment in part and dissent in part. I would affirm the judgment of the Appellate Court of Maryland. I agree with the Majority and the Appellate Court that this case is moot. I also agree that this case falls within the recognized mootness exception of presenting a recurring matter of public concern which, unless decided, will continue to evade review. Reaching the merits, I would hold that the Coalition is not entitled to a common law writ of mandamus because Section 5-505 of the Business Regulation Article of the Maryland Code ("BR") is not mandatory. I also agree with the Majority that "the statutory mechanism is only available for certain types of burial grounds[.]" Maj. Slip. Op. at 75. By its plain terms, it only applies where "burial lots have been sold in the burial ground and deeds executed or certificates issued to the buyers of the lots[.]" BR § 5-505(a)(2).

Additionally, I agree with both the Majority and the Appellate Court that the Coalition may have remedies available under other recognized causes of action or claims. Respectfully, given that this case is moot, I am uncomfortable discussing remedies that may or may not be available in the absence of an actual case or controversy that has been decided by the circuit court and briefed on appeal. Remedies are a means of carrying out a substantive right, and they arise pursuant to a particular cause of action or claim. *See* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies: Damages, Equity, Restitution* § 1.1 (3d. ed. 2018) ("The law of judicial remedies determines the nature and scope of relief to be given to a plaintiff who has established a substantive right in court.").

Accordingly, to the extent that the Majority opinion ventures farther than I am comfortable, I respectfully dissent. As the Majority correctly observes, the General Assembly has enacted a host of Maryland statutes that apply to ensure that human remains are undisturbed and to permit their disturbance where authorized by those statutes. Where the remains are interred in a cemetery, the General Assembly has enacted detailed regulations and protections that apply to the right of interment. *See* Title 5 of the Business Regulation Article of the Maryland Code. Criminal laws prevent the disinterment of human remains and the desecration of funerary objects, *see* Md. Code Ann. Criminal Law Article ("CR") §§ 10-402, 10-403, 10-404. Where disinterment and reinterment are authorized, other statutes describe in detail the manner in which these acts must occur. *See, e.g.*, CR §§ 10-402; Md. Code Ann. Real Property Article ("RP") § 12-112.

And where human remains have been interred in a burial site on private property, in the absence of an easement or restrictive covenant, the General Assembly has codified processes for the property owner to grant access to the burial site, as well as provisions for maintenance and upkeep. *See* RP §§ 14-121, 14-121.1, and 14-122. Given that these provisions all require the property owner's agreement, they do not implicate the Fifth Amendment of the United States Constitution.

I agree with the Majority that there may be equitable remedies available to an individual with standing who seeks to disinter remains that are located in a burial site on private property in order to reinter them elsewhere where the statutory provisions do not provide complete relief. I look forward to considering these and other important legal issues when they are briefed and presented to us in another case.

2

For these reasons, I respectfully concur in that portion of the judgment that affirms the judgment of the Appellate Court of Maryland, and dissent in part.

Circuit Court for Montgomery County
Case No. 486734V

Argued: January 8, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 18

September Term, 2023

_____

BETHESDA AFRICAN CEMETERY
COALITION, ET AL.

v.

HOUSING OPPORTUNITIES COMMISSION
OF MONTGOMERY COUNTY

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: August 30, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision.

Respectfully, I dissent. I would reverse the judgment of the Appellate Court of Maryland and remand the case to that Court with instruction to affirm the judgment of the Circuit Court for Montgomery County, which concluded that the provisions of Md. Code Ann., Bus. Reg. (1992, 2015 Repl. Vol.) ("BR") § 5-505 are mandatory and that the Housing Opportunities Commission of Montgomery County ("the Commission"), Respondent, must comply with the statute for Moses Cemetery[1] to be sold for a purpose other than use as a burial ground. I disagree with the Majority's conclusion that a writ of mandamus is unavailable because of the possibility of relief under the "common law of burial places" and because the provisions of BR § 5-505 are optional. Maj. Slip Op. at 39-40, 57.

The majority opinion is like a Trojan horse; it seems more benign than it actually is. The majority opinion creates an appearance of reasonableness but reaches a harsh result. The Majority starts creating the appearance of reasonableness by discussing "the common law of burial places" and stating that it disagrees with the Appellate Court that BR § 5-505 is simply a quiet title statute. See Maj. Slip Op. at 3, 4, 37-38. The Majority indicates that, unlike the Appellate Court and the Commission, it determines that BR § 5-505 is not just a quiet title statute, but that it is also a statute that facilitates sales of burial grounds by removing certain restrictions in the chain of title. See Maj. Slip Op. at 38. In reality, these are just two ways of saying the same thing, as the whole point of a quiet title action is to

_____

[1]The burial ground is also known as Moses African Cemetery, Moses Macedonia Cemetery, Moses Cemetery on River Road, and River Road Cemetery. Like Petitioners, I will refer to it as Moses Cemetery.

perfect title, eliminate adverse claims, and thus make property easier to sell.  See Action to

Quiet Title, Black's Law Dictionary (11th ed. 2019) ("A proceeding to establish a

plaintiff's title to land by compelling the adverse claimant to establish a claim or be forever

estopped from asserting it.").  Despite purporting not to hold that BR § 5-505 is simply a

quiet title statute, the Majority's conclusion fully comports with the Appellate Court's and

the Commission's determination that BR § 5-505 is an optional quiet title statute.  See Maj.

Slip Op. at 57.[2]

Next, the Majority affirms in part, reverses in part, and remands so that Petitioners

may seek leave to amend their complaint "to state a claim for equitable relief to remedy an

alleged violation of a specific right or rights protected under the common law of burial

places."  Maj. Slip Op. at 4-5, 80.[3]  At first glance, it could appear as though the Majority

is providing Petitioners with a viable lifeline.  But, despite spending nearly half of its

eighty-one-page opinion on a discussion of the nature and origin of the common law of

burial places, the Majority leaves unclear what kind of relief Petitioners could seek or

would be available under the common law of burial places.  See Maj. Slip Op. at 5-28, 39-

56.  Tellingly, the Majority acknowledges that "the common law of burial places is not

---

[2]The Majority denies that referring to a quiet title statute and referring to a statute designed to remove restrictions in the chain of title are two ways of saying the same thing.  See Maj. Slip Op at 38 n.27.  But, after reading the Majority's footnote on the point, I still do not see a distinction between the two.  The Majority's description of BR § 5-505 as a statute "designed to remove restrictions in the chain of title" is euphemistic way of concluding that the statute is a quiet title statute.  Maj. Slip Op. at 38 n.27.

[3]According to the Majority, Petitioners are ineligible for a writ of mandamus because "the common law of burial places supplies the appropriate legal framework to adjudicate concerns like those brought by" Petitioners.  Maj. Slip Op. at 41.

always easy to discern and apply," and the Majority expressly declines to "attempt to detail all of the potentially applicable principles here." Maj. Slip Op. at 41, 54.

One of the few things that the Majority makes clear is that the common law of burial places cannot prevent the sale of a burial ground. See Maj. Slip Op. at 43-44. Stopping the Commission from selling Moses Cemetery without court approval was the whole point of Petitioners' filing this action in the first place. The Majority's foreclosure of Petitioners' ability to stop the sale of Moses Cemetery begs the questions of what kind of relief the Majority expects Petitioners to seek on remand based on the common law of burial places in the United States. Although the Majority advises that "[c]ourts have enjoined desecration of burial grounds" and that "interested parties need not wait for a burial ground to be the subject of a contract for sale to seek equitable relief in connection with an alleged desecration of the burial ground[,]" the Majority leaves unclear what relief would consist of on remand. Maj. Slip Op. at 50, 77 (citations omitted).

The lack of clarity in the majority opinion about the common law of burial places is compounded by the circumstance that most of the authorities that the Majority cites when explaining the nature of the common law of burial places are secondary sources, cases that are many decades (or even more than a century) old, and/or cases from other jurisdictions. See Maj. Slip Op. at 40-54. In just one of many examples, the Majority cites a 1911 case from Tennessee for the proposition that "courts articulating the common law of burial places outside of Maryland have [] referenced sales and other conveyances of burial grounds that have been made without court approval." Maj. Slip Op. at 66 n.47 (citing Hines v. State, 149 S.W. 1058, 1059 (Tenn. 1911)). Although the Majority's deep dive

- 3 -

into ancient cases from other States is interesting, readers—including the parties, the circuit court on remand, and litigants and judges in future cases—will be left to guess whether those cases actually reflect Maryland common law. In any event, the Majority's discussion of the common law of burial places is not only an effort to make it seem as though the Majority does not close the door on some type of relief for Petitioners, but is also an attempt to fill the enormous gap in Maryland law for the protection of burial grounds that the Majority creates by concluding that the provisions of BR § 5-505 are optional.[4]

And, making matters worse, in addition to leaving unclear what relief Petitioners could potentially seek on remand, the Majority unnecessarily gives the Commission a blueprint for its position in future litigation. The Majority spends several paragraphs discussing the principle of abandonment, which allegedly applies where a property stops being used as a burial ground. See Maj. Slip Op. at 46-49. During this discussion, the Majority states that abandonment of a burial ground "through a sufficient showing of neglect and disuse or destruction" "is often asserted by landowners or purchasers of land as a defense." Maj. Slip Op. at 47 & n.32 (cleaned up). The Majority also counsels that abandonment and laches may be asserted as defenses, advising that "certain considerations

---

[4]In fact, the Majority acknowledges that it does not determine whether the out-of-State cases and secondary sources that it discusses "state the law in Maryland." Maj. Slip Op. at 54-55 n.41. This acknowledgement reinforces that the majority opinion will lead to confusion on remand. Also, the Majority emphasizes that circuit courts should address in the first instance in each case how the common law of burial places applies, stating that circuit "courts are closest to the facts, they hear from the interested persons, and they will have a strong sense of the equities, which they can draw upon to fashion appropriate remedies." Maj. Slip Op. at 54-55 n.41. In my view, this language underscores that the Majority should not throw out the circuit court's thoughtful ruling in Petitioners' favor and remand the case for consideration of a vague, amorphous legal doctrine.

may inform both an abandonment and a laches inquiry." Maj. Slip Op. at 48 n.33. Thanks to these advisements by the Majority, the Commission—whose counsel indicated at oral argument that it likely would assert laches if Petitioners raised claims based on the desecration of Moses Cemetery—will now certainly raise both abandonment and laches on remand.

Next, the Majority engages in a discussion that makes it seem as though it would not be so bad if the Commission prevailed on remand. The Majority advises that the Commission's purpose is "to provide affordable housing and supportive services." Maj. Slip Op. at 31 n.22 (internal quotation marks omitted). The Majority also notes that the contract for the sale of the property would have required the buyer to "set aside a percentage of the residential units for low- and moderate-income families, and use 'commercially reasonable efforts ... to memorialize the historical significance of the land formerly owned by White's Tabernacle … (which is sometimes referred to as Moses Cemetery[.]).'" Maj. Slip Op. at 33 (alteration and ellipses in original). In my view, that the Commission may have a laudable purpose, and that a buyer may promise to memorialize the cemetery would not mitigate the further desecration of Moses Cemetery or exempt the Commission from compliance with BR § 5-505.[5]

In Maryland, cemeteries are regulated through mandatory statutes in Title 5 (Cemeteries) of the Business Regulation Article, which govern the operation of cemeteries,

---

[5]The Majority finally delivers the holding that it has been building up to all along, stating: "BR § 5-505 provides an optional mechanism for parties to remove certain restrictions on land use and to quiet title." Maj. Slip Op. at 56 (cleaned up).

the handling of remains, burial, and reburial. BR § 5-201(a) creates an Office of Cemetery Oversight. BR § 5-301(1) provides that an individual shall register with that office before operating a cemetery. BR § 5-503(a) states that a burial lot sold in a cemetery shall be used only for the purpose of burial. Amidst the mandatory statutes governing the operation of cemeteries, the Majority reads BR § 5-505 as setting forth provisions that are optional. See Maj. Slip Op. at 79-80.

Since 1868, Maryland statutes (BR § 5-505 and its prior versions) have set forth mandatory requirements for the sale of burial grounds that have ceased to be used for burial. Although BR § 5-505 and its earlier versions have been amended over the years, the mandatory nature of their provisions has remained the same. The plain language and legislative history of BR § 5-505, as well as our case law, demonstrate that compliance with the statute is required for a burial ground to be sold for another purpose.

**Plain Language of BR § 5-505**

BR § 5-505 sets forth mandatory prerequisites that must be satisfied before the owner of a burial ground may sell it for another purpose. "[T]he goal of statutory interpretation is to ascertain and effectuate the actual intent of the General Assembly in enacting the law under consideration. In conducting this inquiry, we begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology." Balt. Police Dep't v. Open Just. Balt., 485 Md. 605, 646-47, 301 A.3d 201, 225 (2023) (cleaned up). "If the statutory language is unambiguous and clearly consistent with the statute's apparent purpose, the inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other

- 6 -

rules of construction." Id. at 647, 301 A.3d at 225 (cleaned up). "To the extent there is ambiguity in statutory language, we strive to resolve it by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." Id. at 647, 301 A.3d at 225-26 (cleaned up). "[W]e construe the statute as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." Id. at 647, 301 A.3d at 225 (cleaned up).

In this case, the text of each subsection of BR § 5-505 is unambiguous and demonstrates that its provisions are mandatory and that the statute must be complied with before the sale of a burial ground for another purpose. BR § 5-505 states:

(a) An action may be brought in accordance with the Maryland Rules and a court may pass a judgment for sale of a burial ground for another purpose if:

(1) the ground has been dedicated and used for burial;

(2) burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots;

(3) the ground has ceased to be used for burial; and

(4) it is desirable to dispose of the burial ground for another purpose.

(b) If the court is satisfied that it is expedient or would be in the interest of the parties to sell the burial ground, the court:

(1) may pass a judgment for the sale of the burial ground on the terms and notice the court sets;

(2) shall order that as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains; and

(3) shall distribute the remaining proceeds of the sale among the parties according to their interests.

(c) A judgment for the sale of a burial ground passes to the buyer of the burial ground the title to the burial ground free of the claims of:

(1) the owners of the burial ground; and

(2) the holders of burial lots.

In BR § 5-505(a), the General Assembly provided for the sale of a burial ground for use as another purpose by stating that an action may be brought under Maryland Rule 14-401 and a court may pass judgment for sale of a burial ground for another purpose if certain preconditions are satisfied—namely, that: (1) the ground has been dedicated and used for burial, (2) lots were sold and deeds or certificates provided to buyers, (3) the ground has ceased to be used for burial, and (4) it is desirable to dispose of the burial ground for another purpose. In BR § 5-505(a), the General Assembly carefully crafted a detailed set of conditions and procedures that are vital to the protection of burial grounds and that must be satisfied before an action for sale of a burial ground may be brought. BR § 5-505(a) does not state or imply in any way that the owner of a burial ground may sell it for another purpose without filing an action under the statute. The statute does not state that an action may be brought if a person selling a burial ground for another purpose chooses to or wants to initiate one. Instead, BR § 5-505(a) specifically states that an action may be brought and the court may pass judgment for the sale if the conditions set forth above are met. To conclude that BR § 5-505 is optional is inconsistent with the principle that "[w]e neither add nor delete language so as to reflect an intent not evidenced in the plain and

- 8 -

unambiguous language of the statute[.]" <u>Open Just. Balt.</u>, 485 Md. at 647, 301 A.3d at 225 (cleaned up).

BR § 5-505(b)(1) provides that a court may pass judgment for the sale of a burial ground if the court is satisfied that it is expedient or in the best interest of the parties. BR § 5-505(b)(1) specifically authorizes a court to determine whether the sale of a burial ground should or should not occur. It would be absurd to conclude that the General Assembly intended for a trial court to assess whether selling a burial ground for another purpose would be expedient or in the interest of the parties only where the owner of the burial ground chose or elected to file an action under BR § 5-505. The plain language of BR § 5-505(b)(1) demonstrates that the filing of an action under BR § 5-505(a) is mandatory.

Further demonstrating the mandatory nature of the statute, BR § 5-505(b)(2) provides that a court "shall" order that as much of the proceeds of the sale of a burial ground as necessary are used to pay for the expense of removing human remains, buying burial lots in another burial ground, and reburying the remains. There can be no dispute that the word "shall" in BR § 5-505(b)(2) imposes a mandatory requirement and that, where a court approves the sale of a burial ground, this provision is mandatory. It would be an illogical and unsupportable interpretation of the statute to conclude that the General Assembly intended to provide for mandatory payment for the removal and reburial of human remains in connection with the sale of a burial ground only if sellers of burial grounds opted or elected to file an action.

Likewise, BR § 5-505(b)(3) provides that a court "shall" distribute any remaining proceeds of the sale of a burial ground among the parties according to their interests. Again, there can be no dispute that this provision is mandatory. It is difficult to conceive that the General Assembly intended to ensure for approval by a court of the sale of a burial ground for use as another purpose, payment for the removal and reburial of remains, and distribution of funds among the parties only if the owner of the burial ground elected to file an action under BR § 5-505.

The conclusion that the statute is mandatory is also compelled by BR § 5-505(c), which provides that a judgment of sale for a burial ground passes to a buyer title free of the claims of the owner of the burial ground and lot holders. In other words, obtaining a judgment for the sale of the burial ground for another purpose is the manner through which good title is passed. Good title is vital, given that "[a]t the opposite end of the spectrum from a property having 'good record title' or 'marketable title[]' is a property that has a *cloud* on its title[,]" which is "'[a] defect or potential defect in the owner's title to a piece of land arising from some claim or encumbrance such as a lien, an easement, or a court order.'" Mayor & City Council of Balt. v. Thornton Mellon, LLC, 478 Md. 396, 415-16, 274 A.3d 1079, 1090 (2022), reconsideration denied (June 15, 2022) (quoting *Cloud on Title*, Black's Law Dictionary (11th ed. 2019)) (emphasis and third alteration in original). Even if the language of BR § 5-505(a) did not speak for itself, it would be an absurd interpretation of the statute to conclude that the General Assembly drafted BR § 5-505(c) with the intent to allow owners of burial grounds to elect to sell burial grounds outside of the provisions of the statute and, in doing so, elect to sell to burial grounds without passing

- 10 -

good title.

Adopting the view that compliance with BR § 5-505 is optional would mean that the General Assembly intended to set up a dual system for selling burial grounds—one in which good title is passed under BR § 5-505 with mandatory protection for burial grounds provided by the statute, and another in which title is passed subject to the claims of former owners and lot holders, with litigation over title to be expected in the future and the burial ground receiving none of the mandatory protections set forth in the statute.

Nonetheless, the Majority concludes that BR § 5-505 is an "optional mechanism" because BR § 5-505(a) uses the word "may," and the General Assembly would have used the word "shall" if compliance with the statute were mandatory. Maj. Slip Op. at 56, 58. It is well settled that "the use of the words 'shall' or 'may' is not controlling[] in determining whether a particular provision is mandatory or directory. The question of construction turns upon the intention of the Legislature as gathered from the nature of the subject matter and the purposes to be accomplished." Dir., Patuxent Inst. v. Cash, 269 Md. 331, 344, 305 A.2d 833, 840-41 (1973) (cleaned up). In other words, as the Majority acknowledges, a mandatory statute can use the word "may." See Maj. Slip Op. at 58.

BR § 5-505 is such a statute. The use of the word "may" in BR § 5-505(a) does not mean that the owner of a burial ground who wants it to be sold for another purpose may choose whether to file an action under the statute. The language of the statute demonstrates that the use of the word "may" does not render compliance with the statute optional. Rather, the use of the word "may" in BR § 5-505(a) authorizes an action to be brought and a court to determine whether a burial ground may be sold for another purpose if an owner

- 11 -

wants to sell the property and if the court determines that the conditions set forth in BR §
5-505(a) and (b) are met.

BR § 505(a) provides that "[a]n action may be brought in accordance with the
Maryland Rules and a court may pass judgment for sale of a burial ground for another
purpose if" certain specific conditions are met. The use of the word "may" in the first
instance simply reflects that the owner of a burial ground is not required or obligated to
sell a burial ground for use as another purpose. If the word "shall" were used in the first
instance in BR § 505(a), the subsection would provide that "[a]n action shall be brought in
accordance with the Maryland Rules and a court may pass judgment for sale of a burial
ground for another purpose if" certain specific conditions are met. Under this language,
any owner of a burial ground, regardless of an intent to sell or not, would be required to
bring an action where the conditions specified in BR § 505(a) were met. Similarly, the use
of the word "may" in the second instance in BR § 5-505(a), simply reflects that a trial court
is not required to allow a burial ground to be sold for another purpose—rather, the matter
is within the trial court's discretion.

In contending that the provisions of BR § 5-505 are optional, the Commission relies
on cases involving other statutes that include the word "may" that are distinguishable from
this one. The Commission cites Md.-Nat'l Cap. Park & Plan. Comm'n v. Silkor Dev.
Corp., 246 Md. 516, 522-23, 229 A.2d 135, 139 (1967), a case in which we held that the
word "may" was permissive as used in a prior version of Md. Code Ann., Land Use (2012)
("LU") § 23-204(b)(1), under which the Montgomery County Council could adopt
regulations that "may provide . . . for tentative or conditional approval or disapproval of []

preliminary plats within . . . sixty (60) days after submission thereof; otherwise, the preliminary plat shall be deemed to have been approved[.]" 1963 Md. Laws 1723-25 (Vol. II, Ch. 815, H.B. 711) (italics omitted). We determined that, under the prior version of LU § 23-204(b)(1), the Montgomery County Council could, but was not obligated to, require the Montgomery County Planning Board to approve or disapprove preliminary plats within sixty days. See Silkor, 246 Md. at 522, 229 A.2d at 139. Because the Montgomery County Council had not done so, we disagreed with a developer that its preliminary plat was deemed approved by virtue of the Montgomery County Planning Board not approving or disapproving the plat within sixty days. See id. at 518-20, 229 A.2d at 136-38.

The Commission also cites Uthus v. Valley Mill Camp, Inc., 472 Md. 378, 399, 246 A.3d 1225, 1238 (2021), in which we held that the word "may" was permissive as used in Md. Code Ann., Real Prop. (1974, 2015 Repl. Vol.) ("RP") § 14-132(d)(1), under which, if a person engages in wrongful detainer of a property, "a person claiming possession may make complaint in writing to the District Court of the county in which the property is located." We determined that the word "may" in RP § 14-132(d)(1) "makes clear that wrongful detainer is one of the legal actions available to pursue when attempting to remove someone not legally on a property, but not the exclusive remedy." Id. at 399, 246 A.3d at 1238. We disagreed with the defendant that the circuit court lacked jurisdiction in a trespass action on the ground that the plaintiff was required to file a wrongful detainer or landlord-tenant action in the District Court. See id. at 386-87, 246 A.3d at 1230.

Under Silkor, 246 Md. at 522, 229 A.2d at 139, as used in the prior version of LU § 23-204(b)(1), the word "may" reflected that the Montgomery County Council had the

discretion to require or not require the Montgomery County Planning Board to approve or disapprove preliminary plats within sixty days. Under <u>Uthus</u>, 472 Md. at 399, 246 A.3d at 1238, as used in RP § 14-132(d)(1), the word "may" plainly reflects that the owner of a property has the discretion to file or not file a wrongful detainer action to remove someone illegally occupying the property. Neither case provides provide guidance here. Rather, the plain language of BR § 5-505 makes clear that it is a statute with mandatory provisions designed to protect burial grounds and not an optional quiet title statute, as the Majority reasons. <u>See</u> Maj. Slip Op. at 57.

### History of BR § 5-505

Like its plain language, the legislative history of BR § 5-505 demonstrates that the provisions of the statute are mandatory. As with BR § 5-505, none of the prior versions of the statute stated or implied that their provisions were optional, and all of the prior iterations of the statute set forth conditions and procedures so detailed and vital to the protection of burial grounds that it would defy logic to conclude that they were permissive. Every version of the statute has provided for a trial court to determine whether a burial ground should be sold for another purpose, for notice to be given (*i.e.*, notice of the filing of an action under the statute and/or notice of a judgment for the sale of a burial ground for another purpose), for proceeds of the sale of a burial ground for another purpose to be distributed among the parties, and for a judgment for the sale of a burial ground for another purpose to pass title to the buyer. And, since 1888, every version of the statute has also provided for proceeds of the sale of a burial ground for another purpose to be used for the removal and reburial of remains. The General Assembly clearly intended to require, not

- 14 -

merely permit, all of these protections whenever a burial ground is sold for another purpose.

In 1868, the General Assembly enacted the first prior version of BR § 5-505—namely, Md. Code Ann., Art. 16 ("Art. 16"), § 79, which stated:

> That upon any bill being filed for the sale of any ground dedicated and used for the purposes of burial in which lots have been sold and deeds executed or certificates issued to the purchasers of such lots, provided such lots shall be no longer used for burial purposes, the court may order notice to be given by publication in one or more newspapers published in the city or county in which the ground to be sold may be situated, stating the substance and object of the said bill, and containing the names of the original lotholders or their assignees if known, warning all the lotholders, whether they be residents or non-residents, adults or infants to appear on or before a day fixed in such order and show cause why the relief prayed should not be granted, and such notice shall be published as the court may direct, not less however than once a week for four successive weeks, two months before the day fixed by such order for the appearance of the parties, and if such lotholders shall not appear at the time stated in such notice a commission to take testimony may be issued by the complainant *ex parte*.
>
> That after the return of such commission the court, upon being satisfied from the testimony, that it is necessary and would be for the interest and advantage of the parties interested that the ground should be sold, may forthwith pass a decree for the sale of the same upon such terms as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests as the same shall be shown to the court.
>
> That a decree passed in a proceeding for the sale of a burial ground shall be valid to pass title to the purchaser or purchasers of the same or any part thereof free, clear and discharged of and from the claims of the corporation or trustees who may hold the same for the purposes aforesaid, their successors or assigns and of all persons an interest as lotholders in such ground whether they are entitled as original lotholders and whether they be residents or non-residents, adults or infants.

1868 Md. Laws 368-69 (Ch. 211) (paragraph breaks added).

- 15 -

Significantly, Art. 16, § 79 did not state or imply that the owner of a burial ground could sell it for another purpose without filing an action under the statute. Instead, Art. 16, § 79 stated "[t]hat upon any bill being filed for the sale of any ground dedicated and used for the purposes of burial in which lots have been sold and deeds executed or certificates issued to the purchasers of such lots, provided such lots shall be no longer used for burial purposes," a trial court "may"—*i.e.*, was authorized to—"order notice to be given by publication[.]" Id. As discussed below, our case law from the 1800s demonstrates that Art. 16, § 79 was mandatory.

Significantly, in 1888, the General Assembly amended Art. 16, § 79 so that it stated:

That in any case in which a burial ground has ceased to be used for burial purposes, and the said ground has been dedicated and used for burial purposes, and lots have been sold therein, and deeds executed or certificates issued to purchasers thereof, and it shall be considered desirable to dispose of said burial ground for other purposes, upon a bill being filed in any of the circuit courts of the state, in equity, in the city or county in which said burial ground is situated, setting forth the aforegoing facts, and containing the names of the lot owners or their assignees so far as known, the court shall order notice by publication in one or more newspapers published in the county or city where such burial ground is situated, warning all the lot holders or other persons in interest, residents or non-residents, adults or infants, to appear in court on or before the day fixed in said notice, to show cause why the relief prayed for should not be granted;

and said notice shall be such as the court may direct, not less, however, than once a week for four successive weeks two months before the day fixed by such order for the appearance of the parties;

and upon a failure of appearance by any of said lot owners, or any party in interest by the time limited in said notice, the court may order testimony to be taken *ex parte*, according to the usual course in equity in cases of default for non-appearance, and upon testimony taken in the cause *ex parte*, or otherwise, if it is made to appear to the satisfaction of the court that it is expedient or would be to the interest and advantage of the parties concerned that the said burial ground should be sold, the court may forthwith pass a

- 16 -

decree for the sale of said ground upon such terms and notice as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests, as the same shall be shown to the court;

and before making said distribution the court may order and direct that so much and such part of said proceeds of sale, as shall be necessary for the purpose, shall be set aside and applied to the removal and burial of any dead that may lie in said burial ground, in the purchase of a lot in any cemetery, graveyard, or other appropriate place of sepulture, and in the expense of disinterment and re-interment of said dead;

and any decree passed in a proceeding for a sale of a burial ground, as hereinbefore provided for, shall be valid to pass to the purchaser or purchasers of said burial ground the title of the same free, clear and discharged of, and from the claims of the corporation or trustees who may hold the same, their successors or assigns, and of all persons in interest as lot holders in such ground, whether they are entitled as original lot holders, and whether they be residents or non-residents, adults or infants.

1888 Md. Laws 617-19 (Ch. 369) (paragraph breaks added).

In 1888, the General Assembly amended to statute to add the language: "That in any case in which a burial ground has ceased to be used for burial purposes[.]" Although there was never any ambiguity, the addition of this language makes clear that the General Assembly intended the provisions of the statute to apply in any case in which a burial ground ceased to be used for burial purposes. In addition, the General Assembly provided for the first time that the proceeds of the sale of a burial ground for another purpose must be used for the removal and reburial of remains. With these amendments, the General Assembly made clear that the statute was mandatory and provided mandatory protections

for the remains of the deceased. The General Assembly did not amend the statute again until 1962.[6]

In 1962, the General Assembly amended Art. 16, § 119 by replacing the language starting with "upon a bill" and ending with "or otherwise" with the phrase "an action for sale of said ground may be commenced in accordance with the Maryland Rules." 1962 (Reg. Sess.) Md. Laws 114 (Ch. 36, S.B. 70) (italics omitted).

In 1992, without substantive change, the General Assembly recodified Art. 16, § 119 as Md. Code Ann., Bus. Reg. (1992) ("BR (1992)") § 5-501. See 1992 (Reg. Sess.) Md. Laws 164-65 (Vol. I, Ch. 4, S.B. 1). The General Assembly has not changed the language of the statute since—*i.e.*, BR (1992) § 5-501 was identical to BR § 5-505, which is quoted in full above. The Revisor's Note accompanying the 1992 recodification stated:

> This section is new language derived without substantive change from former Art. 16, § 119.
>
> In the introductory language of subsection (a) of this section, the reference to the authority of a court to pass a judgment for sale of a burial ground for another purpose is added to state explicitly what only was implied in the former law.
>
> In subsection (c)(1) of this section, the former reference to "their successors or assigns" is deleted as needless.
>
> As to the procedure for sale of burial grounds, see Md. Rules J70 through J73.

---

[6]Although the General Assembly did not amend the statute again until 1962, it was identified by various section numbers in various compilations of Maryland statutes, culminating in The Michie Company identifying the statute as Art. 16, § 119 in 1957. See The Michie Company, The Annotated Code of the Public General Laws of Maryland, Vol. 2 at 74-75 (1957). In the same year, the General Assembly recognized The Michie Company's compilation of Maryland statutes as "evidence of the Public General Laws of the State of Maryland[.]" 1957 Md. Laws 27 (Ch. 23, H.B. 57).

Id. at 165.

On May 22, 1997, without change, the General Assembly renumbered Md. Code Ann., Bus. Reg. (1992, 1996 Supp.) ("BR (1996)") § 5-501 as Md. Code Ann., Bus. Reg. (1992, 1997 Supp.) ("BR (1997)") § 5-505. See 1997 Md. Laws 3875, 3907 (Vol. VI, Ch. 675, H.B. 559). The legislative history of the statute demonstrates that the General Assembly has made no substantive change to the statute since 1888 when it was amended to read "[t]hat in any case in which a burial ground has ceased to be used for burial purposes. . . upon a bill being filed[,]" a burial ground could be sold for use as another purpose upon judgment passed by a court and provide mandatory protection for the deceased.

In fact, part of the bill file of the bill through which the General Assembly renumbered BR (1996) § 5-501 demonstrates that the statute is mandatory. In a letter to the Chair of the Economic Matters Committee dated March 7, 1997, the Coalition to Protect Maryland Burial Sites[7]—through its then-president, James R. Trader—made comments on House Bill 559 (1997), including an objection to "[t]he proposed repeal of" BR (1996) § 5-501 (which is now BR § 5-505).

To be clear, the Coalition to Protect Maryland Burial Sites was mistaken in believing that House Bill 559 (1997) called for repealing BR (1996) § 5-501. Ostensibly,

---

[7]The Coalition to Protect Maryland Burial Sites exists to this day. It was formed in 1992 to save a cemetery in Howard County, but its purpose has expanded to the protection of Maryland burial grounds in general. See Coalition to Protect Maryland Burial Sites, History of the Coalition to Protect Maryland Burial Sites, https://cpmbs.org/history/ [https://perma.cc/78CD-ARRK].

- 19 -

that mistaken belief was based on the circumstances that House Bill 559 (1997) stated that it called for "repealing and reenacting, with amendments," BR (1996) § 5-501 (when it actually called for amending BR (1996) § 5-201 and renumbering it as BR (1997) § 5-501), and that the bill included the proposed text of BR (1997) § 5-501, but not the existing text of BR (1996) § 5-501 (which the bill called for renumbering as BR (1997) § 5-505 without change). See H.B. 559 (1997) (First Reading) at 1-2, 15-17 (Jan. 29, 1997), https://mgaleg. maryland.gov/1997rs/bills/hb/hb0559f.pdf [https://perma.cc/J4C6-CXS7].

In any event, the Coalition to Protect Maryland Burial Sites cogently wrote in no uncertain terms about how repealing BR (1996) § 5-501 would have eliminated all protection of burial grounds, stating:

> The proposed repeal of Section 501 of Title 5 governing the Sale of Burial Grounds, also governed by Maryland Rules J[]70 through J[]73, would remove all protection of human remains, mausoleums, funer[ar]y objects, and the right for use of the burial space, and the rights of any heirs or relatives, now subject to sale under court jurisdiction and is a gross violation of the rights of Maryland citizens and should be kept intact as now in the Annotated Code, or included as written in H.B. 559.

The Coalition to Protect Maryland Burial Sites was correct that what is now BR § 5-505 protects burial grounds by making the sale of burial grounds for other purposes "subject to . . . court jurisdiction[.]" When the Coalition to Protect Maryland Burial Sites made this observation in 1997, the statute read exactly as it does now. Like the Coalition to Protect Maryland Burial Sites, the Bethesda African Cemetery Coalition and the other Petitioners in this case are correct that BR § 5-505 requires court approval before a burial ground is sold for another purpose.

- 20 -

The Coalition to Protect Maryland Burial Sites, the Bethesda African Cemetery Coalition, and the other Petitioners in this case are not the only ones who have recognized that, under BR § 5-505, court approval is required before the sale of a burial ground for another purpose. On April 30, 1996, the General Assembly passed a law that would create a Task Force to Examine the State's Cemetery and Funeral Industry. See 1996 Md. Laws 1649, 1651 (Vol. III, Ch. 209, H.B. 304). Later that year, on December 24, 1996, the task force submitted to the General Assembly a final report in which it recommended, among other things, the creation of an Office of Cemetery Oversight. See Task Force to Examine the State's Cemetery and Funeral Industry, Final Report of the Task Force to Examine the State's Cemetery and Funeral Industry at 11 (Dec. 24, 1996). The following year, in 1997, the General Assembly did exactly that, creating an Office of Cemetery Oversight within the Department of Labor, Licensing, and Regulation (now named the Department of Labor). See 1997 Md. Laws 3874 (Vol. VI, Ch. 675, H.B. 559). The Office of Cemetery Oversight exists to this day, and is required to "adopt[] rules and regulations to carry out" Title 5 (Cemeteries) of the Business Regulation Article, which includes BR § 5-505. BR § 5-204(a)(1)(i).

Significantly, on its webpage regarding frequently asked questions about cemeteries, the Office of Cemetery Oversight correctly and unequivocally states that, under BR § 5-505, "[c]emetery property may not be sold for use for another purpose without first obtaining a court judgment for the sale of the cemetery for another purpose." Md. Dep't of Labor, General Frequently Asked Questions (FAQs) - Cemetery Oversight, https://www.labor.maryland.gov/license/cem/cemgenlfaqs.shtml [https://perma.cc/BCM3-

FXRW].  Although this statement is not a regulation, the statement expresses the view of the entity authorized by the General Assembly to adopt rules and regulations necessary to effectuate BR § 5-505.  There is no need for a regulation to state what BR § 5-505 already makes clear—*i.e.*, that the statute requires court approval before the sale of a burial ground for another purpose.  Given the General Assembly's intent to protect cemeteries—as demonstrated by the mandatory statutes in Title 5 (Cemeteries) of the Business Regulation Article the and the Task Force to Examine the State's Cemetery and Funeral Industry—as well as the trust and authority that the General Assembly has placed in the Office of Cemetery Oversight Office, weight should be given to that Office's interpretation of BR § 5-505, which is already compelled by the plain language and legislative history of the statute, which demonstrate that the statute's provisions are mandatory.[8]

---

[8]The Majority seems to dismiss the position of the Office of Cemetery Oversight (set forth on its webpage) and the Coalition to Protect Maryland Burial Sites (set forth in a letter in a bill file) that BR § 5-505 requires court approval before the sale of a burial ground.  The Majority states: "We see no indication that these policymakers and organizations have considered the history and context of BR § 5-505 that we have discussed here, including the development of the common law of burial places."  Maj. Slip. Op at 73 n.54.  But the plain language and legislative history of BR § 5-505 make clear that the statute requires court approval before the sale of a burial ground, and nothing about the common law of burial places changes that.

The Majority also reasons that, unlike other statutes in Title 5 of the Business Regulation Article, BR § 5-505 is permissive because the other statutes refer to "cemeteries," whereas BR § 5-505 refers to "burial grounds."  Maj. Slip Op. at 73-74 n.54. These are clearly two ways of saying the same thing.  Although no Maryland statute defines "burial ground," BR § 5-101(d)(1) defines "cemetery" in pertinent part as "land used or to be used for interment."  This definition of "cemetery" comports with the dictionary definition of "burial ground," which is "an area of land where dead people have been buried[.]"  Burial Ground, Merriam-Webster, https://www.merriam-webster.com/ dictionary/burial%20ground [https://perma.cc/9C3A-6JWZ].  Additionally, the Revisor's Note as to the recodification of Art. 16, § 120 as BR (1992) § 5-506, which applies to sales

**Maryland Rule 14-401**

Like BR § 5-505, the plain language of Maryland Rule 14-401 and this Court's adoption of Rule J70 in 1962 (the earliest version of Rule 14-401) both demonstrate that the statute's provisions for the sale of burial grounds are mandatory. At a meeting of the Standing Committee on Rules of Practice and Procedure ("the Rules Committee") on February 27, 1959, the Rules Committee approved the report of the chair of a subcommittee on burial grounds and other matters "that there should be a rule to provide for the procedural aspects of Art. 16, sec. 119 (Sale of Burial Grounds)." Rules Committee, <u>Minutes of meeting held in Court of Appeals Conference Room, Court of Appeals Building, Annapolis, Maryland, on Friday, February 27, 1959</u> at 5-6 (Feb. 27, 1959). Two years after that, on September 15, 1961, effective January 1, 1962, we adopted former Maryland Rules J70 to J73, which stated in pertinent part:

**Rule J70. How Commenced—Contents of Bill.**

An action for the sale of a burial ground shall be commenced by filing a bill of complaint, which in addition to complying with Rules 301 (Form and Content) and 370 (Bill of Complaint—Petition), shall contain:

(1) A statement that said ground has been dedicated and used for burial purposes,

---

of burial grounds in Baltimore City, indicates that the General Assembly intended for the terms "burial ground" and "cemetery" to overlap, stating in pertinent part: "[T]he former references to a 'cemetery' and 'other appropriate place of sepulture' are deleted as included in the reference to 'burial ground' and to conform to language used in § 5-501 of this subtitle." 1992 (Reg. Sess.) Md. Laws 167 (Vol. I, Ch. 4, S.B. 1). The same conclusion can be drawn from Md. Code Ann., Real Prop. (1974, 2023 Repl. Vol.) § 14-119(a)(2), a statute that applies to cemeteries in Carroll County and that states that "'[c]emetery' includes a grave, burial ground, monument, or gravestone."

(2)     A statement that the burial ground has ceased to be used for burial purposes,

(3)     A statement that lots have been sold therein and deeds executed or certificates issued to purchasers thereof, if any,

(4)     A list of the names and last known addresses of all lot owners or their assignees, so far as known, if any,

(5)     A description of the burial ground sufficient to enable it to be located,

(6)     A statement that it is considered desirable to dispose of said burial ground for other purposes and the reasons therefor.

(Art. 16, § 119.)

**Cross references.**—See Code, article 16, § 119, which authorizes a proceeding for the sale of a burial ground which has ceased to be used for such purposes.

\* \* \*

## Rule J71. Venue.

The action shall be brought in the county in which the burial ground lies. Where it lies partly in one county and partly in another, the action may be brought in a county in which any part of the land lies.

(Art. 16, § 119.)

\* \* \*

## Rule J72. Order of Publication.

*a. Issuance—As of Course.*

Upon the filing of the bill of complaint, the clerk shall issue, as of course, an order of publication.

*b. Content—Notice—Publication.*

The order shall state the substance and object of the bill, shall give notice to all lot owners or other persons in interest to file an answer in opposition to the relief sought on or before a day fixed in the order and shall direct that a copy thereof be published as provided in Rule 105 d (Process by Publication—Content—Service).

*c. Posting.*

A copy of said order shall also be posted conspicuously upon said property and at all principal gates or entrances to said burial ground.

**Rule J73. Proceedings after Order of Publication.**

Upon failure of any party in interest to appear in response to the order of publication, the cause shall proceed ex parte, and the court may order testimony to be taken and pass such decree as may be proper. A certificate of publication of the order of publication shall be filed with the court before entry of a decree.

(Paragraph breaks added).

The cross reference to Art. 16, § 119 that followed former Maryland Rule J70—stating that the statute "authorizes a proceeding for the sale of a burial ground which has ceased to be used for such purposes"—is almost identical to the cross reference to BR § 5-505 that currently follows Maryland Rule 14-401(b) (except that the latter substitutes "that has" for "which has"). Similar language can be found in the bill file of the bill through which the General Assembly recodified Art. 16, § 119 as BR (1992) § 5-501. That bill file contains a report in which the Department of Legislative Reference summarized Subtitle 5 (Sale of Burial Ground for Another Purpose) of Title 5 (Cemeteries) of the proposed Business Regulation Article in pertinent part as follows: "Subtitle 5 authorizes an action for the sale of a burial ground for another purpose if the ground has ceased to be used for

burial and it is desirable to dispose of the burial ground for another purpose." Dep't of Legislative Reference, <u>Report on Senate Bill 1 [/] Business Regulation Article</u> at 19 (Jan. 8, 1992). The cross references to what is now BR § 5-505 in the former and current versions of Maryland Rule 14-401, as well as the report by the Department of Legislative Reference, demonstrate that both the General Assembly and this Court have recognized that BR § 5-505 "authorizes" an action for the sale of a burial ground. In the absence of such an action instituted under the statute, there is no authorization for the sale of a burial ground for another purpose.

On June 5, 1996, effective January 1, 1997, we adopted Maryland Rule 14-401, which replaced former Maryland Rules J70 to J73. Since then, we have amended only the cross references in Maryland Rule 14-401—*i.e.*, the operative provisions of the rule are the same today as they were in 1997. Both then and now, the operative provisions of Maryland Rule 14-401 have stated:

> (a) **Venue.** — An action for sale of a burial ground for a use other than burial purposes shall be brought in the county in which the burial ground is located. When the burial ground is located in more than one county, the action may be brought in any county in which all or any part of the burial ground is located.

> (b) **Complaint.** — The action for sale of a burial ground shall be commenced by filing a complaint that, in addition to complying with Rules 2-303 through 2-305, shall contain:

>> (1) a description of the burial ground sufficient to enable it to be located,

>> (2) a statement that the ground has been dedicated and used for burial purposes,

(3) a statement that the burial ground has ceased to be used for burial purposes,

(4) a list of names and last known addresses of all known lot owners, or their assignees, if any, and

(5) a statement of the reasons why it is desirable to sell the burial ground for other uses.

* * *

(c) **Notice — Publication and Posting. —** Upon the filing of the complaint, the clerk shall issue a notice instead of a summons. The notice shall be signed by the clerk and shall (1) include the caption of the action, (2) describe the substance of the complaint and the relief sought, and (3) inform all lot owners or other persons in interest of the latest date by which a response may be filed. The notice shall be published as provided in Rule 2-122, and a copy of the notice shall be posted in a conspicuous place on the property and at all principal gates or entrances to the burial ground. Additionally, a copy of the notice shall be sent by ordinary mail to each person whose name and last known address are listed in the complaint pursuant to subsection (b) (4) of this Rule.

(d) **Proceedings When No Response Filed. —** If no party in interest appears in response to the notice, the action shall proceed ex parte. The court may order testimony to be taken and enter judgment as it deems proper.

(Paragraph breaks added).

Maryland Rule 14-401 continues to contain the cross reference stating that BR § 5-505 "authorizes a proceeding for the sale of a burial ground that has ceased to be used for such purposes[,]" demonstrating that BR § 5-505 is mandatory.

**Case Law**

In addition to the plain language and legislative history of BR § 5-505, our case law demonstrates that the statute must be complied with for a burial ground to be sold for another purpose. In Partridge v. First Indep. Church of Balt., 39 Md. 631, 636 (1874), in

a case in which it was conceded that an action for the sale of a cemetery under Art. 16, §

79 complied with the statute, we affirmed the dismissal of a petition by owners of a burial

lot seeking payment from the seller of the burial ground to have a new burial vault built on

a different burial ground. Eaton R. Partridge bought a burial lot in the Cemetery of the

First Independent Church of Baltimore and had a vault built on the burial lot, where remains

of his relatives were interred. See id. at 632. After Mr. Partridge passed away, the cemetery

became unsuitable for burial purposes. See id. Relatives of Mr. Partridge[9] had the remains

removed from the vault, but did not have the vault removed from the cemetery. See

Partridge, 39 Md. at 633.

The church filed an action under Art. 16, § 79 to sell the cemetery for another

purpose, and Mr. Partridge's relatives filed a petition asking the trial court to order the

church to pay them enough to have a new vault built on another burial ground. See id. The

trial court dismissed Mr. Partridge's relatives' petition and issued a decree appointing

trustees to sell the cemetery for another purpose and ordering them to have the remains in

the cemetery removed and reburied in another burial ground. See id. at 632-33. Mr.

Partridge's relatives appealed. See id. at 633.

We affirmed, holding that Mr. Partridge's relatives had a right to have the vault

removed from the cemetery, but not a right to be compensated for the cost of a new vault.

See id. at 639-40. We observed that Mr. Partridge's relatives had conceded that the church

had complied with Art. 16, § 79 by proving that selling the cemetery for another purpose

---

[9]Mr. Partridge was "the father of some of the appellants," who included James R. Partridge and Francis E. Partridge. Partridge, 39 Md. at 631, 638.

was necessary and would be in the interest of, and to the advantage of, the parties. See id. at 639. We explained that the church was not having the cemetery sold for another purpose simply for its own gain. See id. We indicated that, had the church been doing so, Mr. Partridge's relatives might have had a right to be compensated for the cost of a new vault. See id. Notably, we did not state or imply that it would have been lawful for the church to have the cemetery sold for another purpose without complying with Art. 16, § 79 or that burial grounds could be lawfully sold without compliance with Art. 16, § 79 . See id.

Four years later, in Reed v. Stouffer, 56 Md. 236, 251-53 (1881), we determined that due to the terms of its deed, Art. 16, § 79 did not permit the sale of a burial ground for another purpose. In 1808, former Governor John Eager Howard[10] issued a deed for a property near the intersection of Lombard and Paca Streets in Baltimore City to a group of individuals as trustees for the Society of German Baptists. See Reed, 56 Md. at 247-48. The 1808 deed contained a restrictive covenant indicating that Governor Howard intended for the property to contain only a burial ground and possibly a house of worship. See id. at 248.

Decades later, in 1874, a corporation calling itself the "Trustees of the Church of the German Baptist Brethren" filed an action alleging that it was the beneficiary of the trust identified in the 1808 deed and asking the trial court to order the heirs of the trustees for the Society of German Baptists identified in the 1808 deed to convey the property to the

---

[10]Howard served as Governor from 1788 to 1791. See Md. State Archives, John Eager Howard (1752-1827) (Nov. 13, 2002), https://msa.maryland.gov/megafile/msa/ speccol/sc3500/sc3520/000600/000692/html/692bio2.html [https://perma.cc/SJ5V-EQMM].

corporation. Id. at 249. The following year, in 1875, two of the heirs filed an action under Art. 16, § 79, alleging that the property was no longer suitable for burial purposes due to the growth of Baltimore City and acknowledging that the remains on the property would need to be removed and reburied in another burial ground. See id. at 249, 252. The two actions were consolidated, and the parties stipulated that the trial court should allow the property to be sold for another purpose, hold onto the proceeds of the sale subject to further order of the trial court, and ultimately permit the parties to distribute the proceeds of the sale among themselves. See id. at 250.

Later, however, the heirs of the trustees for the Society of German Baptists identified in the 1808 deed filed an amended bill advising that a new group, heirs of Governor Howard, had notified them that, if the property stopped being used as a burial ground, they would assert a claim of ownership of the property. See id. Governor Howard's heirs filed an answer to the amended bill, thus becoming parties to the case. See id. at 251.

The trial court conducted a proceeding at which two witnesses who lived near the property testified that selling it for another purpose would be in the interest of, and to the advantage of, the parties. See id. at 252. One of the witnesses indicated that he could not improve his property because it was close to a burial ground, and the other witness testified that his bedroom window faced the property and that it was unpleasant for him to look at a graveyard. See id. at 252-53. The trial court issued a decree allowing the property to be sold for another purpose. See id. at 251. Governor Howard's heirs appealed. See id.

We reversed and remanded, holding that, because of the restrictive covenant in the 1808 deed, the property could not be sold for another purpose, it had to continue to be used as a burial ground, and, if it were used for another purpose, title to it would vest in Governor Howard's heirs. See id. at 254-55. We were unpersuaded by the argument of the appellees (*i.e.*, the heirs of the trustees for the Society of German Baptists identified in the 1808 deed and the corporation calling itself the "Trustees of the Church of the German Baptist Brethren") that the decree allowing the property to be sold for another purpose was proper under Art. 16, § 79. See id. at 251-52. We determined that the testimony of the two witnesses who lived near the property did not establish that the property was no longer suitable for burial purposes or that selling the property for another purpose was necessary, as required by Art. 16, § 79. See id.[11]

Reed serves as an excellent example of the mandatory nature of BR § 5-505 and its predecessor Art. 16, § 79. Had the provisions of Art. 16, § 79 not been mandatory (and the

---

[11]The Majority and the Commission attempt to downplay Reed, 56 Md. 236, by indicating that the reason why the property could not be sold for another purpose was the restrictive covenant in the 1808 deed, not the appellees' failure to comply with Art. 16, § 79. See Maj. Slip Op. at 66-67. Although that is accurate, it is equally true that we addressed at length the appellees' argument that the decree allowing the property to be sold for another purpose was proper under Art. 16, § 79. See Reed, 56 Md. at 251-53. We could have easily disposed of that argument by simply stating that the restrictive covenant in the 1808 deed rendered it moot, but we did not do so. Instead, we summarized Art. 16, § 79, detailed the testimony of the two witnesses who lived near the property, and determined that their testimony fell short of the standard set forth in the statute. See id. We specifically stated that we were "clearly of [the] opinion that the proof d[id] not come up to the requirements of the Act of 1868, so as to justify a decree for a sale of the lot under its provisions[,]" and that the "facts d[id] not constitute such unsuitableness for a place of burial, and such necessity for its removal as [we]re contemplated by the law, and [we]re not sufficient to warrant a sale of it[.]" Id. at 252-53.

- 31 -

1808 deed not contained the restrictive covenant), the property at issue could have simply been sold for use as another purpose outside of the statute, *i.e.*, there would have been no need for the heirs of the trustees for the Society of German Baptists identified in the 1808 deed to have initiated an action under Art. 16, § 79.

In Gump v. Sibley, 79 Md. 165, 172, 28 A. 977, 979-80 (1894), we held that, through an action under Art. 16, § 79, a buyer received good title to a burial ground. In 1832, the General Assembly enacted a statute under which the trustees of a Roman Catholic church could convey to the Archbishop of Baltimore a property of no more than two acres with a church or burial ground, but the conveyance would become void if the property stopped being used exclusively as a church or burial ground. See id. at 170-71, 28 A. at 979. In 1840, pursuant to the 1832 statute, the trustees of St. John's German Catholic Church of Baltimore conveyed to the Archbishop of Baltimore a property that contained a burial ground. See id. at 169-70, 28 A. at 979.

Decades later, after the General Assembly enacted Art. 16, § 79 in 1868, the Archbishop of Baltimore filed an action under the statute. See id. at 170, 28 A. at 979. Although we lacked the record of the action under Art. 16, § 79, we stated that we understood "the agreement of counsel to mean that [that action was] regularly conducted in compliance with the statute." Id. at 170, 28 A. at 979. In that action, the trial court appointed a trustee to sell the property for another purpose. See id. at 170, 28 A. at 979. In 1873, the trustee issued to the buyer a deed indicating that the property was formerly used as a burial ground. See id. at 170, 28 A. at 979.

Eventually, Ansil H. Sibley acquired the property. See id. at 172, 28 A. at 980. Afterward, Mr. Sibley and Moses B. Gump entered into a contract under which Mr. Sibley would sell the property to Mr. Gump. See id. at 166, 28 A. at 978. Evidently, Mr. Gump had second thoughts about buying the property. See id. at 172, 28 A. at 980. Mr. Sibley sued Mr. Gump, asking the trial court to order him to go through with buying the property. See id. at 166, 28 A. at 978. The trial court did so, and Mr. Gump appealed, contending that Mr. Sibley lacked good title to the property. See id. at 166, 28 A. at 978.

We affirmed, concluding that Mr. Sibley had good title to the property. See id. at 172, 28 A. at 980. We determined that, under Art. 16, § 79, the Archbishop of Baltimore was permitted have the property sold for another purpose, and he was no longer subject to the requirement in the 1832 statute that he use the property exclusively as a burial ground. See id. at 171-72, 28 A. at 979. We held that good title to the property passed through the action under Art. 16, § 79. See id. at 172, 28 A. at 980.

The takeaway of Partridge, Reed, and Gump is that, under Art. 16, § 79, for a burial ground to be sold for another purpose, and for good title to pass, the owner was required to file an action under the statute and prove that the sale was necessary and would be in the interest of, and to the advantage of, the parties. If the owner proved these circumstances, then the burial ground could be sold for another purpose and good title could pass, as was the case in Partridge, 39 Md. at 639, and Gump, 79 Md. at 171-72, 28 A. at 979. By contrast, if the owner failed to prove that the sale of the burial ground for another purpose was necessary, there could be no sale, as was the case in Reed, 56 Md. at 253.

The principle demonstrated by <u>Partridge</u>, <u>Reed</u>, and <u>Gump</u>—*i.e.*, that the statute must be complied with for a burial ground to be sold for another purpose—remains good law. Although the General Assembly has changed what the owner of a burial ground must prove—from the "necessary and [] for the interest and advantage of the parties" standard under Art. 16, § 79, as enacted in 1868, to the "expedient or [] in the interest of the parties" standard under BR § 5-505(b)—this change does not affect the principle that, to have a burial ground sold for another purpose, the owner must satisfy the requirements of the statute.

This conclusion is in no way affected by <u>Rayner v. Nugent</u>, 60 Md. 515 (1883), a case in which we did not address the question of whether a burial ground could be sold outside of the provisions of Art. 16, § 79. Mr. Rayner sought to set aside a sale, by Mr. Nugent's estate to him, of property that was previously used as a burial ground. <u>See</u> <u>id.</u> at 516. Mr. Nugent had purchased the property from a church. <u>See</u> <u>id.</u> at 517. Before conveyance of the property to Mr. Nugent, the church had paid back some holders of certificates who reinterred their deceased elsewhere, and other bodies buried in the cemetery were taken up and reinterred in another cemetery. <u>See</u> <u>id.</u> at 517-18.

In objecting to the ratification of Mr. Nugent's estate's sale of the property to him, Mr. Rayner argued that the "sale to Nugent was not made under the Act of Assembly [Art. 16, § 79] relating to the sale of burial grounds, and that said lot-holders would have the right to assert their claim against [him], who has notice of their rights." <u>Id.</u> at 517. In other words, Mr. Rayner excepted to the ratification of the sale, contending that the outstanding certificates made the title to the property clouded and unmarketable. <u>See</u> <u>id.</u> Despite Mr.

Rayner's contention concerning the sale to Mr. Nugent having been made outside of Art. 16, § 79, this Court decided the matter on other grounds. See id. at 520. We held that, because the certificates used by the cemetery were issued without the seal of the corporation and with no other formality (*e.g.*, the certificates were not recorded), their only effect was to confer a privilege or license for burial on the holders, not an interest in the property. See id. at 520.

We explained that, where an individual acquires a right of burial through a certificate that is not recorded and under seal, the individual does not receive an easement, and instead merely obtains a privilege or license to have remains buried on the property— that is, as long as it is still being used as a burial ground. See id. at 518-19. We cited two cases, including Partridge, 39 Md. at 637, for the proposition that, where a property lawfully stops being used as a burial ground, the holders of burial lots no longer have a right of burial in the property, and instead can only have remains removed from the property. See Rayner, 60 Md. at 519. We concluded that Rayner was not distinguishable from Partridge on the ground that the church's sale of the property to Mr. Nugent was not pursuant to an action under Art. 16, § 79. See Rayner, 60 Md. at 520. We explained that Art. 16, § 79 was consistent with the principle on which we relied in Rayner—*i.e.*, that a right of burial can be extinguished where it is based on a certificate that is not recorded and under seal. See id.

We expressly stated that the appeal had been decided based on the doctrine related to rights conferred by certificates. See id. In resolving the appeal on that ground, we did not address the issue raised by Mr. Rayner as to whether a sale outside of Art. 16, § 79

rendered title unmarketable or constituted a ground for setting aside the sale. See id. at 520.

We mentioned, however, that Art. 16, § 79 "furnished additional facilities for parties interested in abandoned burial grounds to procure a sale of the same[.]" Id. Nothing in Nugent states that compliance with Art. 16, § 79 was not mandatory or that a valid sale of property that ceased to be used as a burial ground could have occurred absent compliance with the statute.

The Majority is wrong that Rayner indicates that the provisions of BR § 5-505 are optional. See Maj. Slip Op. at 46 n.31, 65, 75. The church's sale of the property to Mr. Nugent, as the Majority acknowledges, took place in 1867—i.e., the year before the General Assembly enacted Art. 16, § 79 in 1868. See Maj. Slip Op. at 64 n.46; Rayner, 60 Md. at 518, 520. The reason that Art. 16, § 79 did not apply to the church's sale of the property to Mr. Nugent was not that compliance with the statute was optional, but instead that the statute did not even exist yet. Nor did Art. 16, § 79 apply to Mr. Nugent's estate's sale of the property to Mr. Rayner, given that, by that time, the remains had been removed and the property was no longer a burial ground. See id. at 516, 518.[12] This makes clear that, when we stated in Rayner, 60 Md. at 520, that Art. 16, § 79 "furnished additional

---

[12]Unlike Mr. Nugent's estate's sale of the property to Mr. Rayner in Rayner, 60 Md. at 516, 518, the actions under Art. 16, § 79 in Partridge, Reed, and Gump, as well as the Commission's attempt to sell Moses Cemetery for another purpose, took place when the properties evidently still contained remains and thus were still burial grounds. See Partridge, 39 Md. at 638 (The trial court ordered trustees to have remains removed and reburied before selling a burial ground for another purpose.); Reed, 56 Md. at 249 (In seeking to have a burial ground sold for another purpose, the owners acknowledged that the remains needed to be removed and reburied.); Gump, 79 Md. at 170, 28 A. at 979 (After a sale pursuant to an action under Art. 16, § 79, a deed was issued indicating that the property was formerly used as a burial ground.).

facilities for parties interested in abandoned burial grounds to procure a sale of the same[,]"

we were not implying at all that Art. 16, § 79 created an optional method of having a burial

ground sold for another purpose. Rather, we were explaining that, by setting forth the

procedures for the sale of a burial ground for another purpose, Art. 16, § 79 set forth

additional requirements (facilities) that did not exist at the time of the church's sale of the

property to Mr. Nugent.

The Majority is wrong that Rayner stands for the proposition that "the owner of a

burial ground has 'the lawful power and authority' to seek to abandon a burial ground

without going through the BR § 5-505 process[.]" Maj. Slip Op. at 46 n.31 (quoting

Rayner, 60 Md. at 519). The language in Rayner that the Majority that relies on states in

pertinent part that, when the church "decided that the ground was no longer desirable as a

place of interment, possessing the lawful power and authority so to determine, that decision

operated to revoke the certificate or license, and the right of further interment was

extinguished." Rayner, 60 Md. at 519. With this remark, we were referring to the church's

determination that the property was no longer suitable as a burial ground and that remains

would be reinterred.[13] This statement in no way meant or implied that, after 1868, the

owner of a burial ground could make a decision to abandon, much less sell, the property

absent compliance with Art. 16, § 79. Both the church's sale of the property to Mr. Nugent

and the church's removal of remains took place in 1867, the year before the General

Assembly enacted Art. 16, § 79 in 1868. See Rayner, 60 Md. at 518. In Rayner, when we

---

[13]We explained that the church's removal of remains helped demonstrate that the church made such a determination. See Rayner, 60 Md. at 519.

referred to the sale as "a private one, and not made under a bill filed according to the provisions of the Act of 1868," we did so because the Act did not exist in 1867, at the time of the church's sale of the property to Mr. Nugent. Id. at 520. Language referring to occurrences before Art. 16, § 79 was enacted could in no way mean that the provisions of the statute are optional. Simply put, Rayner does not stand for the proposition that the owner of a burial ground may abandon and/or sell it without complying with BR § 5-505.

Rayner does not in any way detract from the circumstance that Partridge, Reed, and Gump demonstrate that compliance with Art. 16, § 79 was mandatory. Our case law, as well as the plain language and legislative history of BR § 5-505, establish that the same is true of the current version of the statute—*i.e.*, the provisions of BR § 5-505 are also mandatory.[14]

## Deeds or Certificates

In *dicta*, the Majority indicates that, even if BR § 5-505 were mandatory, it would likely not apply to Moses Cemetery because Petitioners have not proven that deeds were executed or certificates were issued to buyers of burial lots in the cemetery, as contemplated by BR § 5-505(a)(2). See Maj. Slip Op. at 76 n.56. The issue of what the

---

[14]This conclusion is unaffected by *dicta* from subsequent cases. For instance, in Hickman, ex rel. Hickman v. Carven, 366 Md. 362, 371-72, 784 A.2d 31, 36 (2001), we stated that BR § 5-505 "provide[s] for, and perhaps requires, a court judgment prior to the sale of a burial ground." We stated that, without a judgment for the sale of a burial ground for another purpose, "it may well be that a deed to land that constitutes a burial ground does not pass title free of [] claims" by the owners of the burial ground and the holders of burial lots. Id. at 372, 784 A.2d at 37 (emphasis omitted). As the Majority acknowledges, the former statement in Hickman was *dicta*. See Maj. Slip Op. at 71 n.51. Indeed, both of the above statements in Hickman were *dicta* because BR § 5-505 and its prior versions were not at issue in the case.

evidence in this case supposedly shows as to Petitioner's ability to satisfy the requirements of BR § 5-505 is not dispositive of the question of whether BR § 5-505 is mandatory. It would be flawed reasoning to conclude that BR § 5-505 is optional in every case simply because, in this particular case, Petitioners allegedly could not satisfy all of the criteria set forth in the statute.[15]

Additionally, the contention by the Commission that the alleged lack of deeds or certificates renders BR § 5-505 inapplicable is not properly before this Court because the Commission did not raise that argument in the Appellate Court or in a conditional cross-petition for a writ of *certiorari*. Under Maryland Rule 8-131(b)(1), we ordinarily do not consider an issue that was not raised in a petition or cross-petition for a writ of *certiorari* or was not preserved for our review. "To preserve an issue for this Court's review, a party must raise the issue in the [Appellate Court] if the case came before that Court." Balt. Cnty. v. Quinlan, 466 Md. 1, 16, 215 A.3d 282, 291 (2019) (cleaned up). In this case, in the Appellate Court, although the Commission contended that Petitioners needed to "produce certificates or deeds to establish their standing," the Commission did "not argue that the absence of deeds and certificates means that BR § 5-505 does not apply to" Moses Cemetery. Hous. Opportunities Comm'n of Montgomery Cnty. v. Adebayo, 258 Md. App. 137, 159-60 & n.17, 297 A.3d 289, 302 & n.17 (2023).

---

[15]By way of analogy, under Md. Code Ann., Health Occ. (1981, 2021 Repl. Vol.) § 7-302(b)(1), an individual must have a license to serve as a funeral director. That provision would not become optional in every case if it were determined in one specific case that an applicant did not meet the requirements for a funeral director license.

In addition to being unpreserved, the issue of whether deeds were executed or certificates were issued for burial lots in Moses Cemetery is a purely factual question that would be resolved by the circuit court, not this Court. Yet, the Majority essentially concludes that, because the record does not contain deeds or certificates associated with Moses Cemetery, none ever existed in the first place. See Maj. Slip Op. at 76 n.56. This amounts to appellate fact-finding, and, "under well-established rules of appellate review, this Court is not a fact-finder[.]" Grimm v. State, 458 Md. 602, 655, 183 A.3d 167, 198 (2018) (cleaned up).

In any event, the matter is beside the point because BR § 5-505(a)(2) does not indicate that, where the relatives of the deceased are unable to produce deeds or certificates, the owner of a burial ground is relieved of the requirement to file an action under the statute. BR § 5-505 creates a requirement for the owner of a burial ground to file an action under the statute, not an obligation for relatives of the deceased to come forward with documentation concerning deeds or certificates. In this case, when denying the Commission's motion to dismiss and granting a preliminary injunction, the circuit court correctly concluded that BR § 5-505(a)(2) did not require Petitioners to produce deeds or certificates when filing the complaint.[16]

---

[16]The Majority insists that BR § 5-505 applies only if deeds were executed or certificates were issued. See Maj. Slip. Op. at 76 n.55. As already explained, the language at issue in BR § 5-505 does not relieve a burial ground owner of compliance with the statute where there are no deeds or certificates—instead, that language means that the existence or lack of existence of deeds or certificates is among other matters for a court to determine under BR § 5-505.

- 40 -

Even though BR § 5-505(a)(2) did not obligate them to do so, Petitioners provided a reasonable explanation as to why there might not necessarily be a deed or certificate associated with every burial lot in Moses Cemetery. In its opinion granting a preliminary injunction, the circuit court stated that it found, Petitioner, Reverend Abioise Olusegun Adebayo's testimony credible. As the circuit court explained, Reverend Adebayo is the pastor of the Macedonia Baptist Church, which is approximately half a mile from Moses Cemetery. The circuit court observed that, after being asked whether deeds were given to individuals buried in historically African American cemeteries, Reverend Adebayo responded that members of the Macedonia Baptist Church did not have deeds for burial lots within Moses Cemetery. Instead, Reverend Adebayo explained, after the Macedonia Baptist Church sold burial lots to its members for a nominal price, their relatives simply knew where their loved ones were buried within Moses Cemetery, and they visited those burial lots. It is to be expected that individuals who were buried in Moses Cemetery—including formerly enslaved people—were not necessarily always provided the same level of documentation as those who were buried in cemeteries outside historically marginalized communities.

### The Impact of the Majority's Decision

Moses Cemetery is not the only burial ground that the Majority's decision will affect. As of today, any funeral home or other owner of a burial ground in Maryland may sell it for another purpose without seeking court approval. This clearly undermines the important interests that the statute was designed to protect.

The risk to preservation of burial grounds in this State will be greatest in historically marginalized communities, which will likely be unable to successfully challenge sales of burial grounds for other purposes. In this case, as a result of the Majority's decision, the Commission is free of the requirement to file an action under BR § 5-505 to have Moses Cemetery sold for another purpose. The cemetery, which is a legacy of the River Road African American Community and home to remains of formerly enslaved people, may change hands and continue to be desecrated without any regard for the memory of the deceased or the individuals whose ancestors are buried there.

Respectfully, in my view, it will now fall to the General Assembly to consider addressing the risks created by the Majority's decision. As discussed above, the plain language of BR § 5-505 and its legislative history demonstrate that compliance with the statute is mandatory. An express statement to that effect in BR § 5-505 would give meaning to the General Assembly's intent to protect burial grounds, just as the language stating that the statute applied "in any case in which a burial ground has ceased to be used for burial purposes" did in BR § 5-505's predecessor, Art. 16, § 79, and would supersede the majority opinion.

For the above reasons, respectfully, I dissent.

Circuit Court for Montgomery County
Case No.: 486734V
Argued: January 8, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 18

September Term, 2023

_____

BETHESDA AFRICAN CEMETERY
COALITION, ET AL.

v.

HOUSING OPPORTUNITIES
COMMISSION OF MONTGOMERY
COUNTY

_____

Fader, CJ.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Dissenting Opinion by Hotten, J.

_____

Filed: August 30, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision.

*At a fundamental level, there is privilege in a permanent, marked grave, which implies that the deceased in some way deserves eternal remembrance. Black and Indigenous people in this country have systematically been deprived of this permanence, their graves razed and erased.*[1]

### Introduction

Respectfully, I dissent.

The circuit court provided an extensive history of the case in this record, which we reference, in part, below. In Montgomery County, Maryland, near Bethesda, land identified as parcel 175 and the adjacent parcel 177 served as an informal burial ground for the remains of enslaved Black persons and their descendants, who served as labor on several plantations near River Road, decades after the Civil War. The Moses Cemetery was established on parcels 175 and 177[2] in 1910. In 1958, after an estimated 200 or more persons were buried in the Cemetery, the parcels were sold to developer Leo Furr. After subsequent transfers to other developers, Westwood Tower Apartments ("Westwood") was constructed on parcels 175, 238, and 240, in 1968. Moses Cemetery was largely paved over as a parking lot for Westwood, but the buried remains were never relocated.

---

[1] Devinne Melecki, *The Potential of Our Decay: Cemeteries That Save the American Landscape*, SMITHSONIAN MAGAZINE, April 17, 2023, *archived at* https://perma.cc/T5FU-UKYK (citing Char Adams, *The Growing Movement to Save Black Cemeteries*, NBC NEWS, February 10, 2022, *archived at* https://perma.cc/W7PA-A8EP ("Historical Black burial sites are a reminder of the ways Black humanity is devalued in life and in death."); Sue Sturgis, *Wal-Mart's History of Destroying Sacred Sites*, FACING SOUTH, September 3, 2009, *archived at* https://perma.cc/2NQK-86G3 (detailing many instances of destruction of Indigenous burial grounds)).

[2] Parcel 177 is not subject to Petitioners' suit but serves as "an unpaved parking area [owned] by [an] adjoining industrial landowner." (Footnote omitted).

In 2018, after leasing Westwood since 1997, the Housing Opportunities Commission of Montgomery County ("HOC") acquired the apartment complex and parking lot. In 2019, Petitioners, comprised of membership from the Macedonia Baptist Church, established the "Bethesda African Cemetery Coalition [("Coalition")]. . . to stop the desecration of and require the memorialization of . . . Moses African Cemetery[.]" "Macedonia Baptist Church traces its heritage back approximately 370 years, [to] when the first Africans arrived on River Road and [serves as] the sole surviving institution from the River Road African Community." (Footnotes and quotation marks omitted). In 2021, HOC contracted to sell Westwood for further development by Charger Ventures Bethesda, LLC ("Charger"). The agreement did not "contain any language restricting Charger from building a structure" on the over-paved Moses Cemetery.

On August 10, 2021, Petitioners filed a complaint, seeking a Writ of Mandamus and asserting HOC must adhere to Maryland Code Ann., Business Regulations Article ("Bus. Reg.") § 5-505 for the then-pending sale of parcel 175. On September 1, 2021, Petitioners requested an emergency temporary restraining order and preliminary injunction to prevent the sale of Westwood by HOC. Subsequent to the grant of the temporary restraining order, HOC motioned to dismiss Petitioners' complaint on September 7. A hearing on the motion to dismiss and preliminary injunction was held on September 27, 2021 before the Honorable Karla N. Smith.

Following the hearing and consideration of the record presented, on October 25, 2021, Judge Smith denied the motion to dismiss and granted the preliminary injunction, accompanied by a well-reasoned opinion. Judge Smith opined that

2

[a]lthough there is limited case law on [] Bus. Reg[.] § 5-505, *Hickman ex rel Hickman v. Carven*[, 366 Md. 362, 371, 784 A.2d 31, 36 (2001)] explains that the [General Assembly "]provided for, and perhaps requires, a court judgment prior to the sale of burial ground." This requirement is consistent with the "extensive regulations on the use and operation of land used for burial." [citing *Hickman*, 366 Md. at 371, 784 A.2d at 36.] Furthermore, [Petitioners] are correct that the [Supreme Court of Maryland] has long recognized a host of laws protecting burial grounds, what can and cannot occur on the land, and how to protect the property right[s] of the deceased and their respective assignees or descendants. [citing *Hickman*, 366 Md. at 371, 784 A.2d at 36.] [] Bus. Reg. §5-505 originated in the []Act of 1868, ch. 211, and evolved over the past 100 years with several revisions. The []Act of 1868, ch. 211 required that before the sale passes under the Act, the proof must be sufficient to satisfy the [c]ourt that such sale is necessary, as well as for the interest and advantage of the parties in the place of the burial.

\* \* \*

[The] law evolved to Art. 16[,] §119, which was amended in 1962 to reference the Maryland Rules. The law was later codified as [Bus. Reg.] § 5-505 without fundamental changes. As previously mentioned, ["w]hether a particular statute is mandatory or [discretionary] does not depend upon its form, but upon the intention of the [General Assembly], to be ascertained from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way [over another."] [quoting *Bond v. Balt.*, 118 Md. 159, 166, 84 A. 258, 260 (1912).]

Upon such consideration, the [c]ourt is not convinced that the [General Assembly] created [Bus. Reg.] § 5-505 to be permissive over mandatory. [citing *Hitchins v. Mayor & City Council of Cumberland*, 215 Md. 315, 323, 138 A.2d 359, 362 (1958); *Hersh v. Welsh*, 179 Md. 270, 274, 18 A.2d 202, 204 (1941)]. The [General Assembly] implemented such protections for burial grounds as means of respecting the final resting place of the deceased.

\* \* \*

Based upon the above analysis, the [c]ourt finds [] Bus. Reg. § 5-505 imposes a mandatory duty on an owner of property to act prior to selling the property that is being used for purpose other than as burial ground. Once [] Bus. Reg. § 5-505 is invoked, [Maryland] Rule § 14-401 serves as a mandatory procedural rule focused on what must be contained in the complaint.

(Footnotes omitted).

3

HOC timely appealed to the Appellate Court of Maryland, which reversed. *Hous. Opportunities Comm'n of Montgomery Cnty. v. Adebayo*, 258 Md. App. 137, 144–45, 297 A.3d 289, 294 (2023). The Coalition thereafter noted an appeal to this Court. *Bethesda African Cemetery Coalition, et al. v. Hous. Opportunities Comm'n of Montgomery Cnty.*, 486 Md. 96, 302 A.3d 542 (2023). The proposed sale to developers dissolved during the pendency of the case. *HOC*, 258 Md. App. at 156, 297 A.3d at 300.

## Discussion

In considering the propriety of the circuit court granting a preliminary injunction, the question of whether the duties and requirements outlined in Bus. Reg. § 5-505 are mandatory or permissive serves as a critical focal point. Bus. Reg. § 5-505 provides that,

(a) *An action may be brought in accordance with the Maryland Rules* and a court may pass a judgment for sale of a burial ground for another purpose if:

    (1) the ground has been dedicated and used for burial;
    (2) burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots;
    (3) the ground has ceased to be used for burial; and
    (4) it is desirable to dispose of the burial ground for another purpose.

(b) If the court is satisfied that it is expedient or would be in the interest of the parties to sell the burial ground, the court:

    (1) may pass a judgment for the sale of the burial ground on the terms and notice the court sets;
    (2) shall order that as much of the proceeds of the sale as necessary be used to pay the expenses of removing any human remains in the burial ground, buying burial lots in another burial ground, and reburying the remains; and
    (3) shall distribute the remaining proceeds of the sale among the parties according to their interests.

(c) A judgment for the sale of a burial ground passes to the buyer of the burial ground the title to the burial ground free of the claims of:

>    (1) the owners of the burial ground; and
>    (2) the holders of burial lots.

(Emphasis added).

The General Assembly grants mandatory jurisdiction for the courts to oversee the sale of certain burial grounds for another purpose, based on the language, context, legislative history and remedial nature of Bus. Reg. § 5-505. This interpretation is consistent with the conclusion by Judge Smith that "the statute expressly applies when (1) the ground has been dedicated and used for burial; (2) burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots; (3) the ground has ceased to be used for burial; and (4) it is desirable to dispose of the burial ground for another purpose." (Citing Bus. Reg. § 5-505).

*Standard of Review.*

"Where questions of law and statutory interpretation are presented, this Court reviews them *de novo*[.]" *Wheeling v. Selene Fin. LP*, 473 Md. 356, 373, 250 A.3d 197, 207 (2021) (citations omitted).

*Statutory Interpretation of "may."*

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the [General Assembly]. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is

5

unambiguous *and clearly consistent with the statute's apparent purpose*, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.

We, however, *do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone.* Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the [General Assembly] in enacting the statute. We presume that the [General Assembly] intends its enactments to operate together as a consistent and harmonious body of law, and, thus, *we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope*.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions. In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Lockshin v. Semsker*, 412 Md. 257, 274–76, 987 A.2d 18, 28–29 (2010) (cleaned up) (emphasis added); *see also Elsberry v. Stanley Martin Companies, LLC*, 482 Md. 159, 179, 286 A.3d 1, 12 (2022) ("Consideration of the plain meaning of the statutory language does not entail a bare, isolated, or literal reading of the statutory language.") (citation omitted). Further, "the modern tendency of this Court is to continue the analysis of the statute beyond the plain meaning to examine extrinsic sources of legislative intent in order to check our

6

reading of a statute's plain language through examining the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments." *In re S.K.*, 466 Md. 31, 50, 215 A.3d 300, 311 (2019) (cleaned up).

The Appellate Court focused on the word "may" in concluding that "[Bus. Reg.] § 5-505 is . . . a quiet-title statute[]" that "does not compel HOC to seek court approval for the sale of parcel 175." *HOC*, 258 Md. App. at 196, 297 A.3d at 324.  Rather, "HOC can sell the property without court approval, but the [lotholders'] rights will not have been extinguished by a court order." *Id.* at 197, 297 A.3d at 324.  In reaching its conclusion, the Appellate Court did not adhere to our precedent regarding statutory interpretation or permissive and mandatory statutes.  "[I]t is well settled that the use of the words 'shall' or 'may' *are not controlling*, in determining whether a particular provision is mandatory or directory."  *Hitchens*, 215 Md. at 323, 138 A.2d at 362 (citations omitted) (emphasis added); *see also Md.-Nat'l Cap. Park and Plan. Comm'n. v. Silkor Dev. Corp.*, 246 Md. 516, 524, 229 A.2d 135, 140 (1967) (construing the word 'may' to signal the "ordinary significance of permission *unless the context or purpose of the statute shows that it is meant to be imperative*[.]") (citation omitted) (emphasis added).

While "may" is *typically* discretionary, certain appearances of permission are mandatory.  *See, e.g.*, *Office & Pro. Emps. Int'l Union, Local 2 (AFL-CIO) v. Mass Transit Admin.*, 295 Md. 88, 96, 453 A.2d 1191, 1195 (1982) ("*MTA*") ("[W]here a statute authorizes or permits a person or agency to take a certain type of action in a particular manner, such manner becomes a mandatory limitation, and the action must be taken in conformity with it.") (citation omitted); *see also Hersh*, 179 Md. at 274, 18 A.2d at 204

7

("[W]ords by which acts are to be performed in the public interest are construed as imposing duties rather than discretion.") (citations omitted).

"The regulation of cemeteries in the interest of the public health is within the police power of the state." *Gordon v. Comm'rs of Montgomery Cnty.*, 164 Md. 210, 213, 164 A. 676, 678 (1933). Accordingly, our precedent shows that "may" as reflected in Bus. Reg. § 5-505, could be construed as mandatory, given its public purpose to regulate cemeteries. "May" is susceptible to "more than one reasonable interpretation," therefore, it is ambiguous. *Lockshin*, 412 Md. at 276, 987 A.2d at 29. To resolve whether Bus. Reg. § 5-505 is permissive or mandatory, we must examine other indicia of legislative intent. *Id.*, 987 A.2d at 29. Even assuming, *arguendo*, that "may" is unambiguous, our precedent still leads us to consider the context, statutory scheme and legislative history of Bus. Reg. § 5-505. *In re S.K.*, 466 Md. at 50, 215 A.3d at 311.

*Bus. Reg. § 5-505 Has Granted Mandatory Court Jurisdiction Since Inception.*

Bus. Reg. § 5-505 has previously been construed as mandatory for the sale of certain burial grounds that are utilized for another purpose. Courts have been intimately involved in transfers of such property between parties. At the time of the Act of 1868, ch. 211—the genesis of Bus. Reg. § 5-505—almost all "[d]eed or [d]eeds of [c]onveyance or [c]onveyances" were required to be filed with the courts to be valid transfers of property rights. Archives of Maryland, Vol. 26, Page 262–63. Landowners are required to file land transfers with the courts today. Maryland Code Ann., Real Property Article ("Real Prop.") §§ 3-101, 3-103, 3-703; *Mayor and City Council of Balt. v. Thorton Mellon, LLC*, 478 Md. 396, 412–13, 274 A.3d 1079, 1088 (2022) ("[W]ith limited exception, the only means by

8

which legal title to real property can transfer . . . is by recording a deed[.]") (footnote omitted).

Also, use restrictions run with the land in burial grounds. In the past, perpetual usage as a burial ground has largely been provided via the deed, land grants, or easements. *See, e.g.*, *Beatty v. Kurtz*, 27 U.S. (2 Pet.) 566, 584 (1829) ("The property consecrated to their use by a *perpetual servitude or easement*[.]") (emphasis added); *Reed v. Stouffer*, 56 Md. 236, 247–48 (1881) ("John Eager Howard . . . executed a deed of conveyance of a lot . . . to and for the use and behoof of the [] German Baptist Society forever. . . . [I]t was the intention of said Howard, that the said lot of ground should at all times thereafter be used as a burial ground[.]" (internal quotation marks omitted)).

More recently, our Court recognized buried remains are protected, regardless of the presence of deed language or covenants. *See, e.g.*, *Radomer Russ-Pol Unterstitzung Verein of Balt. City v. Posner*, 176 Md. 332, 339, 4 A.2d 743, 746 (1939) (After burial, "the body is in the custody of the law, and its disinterment and removal [are] subject to the direction and removal of a court of equity[.]" (citations omitted)); *Dougherty v. Mercantile-Safe Deposit & Trust Co.*, 282 Md. 617, 620, 387 A.2d 244, 246 (1978) ("[W]hen the duty to furnish proper burial has been discharged, . . . the body is thereafter in the custody of the law and disinterment or disturbance of the body is subject to the control of a court of equity."); *see also Unger v. Berger*, 214 Md. App 426, 434, 76 A.3d 510, 515 (2013) ("[O]nce a body has been buried, it 'is subject to the control of a court of equity.'" (quoting *Dougherty*, 282 Md. at 620, 387 A.2d at 246)).

9

Prohibitions on disinterment directly speak to what landowners can do with the ground itself, as well as any remains. By the same respect, that a court can order disinterment speaks to the same court control of the remains, and the inherent court interest in the land to effectuate such protections. Prohibitions against any disturbance of buried remains find the same result. That the remains are in the control of the courts necessitates that the ground surrounding those remains is implicated as well, otherwise the power of the courts is a nullity. This court interest runs with the land so long as the remains are buried. *Yome v. Gorman*, 242 N.Y. 395, 403, 152 N.E. 126, 129 (1926) (Cardozo, J.) ("The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose[.]" (citations omitted)); *Radomer*, 176 Md. at 339, 4 A.2d at 746. To that end, enforceable use restrictions run with the land to prevent disinterment and disturbance of the buried remains and the grounds they are buried in.

Within the context of required filing and for the purpose of removing these use restrictions, "[u]pon any bill being filed for the sale[3] of any ground dedicated and used for the purposes of burial in which lots have been sold and deeds executed or certificates issued . . . , the court may[4] order notice . . . [and] upon being satisfied from the testimony, that it

---

[3] *Bill of Sale*, THE GUTENBERG WEBSTER'S UNABRIDGED DICTIONARY, *archived at* https://perma.cc/MY2V-X4ZS ("a formal instrument for the conveyance or transfer of goods and chattels."); *see also Bill of Sale*, CORNELL LEGAL INFORMATION INSTITUTE, *archived at* https://perma.cc/F6AQ-7ML2 ("A bill of sale is a written instrument that attests to a buyer's purchase of property from a seller.")

[4] The potential *court* discretion reflected in the statute is not at issue in the case at bar.

is necessary . . . that the ground should be sold, may forthwith pass a decree for sale of [that ground.]" Archives of Maryland, Vol. 142 at 2706–07 (emphasis added).[5] Read together, there was no discretion by landowners regarding whether the Act of 1868, ch. 211 applied to a bill of sale for certain burial grounds. Landowners were separately

[5] The 1868 statute in full, read:

*Upon any bill being filed for the sale of any ground* dedicated and used for the purposes of burial in which lots have been sold and deeds executed or certificates issued to the purchasers of such lots, provided such lots shall be no longer used for burial purposes, the court may order notice to be given by publication in one or more newspapers published in the city or county in which the ground to be sold may be situated, stating the substance and object of the said bill, and containing the names of the original lotholders or their assignees if known, warning all the lotholders, whether they be residents or non-residents, adults or infants to appear on or before a day fixed in such order and show cause why the relief prayed should not be granted, and such notice shall be published as the court may direct, not less however than once a week for four successive weeks, two months before the day fixed by such order for the appearance of the parties, and if such [lotholders] shall not appear at the time stated in such notice a commission to take testimony may be issued by the complainant ex parte. That after the return of such commission the court, upon being satisfied from the testimony, that it is necessary and would be for the interest and advantage of the parties interested that the ground should be sold, may forthwith pass a decree for the sale of the same upon such terms as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests as the same shall be shown to the court. That a decree passed in a proceeding for the sale of a burial ground shall be valid to pass the title to the purchaser or purchasers of the same or any part thereof free, clear and discharged of and from the claims of the corporation or trustees who may hold the same for the purposes aforesaid, their successors or assigns and of all persons an interest as [lotholders] in such ground whether they are entitled as original [lotholders] and whether they be residents or non-residents, adults or infants.

Archives of Maryland, Vol. 142 at 2706–07 (emphasis added).

11

required to submit bills of sale to the courts to validly transfer the lands. At the same time, courts had an enforceable land interest in protecting the repose of the buried remains. So, once a bill of sale was filed, the Act of 1868 granted jurisdiction to the courts to oversee these specialized transfers in order to safeguard the rights of landowners and the additional interested parties such as lotholders and their successors, and to clear these use restrictions in the land from clouding the title. *See Partridge v. First Independent Church of Balt.*, 39 Md. 631, 637 (1874) ("Whenever, therefore, *by lawful authority*, the ground ceased to be a place of burial, . . .") (emphasis added); *Rayner v. Nugent*, 60 Md. 515, 519 (1883) (same).

In 1888, the General Assembly revised the Act of 1868 and provided courts with jurisdiction "[*i*]*n any case* in which a burial ground has ceased to be used for burial purposes[.]" Art. 16, § 92 (1888) (emphasis added).[6] "In any case" meant "whatever may

---

[6] The 1888 chapter law in full, read:

That *in any case in which a burial ground has ceased to be used for burial purposes*, and the said ground has been dedicated and used for burial purposes, and lots have been sold therein, and deeds executed or certificates issued to purchasers thereof, and it shall be considered desirable to dispose of said burial ground for other purposes, upon a *bill* being filed in any of the circuit courts of the state, *in equity*, in the city or county in which said burial ground is situated, setting forth the aforegoing facts, and containing the names of the lot owners or their assignees so far as known, the court shall order notice by publication in one or more newspapers published in the county or city where such burial ground is situated, warning all the [lotholders] or other persons in interest, residents or non-residents, adults or infants, to appear in court on or before the day fixed in said notice, to show cause why the relief prayed for should not be granted; and said notice shall be such as the court may direct, not less, however, than once a week for four successive weeks two months before the day fixed by such order for the appearance of the parties; and upon a failure of appearance by any of said lot owners, or any party in interest by the time limited in said notice, the court may order testimony to be taken ex parte, according to the usual course in

12

be the state of affairs[]" at a particular time.  *Case: In any case*, THE GUTENBERG

WEBSTER'S UNABRIDGED DICTIONARY, *archived at* https://perma.cc/H4MR-ZN5N

(emphasis omitted); *see also Case: In any case*, THE GUTENBERG CHAMBERS'S

TWENTIETH CENTURY DICTIONARY, *archived at* https://perma.cc/9C37-B5WB (defining

"[i]n any case[]" as "at all events[;] at any rate[]") (emphasis omitted); Charles H. Winfred,

ADJUDGED WORDS AND PHRASES, 95 (1882) (defining "Case" as "[w]hen applied to legal

proceedings it imports a state of facts which furnishes occasion for the exercise of the

jurisdiction of a court of justice.").

---

equity in cases of default for non-appearance, and upon testimony taken in the cause ex parte, or otherwise, if it is made to appear to the satisfaction of the court that it is expedient or would be to the interest and advantage of the parties concerned that the said burial ground should be sold, the court may forthwith pass a decree for the sale of said ground upon such terms and notice as it shall deem proper, and shall distribute the proceeds of sale among the parties interested according to their several interests, as the same shall be shown to the court; and before making said distribution the court may order and direct that so much and such part of said proceeds of sale, as shall be necessary for the purpose, shall be set aside and applied to the removal and burial of any dead that may lie in said burial ground, in the purchase of a lot in any cemetery, graveyard, or other appropriate place of sepulture, and in the expense of disinterment and re-interment of said dead; and any decree passed in a proceeding for a sale of a burial ground, as hereinbefore provided for, shall be valid to pass to the purchaser or purchasers of said burial ground the title of the same free, clear and discharged of, and from the claims of the corporation or trustees who may hold the same, their successors or assigns, and of all persons in interest as [lotholders] in such ground, whether they are entitled as original [lotholders], and whether they be residents or non-residents, adults or infants.

Archives of Maryland, Vol. 481 at 617–19 (emphasis added); *see also Bill*, CORNELL LEGAL INFORMATION INSTITUTE, *archived at* https://perma.cc/QW53-VM54 ("A bill may be an equitable pleading of a claim in a court of equity.").

The revision to "in any case" changed *when* the General Assembly vested courts with jurisdiction to ratify the sale of burial grounds. The statute shifted from "any bill being filed for sale[,]" to "in any case" a burial ground ceased operations and sale for another purpose was "considered desirable." Art. 16, § 92 (1888). A sale for another purpose could only be pursued upon cessation of burial operations. *Id.* The cessation of the burial operations and related sale process logically occurs prior to filing a finalized bill of sale. Accordingly, as of 1888, the General Assembly required court oversight for and ratification of the entire sale process of such sensitive land transfers as burial grounds shifting to another purpose. As Judge Smith explained, "[t]his requirement is consistent with the 'extensive regulations on the use and operation of land used for burial.' . . . The [General Assembly] implemented such protections for burial grounds as a means of respecting the final resting place of the deceased." (Quoting *Hickman*, 366 Md. at 371, 784 A.3d at 36; footnotes omitted); *see also Hickman*, 366 Md. at 371, 784 A.3d at 36 ("A place for the burial of the dead[] has characteristics differing from those of an ordinary tract of land. To many[,] it is sacred ground which should not suffer intrusion . . . . In furtherance of that notion, the [General Assembly] has enacted a host of laws protective of burial grounds, laws that limit what may be done with and on them.") (citations and quotation marks omitted).

Bus. Reg. § 5-505 remained substantively unchanged from 1888 to 1962. *See* Art. 16, § 103 (1904); Art. 16, § 107 (1912); Art. 16, § 110 (1924); Art. 16, § 115 (1939); Art. 16, § 124 (1951). In 1962, the General Assembly amended Bus. Reg. § 5-505 to allow the Maryland Rules to govern the procedure under the statute. *See* Art. 16, § 119 (1966) ("[A]n

14

action for sale of said ground may be commenced in accordance with the Maryland Rules."); *see also* Maryland Rules J70–73 (1966); Maryland Rule 14-401 (2024) (derived from Maryland Rules J70–73). Bus. Reg. § 5-505 was otherwise unchanged and mandatory court jurisdiction remained "[i]n any case in which a burial ground has ceased to be used for burial purposes[.]" Art. 16, § 119 (1966).

In 1992, Art. 16, § 119, was recodified by the General Assembly for the purpose of "revis[ing], restat[ing], and recodify[ing]" relevant statutes into the new Business Regulations Article. Archives of Maryland, Vol. 808 at 9, 164–65. What would become Bus. Reg. § 5-505 was "derived without substantive change from former Art. 16, § 119." *Id.* at 165; Bus. Reg. § 5-505 legislative note. In recodifying Art. 16, § 119, the General Assembly did not alter the mandatory court jurisdiction in the sale of certain former burial grounds. *MTA*, 295 Md. at 100, 453 A.3d at 1197 ("A change in the phraseology of a statute as part of a recodification will ordinarily not be deemed to modify the law unless the change is such that the intention of the [General Assembly] to modify the law is unmistakable.") (citation omitted).

It appears that the Appellate Court did not conduct a statutory language analysis of Bus. Reg. § 5-505; did not note the ambiguity of the word "may" in line with our precedent; did not analyze the legislative history of Bus. Reg. § 5-505; and thus, did not address the mandatory jurisdiction the General Assembly created in 1868, ch. 211 that remains present today. Judge Smith acknowledged references to the September 1984 Maryland Rules Committee Meeting Minutes in support of its conclusion that Bus. Reg. § 5-505 is mandatory. The excerpts which were referenced are reflected below.

15

Judge Smith noted that, "[a]s Ms. [Anne C.] Ogletree, [former] Chair[] of the Subcommittee on Property, articulated, [']Article 16, §119 sets forth the substantive law *governing the sale* of burial grounds for a purpose other than burial and provides an action for the sale.[']"  (Emphasis added); *see also* September 14–15, 1984 Maryland Rules Committee Meeting Minutes ("*Minutes*") at 100 ("Ms. Ogletree explained that Code, Article 16, §119 sets forth the substantive law governing the sale of burial ground for a purpose other than burial and provides an action for the sale may be commenced in accordance with the Maryland Rules.").  Former Rules Committee Member "Ms. [Linda M.] Richards inquired if the complaint *seeking authority to sell* for a different purpose may be filed when the ground has not ceased to be used for burial.  Ms. Ogletree replied that this is substantive law governed by the [Maryland] Code.  Article 16, §119 provides that an action may be commenced if, inter alia, the burial ground has ceased to be used for burial purposes." *Minutes* at 101 (emphasis added).

Another former Rules Committee Member, "Mr. [Alexander G.] Jones remarked that the statute appears not to apply to the family graveyard.  [Additional former Rules Committee Members] Judge [Frederick W.] Invernizzi[] and Mr. [Avery] Aisenstark agreed that there is *no need for the special procedure* in the event of sale of property on which is located a private family graveyard." *Id.* at 101–02 (emphasis added).  Judge Smith also noted that "['a]n action for sale of a burial ground could involve thousands of persons['] and [']the cost of moving the bodies usually *makes alternative use of the property unfeasible*.[']"  (Quoting *Minutes* 101–03) (emphasis added); *see also Minutes* at 103 (attributing the internal quotations to Former Rules Committee Member Judge Joseph

16

H. H. Kaplan).  Judge Smith explained that "[a]lthough such cases ['] are rare,['] the Rules Committee understood the potential of such a case is not outside the realm of possibility, as we have here."  (Citing and quoting the *Minutes* at 101–03); *see also Minutes* at 103 ("Judge Kaplan [] noted that these actions are rare.").

In reference to Bus. Reg. § 5-505, Judge Smith observed that "the statute expressly applies when (1) the ground has been dedicated and used for burial; (2) burial lots have been sold in the burial ground and deeds executed or certificates issued to buyers of the lots; (3) the ground has ceased to be used for burial; and (4) it is desirable to dispose of the burial ground for another purpose."  (Citing Bus. Reg. § 5-505).  The court concluded that "Bus. Reg. § 5-505 imposes a mandatory duty on an owner of a property to act prior to selling the property that is being used for a purpose other than as a burial ground.  Once [] Bus. Reg. § 5-505 is invoked, [Maryland] Rule § 14-401 serves as a mandatory procedural rule focused on what must be contained in the complaint."  (Citing Md. Rule § 14-401; *Minutes* at 101–03; footnotes omitted).

The Appellate Court overlooked the recognition of Bus. Reg. § 5-505 as mandatory by this Court.  *See Partridge*, 39 Md. at 636 (recognizing that "the proceedings for the sale of the burial ground . . . were under the Act of 1868, [ch.] 211, and *were in all respects regular,*[7] *and in conformity to the requirements of that Act*[.]") (emphasis added); *Reed*,

---

7 *Regular*, THE GUTENBERG WEBSTER'S UNABRIDGED DICTIONARY, *archived at* https://perma.cc/5G7L-6ZFR (Definition 1: "Conformed to a rule; agreeable to an established rule, law, principle, or type, or to established customary forms; normal . . ."; Definition 2: "Governed by rule or rules . . ."; Definition 3: "Constituted, selected, or conducted in conformity with established usages, rules, or discipline; duly authorized[.]").

56 Md. at 252–53 (recognizing that the "facts [offered in testimony] do not constitute such unsuitableness for a place of burial, and such necessity for its removal as are contemplated by the law, *and are not sufficient to warrant a sale of it*[.]") (emphasis added); *Gump v. Sibley*, 79 Md. 165, 170, 28 A. 977, 979 (1894) (acknowledging "that a decree was passed . . . for the sale of this lot . . . by virtue of the act of 1868, for the sale of burial grounds. . . . [W]e understand the agreement of counsel to mean that they *were regularly conducted in compliance with the statute*.") (emphasis added); *Diffendall v. Diffendall*, 239 Md. 32, 37, 209 A.2d 914, 916 (1965) ("This Court has recognized that, subject to constitutional limitations, the State, in the exercise of its police powers, has the right to provide for the creation of cemeteries and to regulate their use. . . .  See also Article 16, Sections 119 and 120 (*providing for the sale* of burial grounds and the removal of interred bodies under certain circumstances)[.]") (citation omitted) (emphasis added).

More recently in *Hickman*, this Court acknowledged that "the [General Assembly] enacted extensive regulations on the use and operation of land used for burial[]" in reference to Title 5 of the Business Regulations Article.  366 Md. at 371, 784 A.2d at 36.  We recognized that the General Assembly "provided for, and perhaps requires, a court judgment prior to the sale of a burial ground." *Id.*, 784 A.2d at 36.[8] *Hickman* concluded

---

[8] We also explained that "[a]bsent such a judgment, it may well be that a deed to land that constitutes a burial ground does *not* pass title free of such claims." *Hickman*, 366 Md. at 372, 784 A.2d at 37 (emphasis in original).  Not all burial grounds are subject to Bus. Reg. § 5-505. *See* Bus. Reg. § 5-505(a) (enumerating requirements of the burial grounds governed by the statute).  The relief available under Bus. Reg. § 5-505 does not envision *all* transfers of *all* burial grounds. *See Minutes* at 101–02 (noting that family burial grounds are not covered by the statute).

18

it was "evident from these statutes . . . that significant limitations have been placed on what may be done with land containing burial sites." *Id.* at 372, 784 A.2d at 37; *see also Radomer*, 176 Md. at 339, 4 A.2d at 746 (concluding that buried remains are in the control of the courts); *Dougherty*, 282 Md. at 620, 387 A.2d at 246 (same).

At its core, Bus. Reg. § 5-505 has served as a mandatory mechanism governing the sale of certain burial grounds which have ceased usage for that purpose. Landowners were required to file land transfers of this nature with the courts. Use restrictions ran with the land so long as the land served as a burial ground. The legislative history reflects court jurisdiction upon filing a bill of sale in 1868, and as of 1888, upon contemplation of a sale. Our precedent acknowledges the Act of 1868, ch. 211 was the "regular" course of business and sales of burial ground were in conformity with the requirements of the Act. In the 156 years since the Act of 1868, ch. 211, never has the mandatory nature of Bus. Reg. § 5-505 reached Maryland's appellate courts. This is because the language of Bus. Reg. § 5-505 was clear since landowners were never afforded discretion regarding the applicability of the statute since its inception. Instead, this is statute granting court jurisdiction in an extraordinary circumstance.[9]

---

[9] The mandatory nature of Bus. Reg. § 5-505 has been acknowledged by each branch of the Maryland government. *See* Maryland Department of Labor, Office of Cemetery Oversight, *General Frequently Asked Questions (FAQS) – Cemetery Oversight*, *archived at* https://perma.cc/2R9Z-LEPL ("Cemetery property may not be sold for use for another purpose *without first obtaining a court judgment* for the sale[.]") (citing Bus. Reg. § 5-505) (emphasis added); HB 877 (2018) Fiscal and Policy Note, First Reader ("To the extent a State agency must conduct a genealogical *study in order to petition the court* to sell a former burial ground . . . expenditures increase.") (emphasis added); Maryland Rule 14-301 ("[T]he rules in this Chapter govern all sales of property *that are subject to ratification by a court*.") (emphasis added); Maryland Rule 14-302 ("[T]he court may order a sale if

*The Purpose of Bus. Reg. § 5-505 Extends Beyond Granting Quiet Title.*

This Court has recognized statutes as remedial in nature when they provide "remedies not available at common law." *Pak v. Hoang*, 378 Md. 315, 326, 835 A.2d 1185, 1191 (2003) (quotation marks omitted). "We have said that once we have determined that a statute is remedial in nature that it must be liberally construed in order to effectuate the statute's broad remedial purpose." *Id.*, 835 A.3d at 1191 (cleaned up). Aside from Section (c) quieting claims by the former owners of the burial grounds and any holders of burial lots, Bus. Reg. § 5-505(b) also provides remedies of setting aside the profits of the sale for disinterment and re-burial of remains of the deceased, and distribution of sale proceeds "among the parties according to their interests."

"There is [] no right to disinterment[; r]ather[] it is a disfavored action[.]" *Unger*, 214 Md. App. at 434, 76 A.3d at 515 (citing *Dougherty*, 282 Md. at 620, 387 A.2d at 246; citations omitted); *see also* Maryland Code Ann., Criminal Law Article ("Crim. Law") § 10-402 (prohibiting the unauthorized removal of human remains from a burial site); *Yome*, 242 N.Y. at 403, 152 N.E. at 129 ("The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose[.]") (citations omitted).

"[W]here an interment takes place with the consent, express or implied, of those most interested, the interment is regarded in law as a final sepulture." *Dougherty*, 282 Md. at 621, 387 A.2d at 246 (citations omitted). Once such a body has been interred, it "is

---

satisfied that the jurisdictional requisites have been met and that the sale is appropriate. Cross references: See Code, . . . [Bus. Reg.] § 5-505 for sale of burial grounds[.]") (emphasis omitted).

20

subject to the control of a court of equity." *Id.* at 620, 387 A.2d at 246 (citation omitted). "Accordingly, it is the policy of the law, except in cases of necessity or for laudable purposes, that the sanctity of the grave should be maintained and that, once suitably buried, a body should remain undisturbed." 4 M.L.E. Cemeteries and Dead Bodies § 16 (footnote omitted). "An exigency [for removal of a body] would exist when the cemetery . . . has been abandoned as a place of burial[.]" *Radomer*, 176 Md. at 336–37, 4 A.2d at 745 (citations omitted).

Remedies for the removal and re-burial of human remains are not generally available and unauthorized removal is subject to criminal penalties. Bus. Reg. § 5-505 provides for the remedy of removal and re-burial not available at common law. Accordingly, as a remedial statute, Bus. Reg. § 5-505 "must be liberally construed in order to effectuate the statute's broad remedial purpose." *Pak*, 378 Md. at 326, 835 A.2d at 1191 (cleaned up). Where a burial ground has ceased burial practices, as is evident with one sold for another purpose, an exigency exists that must be addressed for the protection of the deceased and their surviving relatives. *Radomer*, 176 Md. at 336–37, 4 A.2d at 745. Bus. Reg. § 5-505(b) provides Maryland courts the method of addressing that exigency, through dignified removal and re-burial, protecting the remains from desecration and bulldozers. Yet, the broad remedial purpose of Bus. Reg. § 5-505 is circumvented when rendered discretionary for landowners. Our precedent demands the opposite. A liberal construction further confirms Bus. Reg. § 5-505 is mandatory to protect the remains.

*Bus. Reg. § 5-505 also Serves the Public Good.*

21

"Under Maryland law, statutes are remedial in nature if they . . . introduce regulations conducive to the public good." *Pak*, 378 Md. at 325, 835 A.3d at 1190 (citations and quotation marks omitted). Title 5 of the Business Regulations Article exemplifies Maryland's police power to regulate cemeteries and burial grounds for the health and welfare of Maryland's citizens. *Gordon*, 164 Md. at 213, 164 A. at 678; *Hickman*, 366 Md. at 371, 784 A.2d at 36. Accordingly, the General Assembly has criminalized destruction of even the shrubs or trees in cemeteries, let alone any disturbance of the interred. Crim. Law § 10-402, *et seq.*

When viewed as discretionary, Bus. Reg. § 5-505 allows landowners to avoid the judicial process in the sale of a burial ground sought to be used for another purpose. It is illegal to move human remains without authorization, to destroy headstones, trees, shrubs, and associated funerary objects,[10] or to engage in "indecent or disorderly conduct in a cemetery." Crim. Law § 10-402, *et seq.* The burial grounds protected by Bus. Reg. § 5-505 are not small family plots, but might involve numerous interments. *Minutes* at 100–03.

Bus. Reg. § 5-505 provides the remedy of re-burial, not only for the deceased and their survivors, but *also for landowners*. By providing for the removal of the remains, the statute removes land use restrictions present in all burial grounds and accommodates the

_____

[10] "'Associated funerary object' means an item of human manufacture or use that is intentionally placed[] with human remains at the time of interment in a burial site[,] or after interment, as part of a death ceremony of a culture, religion, or group[, and] includes a gravestone, monument, tomb, or other structure in or directly associated with a burial site." Crim. Law § 10-401(b)(1), (2).

22

redevelopment of the land such that it would not violate statutes that further prohibit disturbance and desecration of certain burial grounds. Bus. Reg. § 5-505 thus "protect[s] burial grounds from being used for building sites and other purposes[]" by providing for the removal of the "burial" from the "grounds." 14 Am. Jur. 2d Cemeteries § 23 (footnote omitted); Bus. Reg. § 5-101(d)(1) & (l) ("'Cemetery' means land *used or to be used* for interment[,] . . . [the] final disposition of human remains[.]") (emphasis added).

Once the remains are removed, the land ceases to be a burial ground and the statutory and common-law protections afforded thereto no longer apply. Bus. Reg. § 5-505 serves to respect the dignified repose of those remains and preserves judicial resources by preemptively meeting the task of closing a cemetery. Bus. Reg. § 5-505 accomplishes those solemn duties through required adherence and any necessary protection through removal and re-burial of remains. Bus. Reg. § 5-505(b). Bus. Reg. § 5-505 thus serves a public purpose by carefully navigating the difficult road of a cemetery reaching its end. *Gordon*, 164 Md. at 213, 164 A. at 678. Serving that public good further defines Bus. Reg. § 5-505 as a remedial statute we must liberally construe to effectuate its broad remedial purpose. *Pak*, 378 Md. at 325, 835 A.2d at 1190; *see also Hersh*, 179 Md. at 274, 18 A.2d at 204 ("[W]ords by which acts are to be performed in the public interest are construed as imposing duties rather than discretion.") (citations omitted). In contrast, a discretionary statute removes the protections afforded in Bus. Reg. § 5-505 by allowing sales to proceed, without court judgments effectuating those very protections for the human remains and landowners.

23

**The Appellate Court Erred in Its Determination that Bus. Reg. § 5-505 was a Discretionary Statute.**

As previously explained, Bus. Reg. § 5-505 has provided mandatory court jurisdiction for sales of certain burial grounds for another purpose since 1868. Jurisdiction has been prospective to those sales since 1888. In reaching its conclusion "that [Bus. Reg.] § 5-505 does not compel HOC to seek court approval[,]" *HOC*, 258 Md. App. at 196, 297 A.3d at 324, the Appellate Court erred in several ways.

*First*, the Appellate Court did not commence with analysis of the statutory construction and plain language of Bus. Reg. § 5-505, along with our precedent that "may" is not controlling on the mandatory or permissive nature of a statute. *Hitchens*, 215 Md. at 323, 138 A.2d at 362. Understanding that "may" is susceptible to multiple reasonable interpretations, the Appellate Court neither reviewed nor considered the legislative history of Bus. Reg. § 5-505 or noted that the statute has always granted mandatory jurisdiction to the courts to ratify such land transfers, given the separate requirement of landowners to file land transfers with the courts. Instead, the Appellate Court looked for a common-law prohibition against the sale of cemetery land, while ignoring that land transfers generally were subject to the jurisdiction of the courts.

*Second*, the Appellate Court relied on *Partridge*, *Reed*, and *Rayner*, to opine regarding the common-law lack of prohibition to the sale of cemeteries. Notably, in 1868, the statute was perceived as discretionary for the *courts* on whether to grant notice prior to any hearings and relief. Archives of Maryland, Vol. 142 at 2706–07. The General Assembly revised the language in 1888 to grant jurisdiction prospective to the sale process

24

and seemingly required courts to grant notice. Archives of Maryland, Vol. 481 at 617–19. The reliance by the Appellate Court on *Partridge*, *Reed*, and *Rayner* was misplaced, since these cases interpreted language regarding court discretion that was superseded by the General Assembly in 1888.[11]

*Third*, the Appellate Court concluded that the purpose of the statute was to quiet title. *HOC*, 258 Md. App. at 144, 194, 297 A.3d at 293, 323. However, the statute neither finds its home in, nor any relationship to, Real Property Article, Title 14, Subtitle 6 "Actions to Quiet Title." In fact, cemeteries and burial grounds are only briefly referenced in the Real Property Article. *See, e.g.*, Real Prop. § 14-119 (providing protections to informal burial grounds in Carroll County); Real Prop. § 14-121 (providing the method, means, and rights of access to burial sites for persons in interest); Real Prop. § 14-121.1 (requiring landowners of historical burial sites to consult with the Maryland Historical Trust for their proper care); Real Prop. § 14-122 (providing for county and municipal repair and maintenance as necessary for burial sites on land owned by private entities).

*Fourth*, the Appellate Court failed to note that Bus. Reg. § 5-505 is properly enshrined within Title 5 of the Business Regulations Article, wherein the General Assembly has strictly regulated all aspects of cemeteries, including the mandatory process in cessation. When we examine a statute, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the [General Assembly.]" *Lockshin*, 412 Md. at 276, 987 A.2d at 29 (citations omitted).

---

[11] The sales in *Rayner* took place in 1828 and 1867 and prior to the enactment of the Act of 1868. *Rayner*, 60 Md. at 517–18. Any comment by this Court on the Act was dicta.

25

The statutory scheme surrounding Bus. Reg. § 5-505 also shows the statute is mandatory. Business Regulations Article, Title 5, Subtitle 5, prohibits the following: entities from holding over certain amounts of land for burial purposes (Bus. Reg. § 5-501); public thoroughfares from being constructed through cemeteries (Bus. Reg. § 5-502); usage by lot owners of burial lots or crypts for any purpose other than burial (Bus. Reg. § 5-503); and provides the meaning and effect of conveyance of a burial lot certificate (Bus. Reg. § 5-504). Bus. Reg. § 5-505 provides the means of sales for certain burial grounds and prohibit those sales without a court judgment.[12] *See* Maryland Rules 14-301 and 14-302. Subtitle 5 provides prohibitions and means of conveyance. Bus. Reg. § 5-505 similarly provides a prohibition against sales outside its strictures and a strictly regulated means of conveyance. Thus, like the statutory surroundings of Subtitle 5, Bus. Reg. § 5-505 shows the mandatory nature of the statute, requiring strict adherence.

The same is true of the entire Title. Title 5 of the Business Regulations Article similarly regulates all aspects of cemeteries. Subtitle 2 provides for the Office of Cemetery Oversight and its regulatory authority. Bus. Reg. §§ 5-201, 5-204. Subtitle 3 requires registration of all applicable cemeteries, Bus. Reg. § 5-301, pursuant to Bus. Reg. § 5-102. Subtitle 4 requires permitting before operators engage in cemetery operations, Bus. Reg. § 5-402, pursuant to Bus. Reg. § 5-102. Subtitle 6 requires perpetual care trust funds for the maintenance and upkeep of regulated cemeteries. Bus. Reg. § 5-603. Subtitle 7 provides

---

[12] Where Bus. Reg. § 5-505 is applicable statewide, Bus. Reg. § 5-506 provides *additional* avenues for the sale of burial grounds specific to Baltimore City, premised on abandonment or harm to public health, safety, or welfare. Bus. Reg. § 5-506(a)(3).

requirements for "preneed services."[13] Bus. Reg. §§ 5-701, *et seq.* Subtitle 8 provides requirements for the sale of funerary goods and other miscellaneous requirements or prohibitions. Bus. Reg. §§ 5-801, *et seq.* Subtitle 9 prohibits cemetery operations outside the parameters of Title 5. Bus. Reg. §§ 5-901, *et seq.* Title 5 of the Business Regulations Article governs the opening and operation of a cemetery. Bus. Reg. § 5-505 governs the cessation of those operations. The conclusion by the Appellate Court that Bus. Reg. § 5-505 is discretionary runs counter to the strict regulatory scheme surrounding the statute.

Because of the age of Bus. Reg. § 5-505, some might picture the statute different in functionality from the rest of Title 5 and as an exception to the scheme. However, the General Assembly continued the trend of Bus. Reg. § 5-505 when crafting the mandatory and strict regulatory scheme of Title 5 to further the mission of protecting the deceased in our modern society. An opposite view is contrary to the actions of the General Assembly in constructing an expansive yet strict regulatory Title around the foundation of Bus. Reg. § 5-505 while not amending the trigger or effects of the statute for 150 years.

### Circuit Court Grant Of Preliminary Injunction And Writ of Mandamus

"[S]tanding . . . ordinarily requires that the outcome of the lawsuit might cause the person to suffer some kind of special damage differing in character and kind from that suffered by the general public." *Duckworth v. Deane*, 393 Md. 524, 540, 903 A.2d 883, 892 (2006) (cleaned up). Judge Smith recognized that Petitioners had standing in this case as "person[s] in interest" pursuant to Maryland Rule 14-121. The Appellate Court of

---

[13] "'Preneed services' means services that are sold[] before the buyer's death[] and in connection with burial or cremation." Bus. Reg. § 5-701(e).

27

Maryland affirmed Petitioners' standing under the same provision. *HOC*, 258 Md. App. at 158–60, 297 A.3d at 301–03. Standing was not raised in the petition or in a cross-petition for *certiorari* in this Court and is not before us. Maryland Rule 8-131(b). Upon remand in this case, the doctrine of *res judicata* prevents further litigation of standing. *Poteet v. Sauter*, 136 Md. App. 383, 411, 766 A.2d 150, 164–65 (2001).

Then, recognizing Bus. Reg. § 5-505 as a mandatory provision, Judge Smith granted a preliminary injunction, a common example of appropriately balanced equitable relief, against the proposed sale of parcel 175 containing Moses Cemetery by HOC. Judge Smith concurrently denied the motion to dismiss by HOC. Judge Smith issued a final order on November 22, 2021, that a Writ of Mandamus shall issue and compelling HOC to comply with Bus. Reg. § 5-505.

"We review a trial court's determination to grant [] injunctive relief for an abuse of discretion because trial courts, sitting as courts of equity, are granted broad discretionary authority to issue equitable relief." *Sieglein v. Schmidt*, 447 Md. 647, 674, 136 A.3d 751, 767 (2016) (citation and quotation marks omitted). "[W]e determine whether the trial judge exercised sound discretion in examining the four factors that must be found." *Ehrlich v. Perez*, 394 Md. 691, 707, 908 A.2d 1220, 1230 (2006) (citation and quotation marks omitted). "An abuse of discretion occurs where no reasonable person would take the view adopted by the circuit court." *Devincentz v. State*, 460 Md. 518, 539, 191 A.3d 373, 385 (2018) (citation and quotation marks omitted). Such an abuse "is well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court

deems minimally acceptable." *Wheeler v. State*, 459 Md. 555, 561, 187 A.3d 641, 645 (2018) (citation and quotation marks omitted).

In granting the preliminary injunction, Judge Smith identified the four factors as "whether [Petitioners had] a likelihood of success on the merits[;] whether [Petitioners failed] to show irreparable harm[;] whether the harm to [HOC] outweigh[ed] the harm to [Petitioners; and] whether it [was] in the public interest to grant the preliminary injunction[.]" (Capitalization and emphasis omitted); *see also Erhlich*, 394 Md. at 708, 908 A.2d at 1230 (same factors).

Judge Smith, on the merits, concluded that:

> [Petitioners] provided the [c]ourt with substantial evidence (1) that Moses Cemetery exists on Lot 175; (2) that [] Bus. Reg. §5-505 imposes mandatory duty of the seller prior to selling the property for another purpose; (3) seeking a writ of mandamus would require [HOC] to comply with Bus. Reg. §5-505; (4) and such compliance would protect the remains of those buried on Lot 175 in Moses Cemetery.

This conclusion was driven by the recognition that Bus. Reg. § 5-505 is mandatory. Further, the court noted that there was "overwhelming evidence, supported by historical records, that [parcel] 175 contains a cemetery where former slaves and their descendants were laid to rest[]" and credible, corroborated testimony to the desecration of Moses Cemetery during construction of Westwood in the 1960s. (Footnote omitted). Judge Smith acknowledged that Bus. Reg. § 5-505 and Maryland Rule 14-401 do not require presentation of deeds or certificates for application of the statute, and regardless, "the 1958 Maryland Tax and Assessment records reflect[ed] the sale of the property to Leo Furr with a description of use as a 'burial ground.'" (Footnote omitted). Judge Smith determined

29

that Petitioners are "persons of interest" pursuant to Real Prop. § 14-121 and relative to Maryland Rule 14-401. Judge Smith concluded that "[Petitioners] have proven [the] likelihood of success on the merits[]" due to the mandatory nature of Bus. Reg. § 5-505 that would protect Petitioners' interests and the remains of the deceased buried on parcel 175.

Regarding irreparable harm, Judge Smith recognized that "if [HOC] is allowed to sell [Westwood] without compliance with the statute, then [Petitioners] no longer have any legal remedy to compel [HOC] to adhere to [] Bus. Reg. § 5-505[.]" (Footnote omitted). The court explained that it

> cannot ignore that [Petitioners], African Americans, are seeking to preserve the memory of their relatives and those with whom they share a cultural affiliation. Nor can the [c]ourt ignore that as early as the 1930s when construction began in the River Road community, the deceased have been forgotten, forsaken, and their final resting places destroyed or, at a minimum, desecrated. . . . If the [c]ourt [did] not grant the preliminary injunction, then [HOC] will sell the property to [] a private entity, which is not required to preserve or recognize the burial ground.

(Footnotes omitted). Judge Smith concluded that "if [Petitioners] are unable to compel [HOC] to abide by [Bus. Reg. § 5-505], then [Petitioners] will be forced to stand idly by while the burial sites of their ancestors . . . are sold to the highest bidder." (Footnote omitted).

Judge Smith, applying the "balance of hardship test[,] . . . [was] not persuaded by [HOC's] argument that merely requiring [HOC] to comply with the statute would cause [HOC] substantial harm that is greater than the harm [Petitioners] would suffer." The court noted "[HOC] seems to place more value on the monetary harm over the societal, historical,

and racial harm caused by not granting the injunction." The court explained that while some economic harm may come to HOC by delaying a sale, Petitioners would suffer permanent harm by not being "able to pursue the protection of the remains of their ancestors[.]" Judge Smith recognized that

> [b]ringing a writ of mandamus under Bus. Reg. § 5-505 serves as [Petitioners'] only legal remedy to compel [HOC] to seek the [c]ourt's involvement prior to the [p]roperty sale and argue that the remains be properly respected. Aside from the criminal statutes making it illegal to remove remains from existing graves, the [c]ourt has found that Maryland statutes provide few civil remedies to protect those buried on Lot 175. In direct contradiction of their prior acknowledgement of the burial ground, [HOC] came before this [c]ourt refusing to recognize that Moses Cemetery exists on the [p]roperty despite evidence to the contrary. Increasing the likelihood of irreparable harm to [Petitioners], there are no terms in the agreement between [HOC] and Charger to preserve and memorialize Moses Cemetery. Further, Charger is knowingly entering into the agreement without doing its due diligence to confirm the presence of the burial ground and ensure that the remains are respected. While this alone is not a guarantee that should the sale proceed Charger would not memorialize the burial ground, it arguably foreshadows what is likely to occur in the future should the [c]ourt decide not to intervene. Once the sale occurs, [Petitioners] are left without legal remedy to demand that Charger, private entity, respect the remains of the deceased buried on Lot 175. Once the property is sold, [Petitioners] are left with no redress to protect the cemetery. It is imperative that the [c]ourt, as a court of equity, give significant weight to the lack of alternative remedies and the collateral consequences that will result from the sale of the [p]roperty. For the sake of an expedited closing, the [c]ourt can neither disregard the damage to these grounds and the community that has already occurred, nor the damage that will likely result if [Petitioners] are not permitted to challenge [HOC's] noncompliance with [] Bus. Reg. §5-505.

(Footnotes omitted). Since HOC failed to show that another bidder could not be identified for similar price, Judge Smith concluded that Petitioners established irreparable harm where HOC showed merely delay, balancing in favor of Petitioners.

31

Judge Smith lastly noted that "[t]he regulation of cemeteries is in the interest of the public health and is within the police power of the state." (Citing *Gordon*, 164 Md. at 213, 164 A. at 678). The court reasoned that

> the preservation and understanding of Montgomery County, Maryland's history with slavery is essential to this County's continuing journey toward equality for all. Part of that history are the hardships and inequities faced by freed slaves in the years after Emancipation. It is these inequities that at least in part gave rise to their small insular communities such as the one on River Road, and the same inequities decades and generations later that resulted in the purposeful destruction of those communities by outside forces. To that end, treating the souls interred at Moses Cemetery with the equity and respect that they did not receive in life certainly is in the public interest.

Judge Smith added that "the past of [the] River Road community, including those buried in Moses African Cemetery, should be preserved to allow those in the County to learn from the vestiges of slavery. The broader local community will benefit by Moses Cemetery being acknowledged and respected by the [C]ounty." (Footnote omitted). Such preservation could serve "to rectify the racial inequality permeated by slavery and Jim Crow." (Footnote omitted). Judge Smith concluded "the public interest very strongly favors the issuance of a preliminary injunction."

Upon review of the merits, Judge Smith correctly determined that Bus. Reg. § 5-505 serves as a mandatory provision for the sale of burial grounds as discussed at length above and was applicable here due to findings that remains are buried on Parcel 175 and burial lots were sold. Further, as discussed below, mandamus served as the only remedy for Petitioners that would specifically and adequately protect the remains pursuant to mandate of the General Assembly. It was not an abuse of discretion to conclude Petitioners would succeed in seeking to compel HOC to adhere to Bus. Reg. § 5-505.

32

Regarding irreparable harm, Judge Smith correctly concluded that Petitioners would suffer irreparable harm if HOC did not adhere to Bus. Reg. § 5-505, once the sale is finalized. Judge Smith's conclusion is correct, as Bus. Reg. § 5-505, by the plain language of the statute, applies to sales of burial grounds, and not to burial grounds in other postures. It was not an abuse of discretion to conclude Petitioners would suffer irreparable harm.

Judge Smith correctly concluded, balancing the harms, that Petitioners would suffer permanent and irreparable harm if Bus. Reg. § 5-505 is not adhered to in the sale of parcel 175, and the likely further disrespect and/or destruction of Petitioners' ancestral burial grounds. That harm far exceeded any temporary harm that might be caused by a delay in sale for HOC, as Bus. Reg. § 5-505 does not *per se* prohibit sales of burial grounds, but rather guides sales through the considerations designated by the General Assembly. The conclusion of the court is astute, as Bus. Reg. § 5-505 provides the means and manner of protecting both Petitioners and HOC, as well as the future landowner(s) once HOC sells Westwood, as discussed above. It was not an abuse of discretion to balance the harms, conclude irreparable harm outweighed temporary harm, and find in favor of Petitioners.

Finally, Judge Smith correctly concluded vast public benefit by requiring adherence to Bus. Reg. § 5-505. This Court should find no fault in the well-reasoned exploration of our State's troubled past with slavery and Jim Crow,[14] or how adherence to Bus. Reg. § 5-

---

[14] The movement to preserve Black cemeteries is inherently tied to the predatory land practices of the Jim Crow era, said Kami Fletcher, an associate professor of history at Albright College and president of the Collective for Radical Death Studies. Black towns and cemeteries were disturbed or destroyed for industrial and infrastructure developments.

505 "is essential to [Montgomery County's] continuing journey toward equality for all."

It was not an abuse of discretion to conclude there is a public benefit to "treat[] the souls

interred at Moses Cemetery with the equity and respect that they did not receive in life[.]"

*See also HOC*, 258 Md. App. at 157, 297 A.3d at 300–01 (noting the clear public interest

in the destiny of Moses Cemetery).  Having concluded that Judge Smith did not abuse her

discretion as to conclusions on any of the four factors, it was not an abuse of discretion for

Judge Smith to issue a preliminary injunction to prevent HOC from selling Westwood.

"[I]njunction" is an appropriately balanced remedy "to preserve the repose of the ashes of

the dead, and the religious sensibilities of the living."  *Beatty*, 27 U.S. (2 Pet.) at 585.  The

circuit court should continue to have broad discretion to craft appropriately balanced relief,

---

> "When you look at land ownership in this country, it is absolutely at the intersection of patriarchy, whiteness, racism and Jim Crow—really nefarious ways in which those developers ended up getting land," said Fletcher . . . . "Jim Crow allowed Black cemeteries to go unkempt, and city dollars flowed to white cemeteries.  There's a lot more to be said about how whites were just allowed to dislocate Black folks and trample all over Black Cemeteries[.]"

Adams, *The Growing Movement to Save Black Cemeteries*, *archived at* https://perma.cc/W7PA-A8EP.  There is a difference between abandonment and gentrification.  During the operation of Moses Cemetery, the population of Black citizens in Montgomery dwindled from 33% to 6%.  David Kathan, et al., *Tracing a Bethesda, Maryland, African American Community and its Contested Cemetery*, 29 WASH. HIST., No. 2, Fall 2017, 27, *archived at* https://perma.cc/KR2N-T3PR.  At the same time, segregation and Jim Crow was approved.  *Durkee v. Murphy*, 181 Md. 259, 265, 29 A.2d 253, 256 (1942) (This Court holding that the "[s]eparation of the races is normal treatment in this state.") (citation and quotation marks omitted).

Judge Smith's well-reasoned consideration of these troubled times in Maryland's history informed her grant of specific and adequate equitable relief.

34

considering the desecration of generations of remains, history, identity, and spiritual comfort deprived of the descendants of those buried in Moses Cemetery.

"'Equitable remedies' is a collective term of art for a category of remedies . . . that are 1) *in personam* in character and 2) coercive in nature." *Alternatives Unlimited, Inc. v. New Balt. City Bd. of School Com'rs*, 155 Md. App 415, 460, 843 A.2d 252, 278 (2004). Circuit courts sitting in equity are accorded broad discretion to craft an appropriately balanced remedy. *Sieglein*, 447 Md. at 674, 136 A.3d at 767.

A preliminary injunction is a common equitable remedy. *Beatty*, 27 U.S. (2 Pet.) at 585. Other common equitable remedies include specific performance and restitution. *Remedy*, *Equitable Remedy*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A remedy, [usually] a nonmonetary one such as an injunction or specific performance, obtained when available legal remedies . . . cannot adequately redress the injury."); *Md. Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 707–08, 114 A.3d 676, 689 (2015) (discussing restitution). Issuing writs is also a common remedy in equity. *Talbot Cnty. v. Miles Point Property, LLC*, 415 Md. 372, 393, 2 A.3d 344, 356 (2010) ("[A] writ of mandamus is an equitable remedy, akin to specific performance." (citation omitted)).

"Ordinarily, a writ of mandamus should issue only in those cases where another adequate remedy does not exist and where clear and undisputable rights are at stake." *Wilson v. Simms*, 380 Md. 206, 223, 844 A.2d 412, 422 (2004) (quotation marks omitted).

> A writ of mandamus, therefore, will not lie if there be another legal remedy, but that remedy *must be specific and adequate to the object in view, framed to effect directly the desired end and it must afford complete satisfaction, equivalent to a specific relief*. . . . If the right be doubtful, or the duty discretionary, or of a nature to require the exercise of judgment, or if there

35

be any ordinary adequate legal remedy to which the party applying could have recourse, the writ will not be granted.

*Id.*, 844 A.2d at 422–23 (cleaned up) (emphasis added).

Judge Smith concluded, having "reviewed the entirety of [Petitioners'] Complaint and supporting exhibits[,]" that Petitioners "presented sufficient information to seek a writ of mandamus under [] Bus. Reg. § 5-505 and [Maryland Rule] 14-401." The court noted that

> [HOC was] selling [Westwood] to Charger. The [p]roperty contains Moses Cemetery, which from 1911 to 1958 was used as a burial ground for African Americans in the River Road Community. The sale is for the property to either continue to be used as a parking lot, a different purpose than being used as a cemetery, or for another purpose that the [p]urchaser, Charger, wishes. [] Bus. Reg. § 5-505 outlines the requirements and relief provided for those seeking compliance under the statute. Thus, [Petitioner's] Complaint survives [HOC's] Motion to Dismiss because [Petitioners] have proven an undisputable legal right to seek a writ of mandamus compelling HOC to act before selling [Westwood].

The repurposing and redevelopment of a burial ground with numerous interments is not an ordinary event. As discussed at length above, there is no other specific and adequate remedy that Petitioners may seek for the protection of their ancestors' remains, buried on parcel 175. There is no other specific and adequate mechanism guiding the sale of burial grounds for another purpose and the removal of buried remains is disfavored or illegal without approval. What other relief would provide the same outcome? Either the buried remains are reinterred elsewhere in a respectful manner, or they are desecrated by a process of building atop those remains. A memorial to that desecration would not provide adequate, or appropriate, relief. In the extraordinary circumstance of building atop cemetery lands, the only appropriate remedy is the specific and adequate remedy that has

been directed by the General Assembly: the careful court consideration of all relevant rights during a transfer of cemetery land, and as appropriate in the redevelopment of such land, the disinterment and reinterment elsewhere of "any human remains in the burial ground[]" and subsequent clear title for landowners. Bus. Reg. § 5-505(b)(2), (c).[15]

As discussed previously, Petitioners are parties in interest as reflected in Maryland Rule 14-401. The Appellate Court noted that HOC is a quasi-governmental entity. *HOC*, 258 Md. App. at 157, 297 A.3d at 300. Thus, Petitioners have the clear right to assert HOC failed in its duty to comply with Bus. Reg. § 5-505 and thus impacted Petitioners' own rights as illustrated by Bus. Reg. § 5-505(b). It was not error for Judge Smith to grant the Writ of Mandamus, compelling HOC to adhere to Bus. Reg. § 5-505, a mandatory provision that governs the sale of certain burial grounds used for another purpose and provides specific and adequate relief to all parties. The circuit court should continue to have broad discretion to grant appropriately balanced equitable relief, including the goals of the writ of mandamus, *i.e.*, the dignified re-burial of the remains still interred in Moses Cemetery at an appropriate place elsewhere as balanced against removal of the cloud garnered by decades of desecration of a significant burial ground from the title.

## Conclusion

Our precedent demonstrates that "may" is susceptible to more than one reasonable interpretation. This Court should investigate other indicia of legislative intent to ascertain

---

[15] Any application by a circuit court of Bus. Reg. § 5-505 would not be a new principle of law. Indeed, the statute has existed for over 150 years, and far longer than more recent remedies, *e.g.*, Real Prop. § 14-121.1.

37

whether Bus. Reg. § 5-505 is mandatory or permissive. The language, context, legislative history, remedial nature, public purpose and statutory scheme all show that Bus. Reg. § 5-505 is a mandatory provision relative to the sale of certain burial grounds sought for another purpose. Further, the General Assembly strictly regulates cemeteries and buried remains as a justified exercise of state police powers. Where the General Assembly regulates against even the destruction of shrubs or trees within a cemetery, it is difficult to appreciate a disregard for the regulation of the transfer of land on which those shrubs and trees grow. Instead, Bus. Reg. § 5-505 is the mandatory method for the sale of certain burial grounds and provides the only adequate remedies to protect the specific rights of landowners, and the deceased and surviving relatives. Judge Smith did not abuse her discretion in granting the preliminary injunction or err in issuing the Writ of Mandamus requiring HOC to adhere to Bus. Reg. § 5-505 in the sale of parcel 175 containing Moses Cemetery.

Accordingly, I dissent.